IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 17 2015

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

THE MOST WORSHIPFUL GRAND LODGE )
OF FREE AND ACCEPTED MASONS OF THE )
STATE OF ARKANSAS, )
 )
Plaintiff, )
 )
vs. )  Case No. 4:15CV219- JLH
 )
DCG/UGOC EQUITY FUND, LLC, DCG/UGOC )
FUNDS MANAGEMENT, LLC, DCG FUNDS )
MANAGEMENT, LLC, THE UNITED GROUP OF )
COMPANIES, INC., PAGEONE FINANCIAL, INC., )
EDGAR R. PAGE and JOHN DOES 1-10, )
 )
Defendants )

This case assigned to District Judge _____
and to Magistrate Judge _____

## COMPLAINT

The Plaintiff, by and through its attorneys, Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., hereby files its Complaint against the Defendants and alleges as follows:

## NATURE OF ACTION

1. This is an action for securities fraud and certain state law claims. Based upon misstatements or omissions of the material facts by the Defendants orally and in writing, the Defendants induced the Plaintiff to purchase securities in the form of limited liability company interests in DCG/UGOC Equity Fund, LLC pursuant to a Confidential Private Placement Memorandum (the "PPM") dated July 22, 2008 and amended March 13, 2009.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action under Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa and 28 U.S.C. § 1331. The claims alleged herein arise under Section 10(b) and 20 of the Exchange Act, 15 U.S.C. § 78j

and 78t, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over claims alleged herein that arise out of Arkansas statutes or common law because they are so related to the above referenced claim within original jurisdiction that they form part of the same case or controversy.

3. Venue is proper in the Eastern District of Arkansas because many of the acts complained of, including the dissemination of false and misleading statements or omissions of material facts occurred in the Eastern District or Arkansas. In addition, in connection with the acts, conduct and other wrongs complained of herein, Defendants directly and indirectly, used the means and instrumentalities of interstate commerce and the United States mails.

## PARTIES

4. Plaintiff, The Most Worshipful Grand Lodge of Free and Accepted Masons of Arkansas, is a fraternal non-profit organization formed by Act of the Arkansas Legislature of 1846. The principal office of Plaintiff is located at 700 Scott Street, Little Rock, Arkansas 72201.

5. Defendant, DCG/UGOC Equity Fund, LLC, is a North Carolina limited liability company with its principal place of business located at 9009B Perimeter Woods Drive, Charlotte, North Carolina, 28216-0040. The agent for service for Defendant DCG/UGOC Equity Fund, LLC is Laurie Ephland, 9009B Perimeter Woods Drive, Charlotte, North Carolina, 28216-0040.

6. Defendant, DCG/UGOC Funds Management, LLC is a North Carolina limited liability company with its principal place of business located at 9624 Bailey Road, Suite 260, Cornelius, North Carolina 28031. DCG/UGOC Funds Management, LLC is the manager of DCG/UGOC Equity Fund, LLC. The agent for service for defendant, DCG/UGOC Funds

Management, LLC is Laurie Ephland, 9624 Bailey Road, Suite 260, Cornelius, North Carolina 28031.

7. Defendant, DCG Funds Management, LLC, is a North Carolina limited liability company with its principal place of business located at 9009B Perimeter Woods Drive, Charlotte, North Carolina, 28216-0040. DCG Funds Management, LLC is a member of DCG/UGOC Funds Management, LLC. The agent for service for Defendant DCG/UGOC Equity Fund, LLC, is Laurie Ephland, 9009B Perimeter Woods Drive, Charlotte, North Carolina, 28216-0040.

8. Defendant, The United Group of Companies, Inc. ("UGOC") is a New York corporation with its principal office located at 300 Jordan Road, Troy, New York 12180. UGOC is a member of DCG/UGOC Funds Management, LLC. The Chief Executive Officer of UGOC, is Michael J. Uccellini, 300 Jordan Road, Troy, New York 12180.

9. Defendant, PageOne Financial, Inc., is a New York corporation with its principal place of business located at 2537 Rt. 9, Suite 205, Malta, New York, 12020. Defendant, PageOne Financial, Inc., is an investment adviser registered with the Securities and Exchange Commission. The Chief Executive Officer of Defendant, PageOne Financial, Inc., is Edgar R. Page, 2537 Rt. 9, Suite 205, Malta, New York, 12020.

10. Defendant, Edgar R. Page, is an individual with a business address of 2537 Rt. 9, Suite 205, Malta, New York, 12020. Edgar R. Page is the Chief Executive Officer and owner of one-hundred percent (100%) of Defendant, PageOne Financial, Inc.

11. Upon information and belief, Defendants, John Does 1-10, are persons, yet to be identified, who also committed tortuous acts and breaches described herein.

3

## FACTUAL ALLEGATIONS

12. Beginning in January, 2010, Bryan Harrison, Senior Vice President of UGOC contacted Plaintiff through Jeremy Cook for the purpose of soliciting Plaintiff's investment in a real estate fund in the form of limited liability company interests in DCG/UGOC Equity Fund, LLC packaged by UGOC. At the time of such solicitation, Plaintiff had funds that needed to be invested.

13. Investment in DCG/UGOC Equity Fund, LLC was promoted by Defendants, Edgar R. Page of PageOne Financial, Inc., and Bryan Harrison, Senior Vice President of UGOC. Plaintiff expressed an interest to Defendants in the investment but only after receiving assurances from Bryan Harrison and Edgar R. Page that no commission or other remuneration would be paid on Plaintiff's investment.

14. On or about April 20, 2010, Bryan Harrison and Edgar R. Page traveled to Little Rock and made a presentation on an investment in LLC interest in DCG/UGOC Equity Fund, LLC to representatives of Plaintiff at the offices of Plaintiff in Little Rock, Arkansas. At or about the time of the presentation, Bryan Harrison delivered the PPM, a copy of which is attached hereto as Exhibit "A", to Plaintiff.

15. On or about April 20, 2010, Plaintiff agreed to invest $500,000 in DCG/UGOC Equity Fund, LLC and representatives of Plaintiff executed four (4) subscription agreements for separate investments of $250,000.00, $150,000.00, $50,000.00 and $50,000.00. Copies of the subscription agreements are attached hereto as Exhibits "B", "C", "D" and "E".

16. The limited liability company interests in DCG/UGOC Equity Fund, LLC are "securities" as defined in Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

4

17.   In connection with the offer and sale of the limited liability company interests in DCG/UGOC Equity Fund, LLC, Defendants made be following misrepresentations of material fact, or omitted to state material facts necessary to make the statements made, not misleading:

a.   Failure to disclose that UGOC had entered an agreement to purchase all or a material portion of PageOne Financial, Inc. in 2008 and was in the process of purchasing such interest at the time of the offer and sale to Plaintiff;

b.   The failure to disclose the commission or other remuneration paid to Defendant, PageOne Financial, Inc., for soliciting the purchases by Plaintiff;

c.   The false representation that no commission or other remuneration would be paid in connection with the offer and sale of the securities to Plaintiff;

d.   Failure to disclose that investments through PageOne Financial, Inc. were required in order for UGOC to make acquisition payments to PageOne Financial, Inc.;

e.   Failure to disclose that there was no permanent financing in place or committed on the real estate properties held by DCG/UGOC Equity Fund, LLC;

f.   Failure to disclose that at least one property held by DCG/UGOC Equity Fund, LLC was in a negative equity status when Plaintiff purchased the securities;

g.   Failure to disclose that rents on one or more of the properties held by DCG/UGOC Equity Fund, LLC were not adequate to make debt service payments on the deeds secured by mortgages on the properties;

h.   Failure to disclose conflicts of interest between Defendants;

i.   Failure to disclose the problems and negative aspects of the properties held by DCG/UGOC Equity Fund; and

j.      Failure to disclose that the personal assets of one or more principals of UGOC were being sold to keep the business of UGOC going.

18.   Also at the time of the offer and sale of the securities to Plaintiff, Bryan Harrison represented to Plaintiff that the occupancy of the properties held by DCG/UGOC Equity Fund was near 98% but he could only legally state an occupancy rate of 94%. At the time Plaintiff does not know whether the representation was true or false but is investigating if the representation was true, the occupancy rates must have fallen previously thereafter.

19.   Following the offer and sale of the securities to Plaintiff, Defendants failed to provide Plaintiff with necessary information in order to make the false statements and omissions made by or omitted by them, in light of the circumstances in which they were made, accurate and not misleading. Throughout the entire course of Plaintiff's relationship with Defendants, Defendants continued to materially misrepresent and failed to correct information concerning the true status of the business and operations of DCG/UGOC Equity Fund, LLC.

20.   At all times materials hereto Defendants were well aware of the false and misleading statements and omissions of material fact within the PPM and associated documents provided to Plaintiff.

21.   In December 2014, Plaintiff received notice from DCG/UGOC Funds Management, Inc. that two (2) properties of DCG/UGOC Equity Fund had been deeded to a lender in lieu of foreclosure, one property was being foreclosed and the remaining property was unable to sell housing lots. Upon information and belief, the $500,000.00 investment of Plaintiff in DCG/UGOC Equity Fund, LLC is worthless.

22.   Defendants concealed the relationship of PageOne Financial, Inc. and UGOC from Plaintiff so that Plaintiff did not learn of such relationship until late, 2014. Such concealment is

6

evidenced by the failure of PageOne Financing, Inc. to disclose its relationship with UGOC in its ADV Forms filed with the Securities and Exchange Commission.

## COUNT I - VIOLATIONS OF § 10b OF THE EXCHANGE ACT AND RULE 10b-5.

23.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 22 of this Complaint.

24.   As stated above in Paragraphs 12 through 22, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth and that they failed to ascertain and disclose such facts, even though such facts were available to them.

25.   Such material representations and omissions were made knowingly or recklessly for the purpose and effect of concealing the relationship of PageOne Financial, Inc. and UGOC, the motivation of PageOne Financial, Inc. in soliciting Plaintiff's investment and the true financial condition of properties held by DCG/UGOC Equity Fund, LLC.

26.   As a direct and approximate result of Defendants' wrongful conduct, Plaintiff has suffered substantial damages in the amount to be determined at trial when it purchased the limited liability company interests in DCG/UGOC Equity Fund, LLC.   Had Plaintiff known of the material adverse information not disclosed by the Defendants, or been aware of the truth behind the Defendants' material misstatements or omissions, it would not have purchased interests in DCG/UGOC Equity Fund, LLC.

27.   This action is brought within five (5) years after the securities at issue were purchased and within two (2) years after the discovery of the untrue statements or omissions are after such discovery should have been made by the exercise of reasonable diligence.

28.    Defendants (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, not misleading; and (3) engaged in acts, practices and a course of business which operates as a fraud and deceit on purchasers of DCG/UGOC Equity Fund, LLC securities, including Plaintiff, in an effort to enrich themselves at the expense of Plaintiff and other purchasers. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme described in this Complaint. Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs.

## COUNT II – VIOLATION OF § 20 OF THE EXCHANGE ACT

29.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 28 of this Complaint.

30.    Defendants, DCG/UGOC Funds Management, LLC, DCG Funds Management, LLC and UGOC are control persons of DCG/UGOC Equity Fund, LLC. Upon information and belief, John Does 1-10 are control persons of DCG/UGOC Equity Funds, LLC, and other Defendants.

31.    The control person Defendants John Does 1-10 named above are or were control persons of DCG/UGOC Equity Fund, LLC, DCG/UGOC Funds Management, LLC, DCG Funds Management, LLC, and UGOC and were culpable participants in the fraud alleged herein based on the factual allegations above. The control persons are therefore jointly and severally liable to Plaintiff for the § 10b and Rule 10b-5 violations alleged herein.

## COUNT III – FRAUDULENT CONCEALMENT

32.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 31 of this Complaint.

8

33.    Pursuant to Federal Securities Laws and the Arkansas Securities Act, Defendants had a duty to make certain disclosures to Plaintiff in connection with the offer and sale of the limited liability company interests in DCG/UGOC Equity Fund, LLC.

34.    Defendants intentionally failed to make such disclosures and fraudulently concealed and suppressed material facts pertaining to said disclosures.   After Plaintiff's investment, representatives of Plaintiff requested information on the investment and properties held by DCG/UGOC Equity Fund, LLC.   Defendants failed to provide the requested information and concealed problems with the properties including the lack of permanent financing and declining occupancy.

35.    Defendants' fraudulent concealment and suppression of the material facts was done with the intent of inducing Plaintiff to invest in and remain fully invested in DCG/UGOC Equity Fund.

36.    Plaintiff was reasonable in relying on the Defendants' omissions and misstatements of material facts because of the licensure of PageOne Financial, Inc. and other defendants.

37.    The active and continual concealment of the relationship between the Defendants constitutes fraudulent concealment on the part of the Defendants.

38.    As a result of Plaintiff's reliance on the Defendants' concealment and suppression of material facts, Plaintiff suffered damages.

39.    Plaintiff has suffered due to the fraudulent concealment of any and all statutes of limitations that may apply in this case should be tolled and time should not begin to run until the fraudulently concealed relationships and conflicts of interest were discovered by Plaintiff in late 2014.

## COUNT IV – MISREPRESENTATIONS OR OMISSIONS
## IN CONNECTION WITH SALE OF SECURITIES

40.  Plaintiff realleges and incorporates by reverence paragraphs 1 through 39 of this Complaint.

41.  The interests in DCG/UGOC Equity Fund, LLC offered and sold by Defendants to Plaintiff are securities as defined in Ark. Code Ann § 23-42-102(17).

42.  In connection with the offer and sale of interests in DCG/UGOC Equity Fund, LLC to Plaintiff, Defendants made untrue statements of material fact and omitted to state material facts necessary to make statements made, in light of circumstances under which they were made, not misleading, as set forth above.

43.  The foregoing misrepresentations and omissions to state material facts described above were material to Plaintiff's decision to invest $500,000.00 in DCG/UGOC Equity Fund, LLC.  As per Ark. Code Ann. § 23-42-106(a)(1)(B), Defendants are liable to Plaintiff for $500,000.00 plus interest and attorney's fees.

44.  At all times pertinent hereto, John Does 1-10 controlled DCG/UGOC Equity Fund, LLC and materially aided in the sale of limited liability company interests to Plaintiff. Defendant John Does 1-10 aided, abetted and conspired with each other and the other Defendants in violations of the Arkansas Securities Act.

## COUNT V – FRAUD AND DECEIT

45.  Plaintiff realleges and incorporates by reference paragraph 1 through 44 of this Complaint.

46.  Defendants, jointly and severally, in the offer and sale of securities of DCG/UGOC Equity Fund, LLC, made misrepresentations of material fact and omitted to make material facts

10

all of which were relied on by Plaintiff to its detriment.  Such fraudulent and deceitful conduct caused damages to Plaintiff.  Defendants are jointly and severally liable for such conduct.

47.   The misrepresentations and omissions by Defendants were made intentionally or with such negligence that malice can be inferred.  As such, Plaintiff is entitled to punitive damages.

## COUNT VI – CONSTRUCTIVE FRAUD

48.   Plaintiff realleges and incorporates by reference paragraphs 1 through 47 of this Complaint.

49.   In connection with the misrepresentations or omissions described above, Defendants either intentionally made the misrepresentations or omitted to state material facts or such misrepresentations or omissions were made when Defendants were without knowledge as to the truth or falsity of their statements.

50.   As a result of the statements made or omitted made by Defendants, funds belonging to Plaintiff were lost or dissipated causing Plaintiff to suffer damages as more fully described above.

51.   Plaintiff is entitled to punitive damages to deter Defendants from the course of wrongful, reckless and malicious conduct as described above.

## COUNT VI – UNJUST ENRICHMENT

52.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 51 of this Complaint.

53.   Defendants have been unjustly enriched as a result of Plaintiff's investment of $500,000.00 in DCG/UGOC Equity Fund, LLC and Plaintiff did not receive the benefit of such investment as a result of Defendants' actions or omissions described above.

11

## COUNT VII - BREACH OF FIDUCIARY DUTY

54.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 53 of this Complaint.

55.    In connection with Plaintiff's investment in DCG/UGOC Equity Fund, LLC, PageOne Financial, Inc. was acting as Plaintiff's investment advisor and accordingly a fiduciary relationship exists or existed between Plaintiff and Defendant, PageOne Financial, Inc.

56.    With respect to the misrepresentations and omissions described above, Defendant, PageOne Financial, Inc., breached its fiduciary duty to Plaintiff and is liable to Plaintiff for damages.

WHEREFORE, Plaintiff requests judgment as follows:

1.    For rescission of the purchase by Plaintiff of the interests in DCG/UGOC Equity Fund, LLC;

2.    For compensations and punitive damages, joint and severally against all Defendants in an amount to be determined at trial;

3.    For costs and reasonable attorney's fees; and

4.    For such other and further relief as the court deems just and equitable.

> **HILBURN, CALHOON, HARPER,**
> **PRUNISKI & CALHOUN, LTD.**
> P. O. Box 5551
> North Little Rock, AR 72119
> (501) 372-0110
> *Attorneys for Plaintiff*
>
> By: _____
>    John E. Pruniski, III ABN 76097
>    Lauren W. Hamilton ABN 06159
>    Marjorie Rogers ABN 09126

# Exhibit "A"

# DCG / UGOC Equity Fund, LLC

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM *and* OPERATING AGREEMENT



# CONFIDENTIAL
# PRIVATE PLACEMENT MEMORANDUM

## DCG/UGOC EQUITY FUND, LLC
## (A North Carolina Limited Liability Company)

## $30,000,000 OF LIMITED LIABILITY COMPANY
## MEMBERSHIP INTERESTS

## INVESTMENT UNIT: $500,000

## July 22, 2008

### Amended March 23, 2009

DCG Funds Management, LLC
19315 West Catawba Avenue
Suite 200
Cornelius, NC  28031

Tel: (704) 895-7770
Fax: (704) 973-9462

The United Group of
Companies, Inc.
300 Jordan Road
Troy, NY 12180

Tel: (518) 687-7300
Fax: (518) 687-7330

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

INVESTMENT IN THE SECURITIES OFFERED HEREBY ENTAILS A HIGH DEGREE OF RISK. NO INVESTMENT IN THE SECURITIES SHOULD BE MADE BY ANY PERSON WHO IS NOT IN A POSITION TO LOSE THE ENTIRE AMOUNT OF SUCH INVESTMENT. SEE "INVESTMENT CONSIDERATIONS AND RISK FACTORS" BEGINNING ON PAGE 28.

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS OR THE LAWS OF ANY FOREIGN JURISDICTION.  THE SECURITIES WILL BE OFFERED AND SOLD ON A PRIVATE PLACEMENT BASIS UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER AND OTHER EXEMPTIONS OF SIMILAR IMPORT IN THE LAWS OF THE STATES AND OTHER JURISDICTIONS WHERE THE OFFERING WILL BE MADE.

Name of Prospective Investor: _____

Confidential Private Placement Memorandum No.: _____

ii

# DCG/UGOC EQUITY FUND, LLC

## LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (TOGETHER WITH ANY AMENDMENTS OR SUPPLEMENTS HERETO, THIS "MEMORANDUM") IS BEING FURNISHED TO PROSPECTIVE INVESTORS ON A CONFIDENTIAL BASIS SO THAT SUCH PROSPECTIVE INVESTORS MAY CONSIDER AN INVESTMENT IN THE LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS (THE "INTERESTS") IN DCG/UCOG EQUITY FUND, LLC, A NORTH CAROLINA LIMITED LIABILITY COMPANY (THE "FUND"), AND MAY NOT BE USED FOR ANY OTHER PURPOSE.   BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR AGREES TO TREAT THE INFORMATION CONTAINED HEREIN AS CONFIDENTIAL AND NOT TO REPRODUCE THIS MEMORANDUM OR FURNISH COPIES OF THIS MEMORANDUM TO ANY PERSON OTHER THAN SUCH PROSPECTIVE INVESTOR'S PROFESSIONAL ADVISERS, AND FURTHER AGREES TO RETURN THIS MEMORANDUM TO THE FUND PROMPTLY UPON REQUEST.

THIS MEMORANDUM CONSTITUTES AN OFFER ONLY TO THE PROSPECTIVE INVESTOR NAMED ON THE COVER PAGE OF THIS MEMORANDUM, AND ONLY IF DELIVERY OF THIS MEMORANDUM IS PROPERLY AUTHORIZED BY DCG/UGOC FUNDS MANAGEMENT, LLC (THE "MANAGER").

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.   EACH INVESTOR MUST ACQUIRE INTERESTS SOLELY FOR SUCH INVESTOR'S OWN ACCOUNT, FOR INVESTMENT, AND NOT WITH ANY INTENTION OF DISTRIBUTION, TRANSFER OR RESALE, EITHER IN WHOLE OR IN PART.

**THE INTERESTS HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS OR THE LAWS OF ANY FOREIGN JURISDICTION.   THE INTERESTS WILL BE OFFERED AND SOLD ON A PRIVATE PLACEMENT BASIS UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER AND OTHER EXEMPTIONS OF SIMILAR IMPORT IN THE LAWS OF THE STATES AND OTHER JURISDICTIONS WHERE THE OFFERING WILL BE MADE.**

THE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE OPERATING AGREEMENT OF THE FUND (THE "OPERATING AGREEMENT") AND THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED

TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE FUND FOR AN INDEFINITE PERIOD OF TIME.

THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF INTERESTS IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE FUND WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT") AND THE MANAGER WILL NOT BE REGISTERED AS AN INVESTMENT ADVISER UNDER THE INVESTMENT ADVISERS ACT OF 1940, AS AMENDED (THE "ADVISERS ACT"). CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF THE PROVISIONS OF THE INVESTMENT COMPANY ACT OR THE ADVISERS ACT IN THE CONDUCT OF THE BUSINESS AND AFFAIRS OF THE FUND.

THE INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR BY ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR ANY OTHER JURISDICTION NOR HAS ANY SUCH AUTHORITY OR COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. NO ACTION HAS BEEN TAKEN IN ANY JURISDICTION THAT WOULD PERMIT THE PLACING OF THE INTERESTS, OR POSSESSION OR DISTRIBUTION OF THIS MEMORANDUM OR ANY OTHER OFFERING OR PUBLICITY MATERIAL RELATING TO THE INTERESTS OR THE FUND, IN ANY COUNTRY OR JURISDICTION.

THE CONTENTS OF THIS MEMORANDUM SHOULD NOT BE CONSTRUED AS INVESTMENT, LEGAL OR TAX ADVICE. PROSPECTIVE INVESTORS ARE URGED TO SEEK INDEPENDENT INVESTMENT, LEGAL AND TAX ADVICE CONCERNING THE CONSEQUENCES OF INVESTING IN THE FUND.

AN INVESTMENT IN THE INTERESTS WILL INVOLVE SIGNIFICANT RISKS DUE, AMONG OTHER THINGS, TO THE NATURE OF THE FUND'S INVESTMENTS. INVESTORS SHOULD HAVE THE FINANCIAL ABILITY AND WILLINGNESS TO ACCEPT THE RISKS AND LACK OF LIQUIDITY THAT ARE CHARACTERISTIC OF THE INVESTMENT DESCRIBED HEREIN. NO ASSURANCE CAN BE GIVEN THAT THE FUND'S INVESTMENT OBJECTIVE WILL BE ACHIEVED OR THAT INVESTORS WILL RECEIVE A RETURN OF THEIR CAPITAL.

**THIS MEMORANDUM IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE OPERATING AGREEMENT OF THE FUND AND THE SUBSCRIPTION AGREEMENT RELATING THERETO, COPIES OF WHICH WILL BE MADE AVAILABLE UPON REQUEST AND SHOULD BE REVIEWED PRIOR TO PURCHASING AN INTEREST. IN THE EVENT THAT THE DESCRIPTION IN OR TERMS OF THIS MEMORANDUM ARE**

**INCONSISTENT WITH OR CONTRARY TO THE OPERATING AGREEMENT OR THE SUBSCRIPTION AGREEMENT, THE OPERATING AGREEMENT AND THE SUBSCRIPTION AGREEMENT SHALL CONTROL. NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN AS CONTAINED IN THIS MEMORANDUM. ANY SUCH STATEMENTS, IF MADE, MUST NOT BE RELIED UPON. STATEMENTS IN THIS MEMORANDUM ARE MADE AS OF THE DATE HEREOF UNLESS STATED OTHERWISE HEREIN, AND NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME, NOR ANY SALE HEREUNDER, SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO SUCH DATE.**

NOTWITHSTANDING ANY OTHER STATEMENT IN THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF SUCH PROSPECTIVE INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF, AND TAX STRATEGIES RELATING TO, THE FUND, THE OFFERING OF INTERESTS AND ANY POTENTIAL TRANSACTION DESCRIBED HEREIN, AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE PROSPECTIVE INVESTOR RELATING TO SUCH TAX TREATMENT, TAX STRUCTURE OR TAX STRATEGIES; PROVIDED THAT THE FOREGOING DOES NOT CONSTITUTE AN AUTHORIZATION TO DISCLOSE INFORMATION IDENTIFYING THE FUND, THE MANAGER OR ANY PARTIES TO TRANSACTIONS ENGAGED IN BY THE FUND OR (EXCEPT TO THE EXTENT RELATING TO SUCH TAX STRUCTURE, TAX TREATMENT OR TAX STRATEGIES) ANY NONPUBLIC COMMERCIAL OR FINANCIAL INFORMATION.

THIS MEMORANDUM IS INTENDED SOLELY FOR THE USE OF THE PERSON TO WHOM IT HAS BEEN DELIVERED FOR THE PURPOSE OF ENABLING THE RECIPIENT TO EVALUATE AN INVESTMENT IN INTERESTS, AND IS NOT TO BE REPRODUCED, DISTRIBUTED, OR DISCLOSED TO ANY OTHER PERSON (EXCEPT TO A PROSPECTIVE INVESTOR'S PROFESSIONAL ADVISER). THIS MEMORANDUM IS CONFIDENTIAL. ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ITS CONTENTS, WITHOUT THE CONSENT OF THE MANAGER, IS PROHIBITED. BY ACCEPTING THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR AGREES TO KEEP CONFIDENTIAL ALL INFORMATION CONTAINED HEREIN THAT IS NOT ALREADY IN THE PUBLIC DOMAIN AND TO USE THIS MEMORANDUM FOR THE SOLE PURPOSE OF EVALUATING A POSSIBLE INVESTMENT IN THE FUND.

<u>**INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE**</u>

**TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE ("IRS"), YOU ARE HEREBY NOTIFIED**

v

**THAT THE U.S. TAX INFORMATION CONTAINED HEREIN (I) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE FUND OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (II) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING U.S. TAX PENALTIES. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**FOR FLORIDA INVESTORS ONLY:**

**THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT. EACH OFFEREE WHO IS A FLORIDA RESIDENT SHOULD BE AWARE THAT SECTION 517.061(11)(A)(5) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN FLORIDA, ANY SALE IN FLORIDA MADE PURSUANT TO SECTION 517.061(11) IS VOIDABLE BY THE PURCHASER IN SUCH SALE EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER." THE AVAILABILITY OF THE PRIVILEGE TO VOID SALES PURSUANT TO SECTION 517.061 OF THE FLORIDA ACT IS HEREBY COMMUNICATED TO EACH FLORIDA OFFEREE.**

<div align="center">PRIVACY NOTICE</div>

THE FUND AND THE MANAGER OBTAIN NON-PUBLIC PERSONAL INFORMATION ABOUT INDIVIDUAL MEMBERS IN CONNECTION WITH SUCH MEMBERS' INVESTMENTS IN THE FUND. SUCH INFORMATION INCLUDES, FOR EXAMPLE, ADDRESS, TELEPHONE NUMBER, E-MAIL ADDRESS, SOCIAL SECURITY NUMBER, "ACCREDITED INVESTOR" STATUS AND INFORMATION PERTAINING TO INVESTMENTS IN THE FUND. NEITHER THE FUND NOR THE MANAGER DISCLOSE NON-PUBLIC PERSONAL INFORMATION ABOUT INDIVIDUAL MEMBERS OR FORMER INDIVIDUAL MEMBERS TO ANY OTHER PERSON OR ENTITY EXCEPT PERSONNEL OF THE MANAGER AND THIRD-PARTY SERVICE PROVIDERS WHO NEED TO KNOW SUCH INFORMATION IN ORDER TO PROVIDE SERVICES TO INVESTORS, TO CARRY OUT THE MANAGER'S AND THE FUND'S OPERATIONS, OR AS OTHERWISE REQUIRED BY LAW (INCLUDING, WITHOUT LIMITATION, BY APPLICABLE ANTI-MONEY LAUNDERING REGULATIONS). ADDITIONALLY, THE FUND AND THE MANAGER EACH MAINTAIN PHYSICAL, ELECTRONIC AND PROCEDURAL SAFEGUARDS DESIGNED TO PROTECT INVESTOR RECORDS AND INFORMATION FROM UNAUTHORIZED ACCESS OR USE.

FOR THE AVOIDANCE OF DOUBT, THE FOREGOING PRIVACY POLICY SHALL NOT PREVENT THE FUND OR THE MANAGER FROM DISCLOSING TO APPROPRIATE THIRD PARTIES SUCH INFORMATION AS THE MANAGER MAY DEEM NECESSARY OR ADVISABLE IN ORDER TO COMPLY WITH APPLICABLE ANTI-MONEY LAUNDERING AND OTHER APPLICABLE UNITED STATES OR FOREIGN LAWS AND REGULATIONS.

# Table of Contents

**Page**

INTRODUCTION ...................................................................................................1

INVESTMENT OBJECTIVE AND STRATEGY ......................................................1

MANAGEMENT ....................................................................................................6

USE OF PROCEEDS ..............................................................................................16

SUMMARY OF SELECTED TERMS .....................................................................17

INVESTMENT CONSIDERATIONS AND RISK FACTORS ..............................28

CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS ..................36

BENEFIT PLAN / ERISA CONSIDERATIONS ....................................................43

SUBSCRIPTION FOR INTERESTS; PLAN OF DISTRIBUTION ......................44

INVESTOR SUITABILITY ....................................................................................45

MONEY LAUNDERING PREVENTION ..............................................................45

SCHEDULE A - LIST OF POTENTIAL PROJECTS ............................................47

EXHIBIT A - OPERATING AGREEMENT ..........................................................48

1

## INTRODUCTION

DCG/UGOC Equity Fund, LLC, a North Carolina limited liability company (the "Fund"), is a private investment fund that has been organized by DCG/UGOC Funds Management, LLC, a North Carolina limited liability company (the "Manager"), to invest in opportunistic real estate and real estate related assets in the United States, primarily in the eastern United States and to invest in debt securities. The Manager is comprised of two members with equal interests, DCG Funds Management, LLC ("DCG") and The United Group of Companies, Inc. ("UGOC"). The Manager is seeking capital commitments ("Subscriptions") for limited liability company membership interests in the Fund ("Interests") up to an aggregate amount of $30,000,000, the amount of which may be increased by the Manager in its sole discretion, from a limited number of investors who will be admitted as members of the Fund ("Members"). The Manager intends that the minimum Subscription from each Member shall be $500,000, although the Manager may, in its sole discretion, accept Subscriptions for lesser amounts.

The Fund was organized on June 13, 2008 when Articles of Organization were filed with the Office of the Secretary of State of North Carolina. The Fund commenced operations June 14, 2008. As of the date of this Confidential Private Placement Memorandum (the "Memorandum"), the Fund had not made any investments or otherwise conducted any business operations other than the preparation of this Memorandum and the other offering materials of the Fund and activities related to the offering of the Interests as described herein. As of the date of this Memorandum, there are no legal proceedings pending against the Fund or the Manager.

An investment in the Fund is speculative and illiquid and involves investment and other risks, including possible loss of the entire amount of the investment. The Fund is designed for long-term investors and not as a trading vehicle. It does not represent a complete investment program, and is not suitable for all investors. **The attention of prospective investors is drawn to "Investment Considerations and Risk Factors" in this Memorandum for certain issues each investor should consider before subscribing for Interests.** In making an investment decision, prospective investors must rely on their own examination of the Fund, and the terms of this offering, including the merits and risks involved.

## INVESTMENT OBJECTIVE AND STRATEGY

The Fund's investment objective is to acquire, develop, reposition, manage and operate real estate and real estate related assets in the United States, with a primary focus on the eastern United States and to invest in debt securities. The Managers intend to focus the Fund's investments in the areas where DCG and UGOC have the most expertise and strongest market presence. The Manager believes that DCG and UGOC have demonstrated the capacity to add value in the markets where the Fund will be focused. Geographically that is the eastern United States from New York through Florida. The specific locations being considered are either in "built-out" markets where the Manager believes specific demand sectors are underserved such as student and senior housing or strong regional markets such as Charlotte, North Carolina which appear to be continuing to grow even in the present economic climate.

The Manager is seeking real estate property and other real estate investments that it believes can be converted to cash during the next three to six years.

The Manager intends to target investments for the Fund of approximately $5,000,000 each with targeted annual internal rates of returns to the Fund of greater than 12%. The term of the Fund's investments will vary from investment to investment, but generally will not be expected to exceed five (5) years. The Manager, in its sole discretion, may cause the Fund to make investments of lesser or greater amounts and with different target return profiles and shorter or longer terms. The number of investments the Fund will make will depend upon the amount of Subscriptions raised by the Fund and the availability of the types of investments in which the Fund intends to invest.

The Manager may engage on behalf of the Fund, affiliates, independent consultants and other third parties to assist with acquiring, developing, building, leasing and managing the potential equity investments of the Fund. In addition, the Manager may cause the Fund to co-invest with other investors and may seek their input as to such investments.

The market segments in which the Manager foresees demand growth and which it believes are currently underserved by existing developed real estate, are supported by the factors enumerated below:

      i.    Baby Boomers entering the senior rental independent living sector;

      ii.    "Echo Boomers," the children of baby boomers now entering their college and university years and needing safe and modern dormitories, on or near campus; and

      iii.    Business executives seeking upper-scale, extended-stay hotels with reliable and respected franchise affiliation in markets with barriers to entry.

The Fund will seek investments in new property development, construction and leasing opportunities, existing property acquisitions where it believes the Manager's affiliates can add significant value, and investments in raw land, as well as development and management companies which are involved in its target market sectors. Growth in senior demographics and growth in student enrollment illustrate robust growth in these markets.

The Manager intends to restrict the amount of leverage used in acquiring Investments to no more than 75% of the value if the investment as indicated by an independent third party appraiser either by an "as built" or "as improved" appraisal.

The purchase price of investments developed by affiliates of the Manager will be restricted to no more than the investments appraised value plus costs associated with the equity investment by the Company.

2

## TWO PRIMARY TARGET DEMOGRAPHIC SECTORS

The **baby boom** is the generation of 76 million Americans born between 1946 and 1964. Starting in 2006, this fastest growing and most affluent group of Americans has been turning 60 at the rate of one every 7.5 seconds. The over 60 group will be the fastest growing segment of US demand for the next 16 years. As an example of their buying power, people age 55 or older bought nearly a fifth of the 1.1 million new homes sold in the country in 2003.[1]

The "**echo boomers**" are the children of the baby boomers. During the next two decades another 77 million "echo boomers" will enter into their college and household formation years.[2]

The growth in these age cohorts has been motivating specific demand drivers, and thus investment opportunities. These have included demand for second homes and active adult communities from baby boomers and active seniors; strong demand for student housing given the growing college age population; an increasing trend towards urbanization from "empty nesters;" and echo boomer demand for a low maintenance, 24/7 environment. UGOC, an affiliate of the Manager, has historically been active in several of these areas and intends to continue to pursue them going forward. UGOC notes that while the recent troubles in the single family mortgage markets have dramatically impacted the values of single family homes in many US markets, UGOC believes that demand drivers for senior and student housing remains intact to a large extent (though not entirely) independent of the supply and demand factors which have determined single family home values.

(in millions)



Source: Economy.com

---

[1] Dowell Myers, SungHo Ryu, Journal of American Planners Association, 1 December, 2004.

[2] U.S. Census Bureau, Population Division, 2004 Revision.

3

There is an additional population increase built into these demographics, as many of the echo boomers are approaching college age, and are in need of specialized housing. Based on the U.S. Department of Education (USDE) projections, college enrollment is expected to increase from 15,608,000 in 2002 to 17,673,000 in 2012, an increase of 2,065,000 students or 13.2%. The greatest increase will be among full-time students, where it is projected that 1.4 million of them, or 70% of the increase in students will be attending college full-time over the next 10 years. Since full-time students are those students that are most likely to seek student-oriented rental housing, this projected increase in full-time students will increase the demand for student housing.

- ❑ For the next 20 years, as echo boomers age, college enrollments will increase.[3]

- ❑ Between 2002 and 2012 these enrollments are projected to increase by 2,065,000 or 13.2%.[4]

- ❑ In the last decade the percentage of high school graduates attending college increased from 39.1% to 43.3%, a trend likely to continue in today's economy. More students are taking 5 rather than 4 years to complete their degrees, further increasing student housing demand.[5]

- ❑ The greatest enrollment increase had been among female students, now the majority. By 2012 women will comprise almost 60% of students. The Manager believes student housing design, amenities, and management practices must respect that.

- ❑ While that bulge in educational demand is built into the demographics, most existing university-operated housing is more than 30 years old. They feature small rooms, often double occupancy, many have barracks-like bathrooms. There is not much privacy, limited room and wiring for computers, stereos, and electronic games. There is typically limited storage space and closets.

- ❑ In the last 5 – 10 years almost all new-built student housing has been single student to a bedroom, often suites, and also often private bathrooms. The Manager intends to invest in such properties.

- ❑ The Manager will pursue projects with good access to campus (walking or bus service), good security, Wi-Fi service, communal spaces, and property managers that understand leasing to and managing for students.

## INITIAL GEOGRAPHIC FOCUS

The Fund will initially target two state university systems for the development of college student housing projects: New York and North Carolina. As a general comment, the annual **increase** in student enrollment in these two states is over 15,000 students,

---

[3] US Department of Education 2004 Revision, see also Knocking at the College Door, Florida Department of Education 2003.

[4] Trends in Student Housing, Voght Williams & Bowen LLC, revised July 5, 2008.

[5] Ibid. See also RREEF, quoted on www.investmentnews, November 20, 2007.

4

enough to fill over 35 new college student housing projects **each year** similar in size to UGOC college housing suites at 400 beds per project.

- ❏ Total enrollment in the State University of New York ("SUNY" system) is 427,398 students up 33% in 10 years. In 2007, student enrollment increased by 10,257 students. The student population housed in college-affiliated dormitories ranges from 40%-58%. Therefore over 210,000 students are either in need of private housing or are commuting and this number grows by over 5,000 students each year.

- ❏ Total enrollment in the University of North Carolina ("UNC" system) is 247,309 students up 30% in 10 years. The average annual increase in student enrollment is over 5,000 students. The student population housed in college-affiliated dormitories ranges from 25%-30%. Therefore, over 175,000 students are either in need of private housing or are commuting and this number grows by over 3,500 students each year.

The boomers are the huge bulge in the following chart, but the Manager believes the echo boomers who were 15 at the time of the chart indicate an additional growth in demand beginning to enter college this year.



**Population by Age and Sex: 2003**

Note: The reference population for these data is the resident population.
Source: U.S. Census Bureau, 2004a.

**MANAGEMENT**

The Manager of the Fund is DCG/UGOC Funds Management, LLC. The Manager is responsible for the overall management and administration of the Fund, including the acquisition, management and disposition of the Fund's assets. The Manager may retain a management company or administrator, which may be an affiliate of the Manager, to provide day-to-day accounting, record keeping and certain other administrative services to the Fund. The management and supervision of the Fund is exclusively vested in the Manager. Members generally will not have any right to participate in the management and supervision of the Fund and will have no authority to bind or transact business on behalf of the Fund. The Members of the Manager are DCG Funds Management, LLC ("DCG"), an affiliate of Davis Capital Group, Inc. and The United Group of Companies, Inc. ("UGOC") the latter of which is also the Managing Member of the Manager. The principal of UGOC is Walter Uccellini. The principal of DCG is Richard W. Davis, Jr. Biographies of the management team are set forth below.

## DCG Funds Management, LLC

DCG Funds Management, LLC ("DCG") is an affiliate of the Davis Capital Group, Inc. Founded in 2002, DCG is a real estate investment and development firm headquartered in Charlotte, North Carolina. DCG (http://www.daviscapitalgroup.com) is comprised of a team of professional real estate and financial associates.

### Prior Performance of DCG*

DCG has provided $35 MM million in gap financing with an estimated development cost in excess of $300 million. Of these transactions, 79% have been completed and closed. Investors in these DCG transactions have received amounts sufficient to generate an average net internal rate of return of 32%.

**Richard W. Davis, Jr., Chief Executive Officer:** Mr. Davis is the founder and Chief Executive Officer of DCG. He began his career in 1999 as a financial planner. Mr. Davis founded DCG in 2002. He founded DCG, in part, in order to provide his clients with a means of diversifying their investment portfolios into asset backed debt investments. Mr. Davis has structured over $50 million in debt and equity investments in real estate projects. Mr. Davis and his team at DCG have extensive experience in originating, underwriting, structuring and managing asset backed debt investments.

Mr. Davis is a Registered Financial Consultant. He is an active leader in many non-profit organizations within the Charlotte, North Carolina area and is the founder of the DCG Foundation that serves under privileged children in Charlotte, North Carolina.

**J. Andrew Rowe, Investment Analyst & Chief Underwriter:** Mr. Rowe joined the Davis Capital Group team in 2006. His responsibilities include overseeing loans under management, investment analysis, and underwriting loans made by the firm. He

---

* Past performance is no guarantee of future results. Actual results may vary. There can be no assurance that the Fund will achieve similar results.

began his career as a financial analyst for a full service commercial real estate company while in school at the University of North Carolina at Wilmington. Mr. Rowe is a partner in DCG Commercial Real Estate an affiliated company to Davis Capital Group. He is currently responsible for $40 million in active development projects in the southeastern market. Mr. Rowe has extensive experience in development, construction management, loan underwriting, investment analysis, and deal structuring.

Mr. Rowe received his Bachelor of Science degree in Finance from the University of North Carolina at Wilmington.  He actively holds leadership positions with the Urban Land Institute Young Leaders Council, US Green Building Council Young affiliates, DCG/AEGIS Asset Backed Fund Investment Committee, and the International Council of Shopping Centers.  Mr. Rowe is actively involved with a number of community non profit organizations within Charlotte, North Carolina including United Way Young Leaders Serve Committee, Habitat for Humanity, YMCA, and the DCG Charitable Foundation.

**Zachary J. Schuman, Director of Investor Relations:**  Mr. Schuman joined Davis Capital Group in May of 2006 with a core responsibility to manage client and investor relations.  He is active in capital placement, deal sourcing, and compliance related issues for the firm. Prior to joining Davis Capital Group, Zach held a financial associate position with Northwestern Mutual Financial Network.

Mr. Schuman received his Bachelor of Science degree in Financial Management from the University of North Carolina at Wilmington Cameron School of Business. He is a member of the Association for Corporate Growth, The National Business Association, United Way Young Leaders Council, Samaritans Feet Youth Ambassadors Council, and hold's active leadership positions with non-profit organizations. Zach is also a director for the DCG Charitable Foundation.

**Colin L. Branch, Due Diligence Analyst:**  Colin L. Branch is a Real Estate Development Associate with DCG Commercial. Mr. Branch began his career playing football with the Carolina Panthers and Oakland Raiders until 2007, when an ongoing knee injury led him to retire in early 2008. In February of 2008 he became an investor with Davis Capital Group as well as becoming an integral part of the companies learning collaborative. After being hired full time Mr. Branch began work in the real estate development portion DCG.

Mr. Branch has a B.S. in Public Policy from Stanford University and has been a leader in the Charlotte community, working with such organizations as: Hoops of Hope, World Vision, The Charlotte Rescue Mission, YMCA of Greater Charlotte and the Canon YMCA, Fellowship of Christian Athletes and Youth Homes Inc.


## The United Group of Companies, Inc.

The United Group of Companies, Inc, ("UGOC") (http://www.ugoc.com) is based in Troy, NY.  UGOC's 30+ year history includes arranging and structuring several billion dollars of financing for real estate projects including short term and long term debt, first

mortgage, secondary, mezzanine and equity financing. UGOC believes its depth of experience in finance, property management and development, and its property repositioning skills, will enable the Fund to call on significant expertise in the initial underwriting phase, in the asset management phase, and in the disposition of assets. UGOC's history and depth of construction and property management has consistently delivered what it projected. For example, in three senior apartment projects developed since 2004, UGOC has achieved cash flow projections and paid cash returns to the equity investors of 7, 8 and 9% respectively.*

During its 30+ year history, UGOC founder Walter Uccellini has developed, financed, acquired, repositioned, and managed a wide variety of real estate assets. The top executives alone have a combined industry specific experience base in excess of 100 years. UGOC offers client in-depth expertise in every phase of development, with divisions in development, management, acquisitions, finance and construction. UGOC, together with occasional joint venture partners, has developed over \$2 billion of real estate projects, acquired more than \$500 million in projects and managed 1.5 million square feet of commercial space and 6,000 residential units.

United Realty Management Corp., AMO®, an affiliate of UGOC headquartered in Troy, New York ("URMC"), will manage the day-to-day affairs of the Fund investment properties. URMC is nationally recognized for its accomplishments by the Institute of Real Estate Management ("IREM"). URMC earned its prestigious "Accredited Management Organization" ("AMO") designation in 1989 from IREM. The registered AMO designation is the mark of excellence in the real estate management industry and URMC has been accredited by IREM every year since that time.

In its role as property manager of the real estate investments of the Fund, URMC is charged with marketing, leasing and maintaining the senior and student apartment units. URMC has been marketing and professionally managing income-producing properties for over thirty years. It has completed, sold, currently owns, or has under development 775,000 square feet of office properties, over 450 units in hotel development, and over 3,565 residential units throughout the northeast, southeast and southwest United States. Since its inception in 1972, the staff has delivered office space, hotels, parking facilities, institutional facilities and multi-family communities valued at over \$400 million. URMC currently manages 1,081 senior rental apartments on nine properties, in addition to 1,439 multi-family apartments and 740,000 square feet of office/commercial space.

URMC is experienced in the marketing, promotion and leasing of senior housing projects, and has developed and implemented a number of programs for pre-leasing and on-going marketing of senior apartments. URMC is also well versed in technical reporting requirements, compliance issues, budget procedures and accounting methods.

URMC assigns a regional property manager to oversees the on-site management, maintenance and service staff supervises each property. All on-site operations are automated and standardized with on-line communication to the corporate headquarters

---

* Past performance is no guarantee of future results. Actual results may vary. There can be no assurance that the Fund will achieve similar results.

through a state-of-the-art network of software, advanced computer terminals and interactive communications capability. URMC's senior apartment properties have averaged well over 98% economic occupancy, as the table below indicates, with similar performance for its college student housing properties. No assurances can be made that similar performance can be achieved for the Fund properties.

## Prior Performance of UGOC Real Estate Investments (2004* to Date)

Since 2004 UGOC has developed and admitted outside investors to three senior independent living properties at a total development cost of over $70,000,000. Two have been completed on time. The third is under construction and on schedule. All three projects are distributing full projected cash flows to their investors.

Hearthstone Village in Colonie, NY contains 144 rental units. The equity raised was $3,000,000, the mortgage: $16,529,000. It was completed on time and on budget. Cash flow has been distributed to investors annually to date at the rate of 7% paid semi-annually.

The Club at BridgeMill, in Canton, GA consists of 150 units. The equity raised was $7,250,000, mortgage: $34,717,000. It was completed on time and on budget. Cash flow distributed to investors annually to date: 8% paid quarterly.

Colonial Square Associates, Utica, NY, 144 units, equity raised: $3,925,000, mortgage: $18,340,000; currently under construction with expected completion date of 1Q2008. Cash flow is expected to commence in January: annual rate of 9% quarterly.

---

* Past performance is no guarantee of future results. Actual results may vary. The investments described below are not acquisitions of the Fund and there can be no assurance that the Fund will have access to comparable investment opportunities, that it will be able to implement its investment strategy to achieve its investment objective or that an investment in the Fund will produce comparable, or any, investment returns. An investment in the Fund may result in a loss to investors.

## Occupancy of Senior Multi-Family Communities Managed by the United Group

| Project | Size | Year Completed | Location | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|---|---|---|---|---|
| Monument Square Apartments | 94 | 1980 | Troy NY | | | | | | | |
| Lake Placid Apartments | 122 | 1980 | Lake Placid NY | | | | | | | |
| Mechanicville Apartments | 101 | 1984 | Mechanicville NY | | | | | | | |
| Schaeffer Heights | 118 | 1994 | Schenectady NY | | | | | | | |
| Diamond Rock Terrace | 81 | 1998 | Troy NY | | | | | | | |
| The Beltrone Living Center | 248 | 2000 | Colonie NY | | | | | | | |
| Diamond Rock Terrace II | 36 | 2002 | Troy NY | | | | | | | |
| The Wallkill Living Center | 136 | 2003 | Wallkill NY | | | | | | | |
| Hearthstone Village *** | 144 | 2006 | Colonie NY | | | | | | | |
| The Club at BridgeMill | 150 | 2007 | Canton GA | | | | | | | |
| Colonial Square Associates | 144 | 2008 (Est.) | Utica NY | | | | | | | |
| | 1,374 | | Average Occupancy * | | | | | | | |

*Average Excludes Initial Rent-up Year.

** (U/CR) Indicates properties under construction or during first full year available for rent-up.

*** As of June 1, 2008, Hearthstone completed lease-up in early 2008.



## UGOC Student Housing Beds Developed 2004 to 2008



Occupancy in UGOC Developed Student Housing

12

## The United Group of Companies, Inc. Principal and Staff

**Walter F. Uccellini, CPM®, Chairman**: Walter F. Uccellini is the founder, Principal Owner, and Chairman of The United Group of Companies, Inc., a full-life cycle real estate management company specializing in development, finance, management, and acquisition of real estate that was incorporated in 1978, as a successor to his earlier development efforts, and has subsidiary offices in New York City and Florida. He has over thirty years of professional experience in real estate development, construction, management, acquisition financing and brokerage, having underwritten more than \$2 billion of transactions of residential, office, industrial, hotel and commercial properties, acquired more than \$500 million in properties, and managed 1.5 million square feet of commercial space and roughly 6,000 residential units. Mr. Uccellini's background in real estate provides significant managerial expertise to the operations of the Manager. He helped establish the local IREM chapter, and has considerable community involvement including board positions with Lally School of Management, St. Gregory's School for Boys, the Capital Region Center for Arts in Education, the Capital Region Technology Development Council, and the Colonie Senior Service Center. Mr. Uccellini earned a Bachelor of Science degree in Business Management and a Master of Science degree in business management from Rensselaer Polytechnic Institute's Lally School of Management in Troy, New York.

**Michael J. Uccellini, CPM®, COS, President and Chief Executive Officer**: As President and Chief Executive Officer of UGOC, Michael Uccellini oversees a full service real estate company specializing in development, finance, management, and acquisition of real estate. He also serves as President of United Development Corp., the real estate development arm of UGOC and as President of URMC, the real estate management arm of UGOC. Mr. Uccellini oversees all operations of URMC and is directly involved in the management of each of its properties. He has over ten years of property management experience, having had personal responsibility for 20 different properties comprising more than 2,500 apartments across New York State and Florida, including 1,081 senior units. Mr. Uccellini is a Certified Property Manager (CPM®) with IREM and a Certified Occupancy Specialist with the National Center for Housing Management. Mr. Uccellini is a member and past President of IREM's New York Capital Region Chapter No. 93 and a New York State registered Real Estate Broker. Mr. Uccellini is currently a member of IREM's National Federal Housing Policy Committee. Mr. Uccellini's community involvement includes positions with St. Gregory's School for Boys, the Center for the Disabled, and the Center for Economic Growth. Mr. Uccellini holds a Bachelor of Arts degree in Managerial Economics from Union College in Schenectady, New York and a Master's degree in Business Administration from Rensselaer Polytechnic Institute's Lally School of Management.

**James F. Quinn, Esq., CPA, Vice Chairman and Counsel**: Mr. Quinn is in-house counsel for UGOC and is also President of The Solstice Group, LLC, an affiliated financing and acquisition company. He advises UGOC on all legal and financial matters and also contributes on overall management. Mr. Quinn is an attorney, a certified public accountant and has over forty year's professional experience. He has an MBA degree from Hofstra University and has his JD from Touro College School of Law. Mr. Quinn has served as a senior executive for several diversified national real estate firms,

13

and has been directly involved in the development, acquisition, financing and management of several hundred million dollars of apartments throughout the United States. Mr. Quinn's experience also includes commercial office buildings, industrial parks and shopping centers, as well as manufacturing operations, oil and gas production and telecommunications.

**John D. Ball, Executive Vice President**: Mr. Ball is responsible for all marketing and operations of UGOC's portfolio of residential and mixed-use properties. He has over 25 years of executive experience in Profit and Loss Operations and Service Product Offerings in both real estate and technology. Mr. Ball currently heads a property management portfolio of over 2,500 residential units at 20 properties. He also heads a commercial real estate portfolio of 740,639 square feet. Mr. Ball did his undergraduate work at Syracuse University and his graduate studies at Columbia University in New York. Prior to joining UGOC, he was a Senior Group Vice President with worldwide technology services leader Keane, Inc. While at Keane, Inc. he served as a Board Member of the Information Alliance Company, a joint venture technology entity of General Electric Company and Keane, Inc.

**Jeffrey Smetana, Executive Vice President, United Development Corp.:** Mr. Smetana, EVP for over six years, has over 25 years of development experience and oversees all student housing development for UGOC. He is responsible for all phases of project development, including: project planning; approvals; design development; financial modeling; construction budgeting; project management; and construction and permanent financing. Under Mr. Smetana's direction, UDC has developed 2,300 beds of student housing and has 4,295 beds of student housing in development. While his development activities are singularly focused on student housing, his extensive experience includes the development of Senior/Multi-Family housing projects, in addition to commercial and mixed-use development projects. A Certified Public Accountant, Mr. Smetana earned his Bachelors Degree in Economics and a Master of Science degree in Accounting from the State University of New York at Albany.

**John A. Peterson, Senior Vice President**: Mr. Peterson is Senior Vice President of UGOC and MCM Securities LLC. He has over twenty-four years of experience in real estate, finance and banking, and is involved in the financial and operations management of all UGOC's properties. Mr. Peterson has participated in the development and management of over 5,000 apartments and the financing of over $400 million of real estate related assets. Mr. Peterson has extensive experience with a variety of bond financings, including senior apartment projects, and provides expertise on compliance and finance related matters. Mr. Peterson's prior experience includes several years as a bank commercial lending officer. Mr. Peterson holds a Bachelor's degree in Education and History from Springfield College in Massachusetts.

**Timothy Quinn, Chief Financial Officer**. Mr. Quinn is Chief Financial Officer of UGOC. He has over fifteen years of accounting experience, primarily in property management. Mr. Quinn currently oversees the accounting operations for over 2,500 senior and multi-family apartments. He worked previously for another real estate firm, managing finances for over 2,000 apartments and multiple commercial properties. Mr. Quinn holds a Bachelor's degree in Accounting from Siena College in Loudonville, New

York and a Master's of Science degree in Business Management from the Rensselaer Polytechnic Institute's Lally School of Business Management.

**Michael Dowd, Senior Vice President**. Mr. Dowd is employed by Millennium Credit Markets, an affiliate of UGOC. He has been directly involved in the financing of over one billion dollars in real estate finance over a period of 37 years. He is a graduate of Columbia College with a Bachelors degree and Harvard Business School with a Master's degree in Business Administration. He is a published author on real estate securities, having served as the founding Chairman of the editorial board of Real Estate Finance, and a member of the editorial board of the Journal of Real Estate Development.

**Bryan Harrison, Senior Vice President:** Mr. Harrison, Senior VP of UGOC has over 30 years of experience in public and private financing. He was the first President of UGOC predecessor United Investors Equity Corp, an SEC registered broker-dealer formed by Walter Uccellini to finance the acquisition and development of multi-family projects, mixed use and office building projects, historic preservation and subsidized housing. Mr. Harrison also supervised two affiliates, United Investor Services Corp. and United Investor Securities Corp. that provided investor services and assured compliance with securities laws. In separate ventures, he developed, financed and/or consulted thereto, numerous industrial projects, most involving sophisticated technologies, in Albany and Ft Edward, NY, Albuquerque, NM, El Paso, TX, New York City, Phoenix and San Diego. Mr. Harrison graduated from Rensselaer Polytechnic Institute with a Bachelor of Science and a Professional Degree of Architecture. He has graduate credits in economics, law and business finance.

# USE OF PROCEEDS

The proceeds of the offering of Interests shall be used to pay organizational expenses of the Fund and expenses of the offering, and the remainder of the proceeds, less amounts required to pay ongoing operating and transaction expenses of the Fund and management fees, shall be used for investments of the Fund.

### Use of Proceeds Chart

| | |
|---|---:|
| Total Equity Raised | $ 30,000,000 |
| Investment Banking Fees | 200,000 |
| Legal/Accounting Expense | 100,000 |
| Offering Preparation Expense | 150,000 |
| Estimated Placement Fees | 525,000 |
| Fund Working Capital | 200,000 |
| Available for Investment | $ 28,825,000 |

## SUMMARY OF SELECTED TERMS

*The following is a summary of selected terms of DCG/UGOC Equity Fund, LLC. This summary is not a complete description of the terms of the Fund and is qualified in its entirety by reference to the detailed provisions of this Memorandum and the Operating Agreement of the Fund, both of which should be reviewed thoroughly by each prospective investor. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Operating Agreement.*

| | |
|---|---|
| **The Fund** | DCG/UCOG Equity Fund, LLC, a North Carolina limited liability company (the "Fund"). |
| **The Manager** | DCG/UGOC Funds Management, LLC, a North Carolina limited liability company, will be the manager of the Fund (the "Manager"). The Manager will be responsible for the management and administration of the Fund and will make all investment decisions on behalf of the Fund. |
| **Investment Objective** | The Fund's investment objective is to acquire, develop, reposition, manage and operate real estate and real estate related assets in the United States, with a primary focus on the eastern United States, and to invest in debt securities. |
| **Leverage** | The Fund intends to limit the amount of leverage used to acquire investments to no more than 75% of value as determined by an independent third party appraiser. |
| **Subscriptions** | The Fund is seeking Subscriptions of $30,000,000 in the aggregate for Interests. The Manager intends to require a minimum Subscription from each Member of $500,000, but the Manager, in its sole discretion, may accept Subscriptions for lesser amounts. Each Member will commit to fund its Subscription upon the execution and delivery of its Subscription Agreement to the Fund. The Manager, in its sole discretion, may permit installment payments according to the terms of the Subscription Agreement, with a minimum payment of $100,000 upon the execution and delivery of said Subscription Agreement. Installment calls, made by the Manager, will be given with thirty (30) days notice. |
| | The Manager intends to limit the number of Members so as to not have to register as a public company und Securities and Exchange Acts. |
| | In the sole discretion of the Manager, persons ("Members") subscribing for limited liability company membership interests in the Fund ("Interests") may be |

admitted on the first business day of each calendar quarter, or, in the discretion of the Manager, more frequently until the date which is 18 months following the Initial Closing Date. Existing Members may also make additional Subscriptions (in increments of $50,000), although the Manager has discretion to accept lesser amounts or in different increments, on the first business day of each calendar quarter, or, at the discretion of the Manager, more frequently, until the date which is 18 months following the Initial Closing Date. Costs incurred by the Fund for additional Subscriptions may, in the sole discretion of the Manager, be paid by the Member making such additional Subscriptions. Capital contributions will be made in accordance with the Members' Percentage Interests.

**Investor Suitability**

Persons subscribing for Interests through this offering will be furnished, and will be required to complete and return to the Manager, a Subscription Agreement, which includes an Investor Questionnaire. Investors in the Fund (a) must be "accredited investors" as defined under the Securities Act of 1933, as amended (the "Securities Act"), and (b) must have a high level of sophistication to enable the investor to understand the risks involved in an investment in the Fund, or have a recognized purchaser representative acceptable to the Manager. The Manager, in its sole discretion, may decline to accept the subscription of any investor as a Member for any reason.

**Placement Agent Fees**

The Manager may retain placement agents (the "Placement Agents") to assist in the private placement of Interests in the Fund. The Fund will be responsible for paying the placement agent fees of the Placement Agents (the "Placement Agent Fees"). Investors solicited by such persons will be advised of, and asked to consent to, any such compensation arrangement. In addition, the Placement Agents may, from time to time and in their sole discretion, waive all or part of the Placement Agent Fees in respect of certain other investors.

**Initial Closing**

The Fund will have its initial closing and will commence investment activities once it has received $500,000 of Subscriptions from investors. The date of the initial closing shall be referred to as the "Initial Closing Date".

18

**Subsequent Closings**    Until the date which is 18 months following the Initial Closing Date or until the Fund has secured $30,000,000 of Subscriptions (the "Final Closing Date"), the Manager may accept additional Subscriptions from existing or new Members and hold subsequent closings ("Subsequent Closings") of the Fund.

Members admitted to the Fund subsequent to the Initial Closing Date and Members who increase their Subscriptions after the Initial Closing Date will contribute to the Company upon their admission as a Member an amount equal to (i) their Percentage Interest of all drawn Subscriptions less (ii) their Percentage Interest of all Distributions, if any, made to the Members admitted at any prior Closings. The amount so contributed by the incoming Members will be refunded to the existing Members pro rata in accordance with drawn and unreturned Subscriptions. Each Member's portion of these refunds will be added back to such Member's Subscriptions and will be subject to recall.

**Investment Period**    The investment period for the Fund (the "Investment Period) will commence on the Initial Closing Date and end on the fifth anniversary of the Initial Closing Date or, if earlier, the dissolution of the Fund.

After the expiration of the Investment Period, the Fund will not make investments other than: (a) to fund investments expected to close within 90 days after the expiration of the Investment Period, (b) to fund investments that were in process (i.e. pursuant to a signed letter of intent or definitive agreement) at the end of the Investment Period, (c) to fund existing investment commitments in existing portfolio companies, or (d) to fund the exercise of any options, warrants, or convertible securities held by the Fund.

**Term**    The Fund will terminate on the fifth anniversary of the Final Closing Date, unless the Manager in its reasonable discretion extends its term, for up to two (2) consecutive one-year periods. In addition, the Fund will terminate upon (a) the withdrawal of the Manager, if there is no additional or successor Manager, (b) the election of the Manager to terminate the Fund, or (c) certain other events affecting the Fund or the Manager specified in the Operating Agreement.

19

**Reinvestment**

The Manager may cause the Company to retain proceeds from Investments and Cash Equivalents to the extent such proceeds represent a return of capital or principal (as determined by the Manager in good faith), and to reinvest such retained proceeds in new Investments and Cash Equivalents, or may distribute to Members proceeds from Investments subject to the maintenance of Reserves as determined by the Manager in its sole discretion. For purposes of determining distribution priorities, any distributable proceeds that are retained for reinvestment by the Company shall be deemed to have been distributed to the Members and then re-contributed to the Company by the Members.

**Co-investment**

The Manager, in its sole discretion, may offer to one or more of the Members, the Manager, affiliates of the Manager and/or unaffiliated third parties the opportunity to co-invest with the Fund in investments from time to time, in such proportions as the Manager may determine in its sole discretion. The Manager may offer such co-investment opportunities to certain Members, the Manager, affiliates of the Manager and/or unaffiliated third parties without offering the opportunity to all of the Members. As an example, the Manager expects to structure the acquisition of Plattsburg Suites as follows: the underlying asset would be owned by a two member limited liability company (the "Co-Investment LLC"), whose members would consist of (i) an affiliate of the Manager, as the managing member (the "Co-Investment Manager"), with a 20% membership interest and (ii) the Fund, with an 80% membership interest. The Fund would provide all of the cash capital contributions to the Co-Investment LLC. The Co-Investment LLC would provide an 8% cumulative preferred return to the Fund and thereafter distributions of net cash flow would be as follows: (x) 80% to the Fund and 20% to the Co-Investment Manager, until each of the Fund and the Co-Investment manager has achieved a 15% IRR and thereafter (y) 50% to the Managing Member and 50% to the Fund. Other co-investments may provide for different equity structures, distribution provisions and/or fee arrangements.

**Distributions**

The Net Cash Flow of the Fund for each fiscal year shall be calculated and distributed not less frequently than annually. Net Cash Flow to be distributed shall initially be apportioned among the Members in proportion to their Percentage Interests and then immediately

20

reapportioned between each such Member on the one hand and the Manager on the other hand, as follows:

(a) first, one hundred percent (100%) to such Member until such Member has received (or been deemed to receive) a return of such Member's capital contribution (net of amounts previously returned) plus a return sufficient to cause such Member to have realized a 12% internal rate of return ("IRR");

(b) second, (i) 85% to such Member and (ii) 15% to the Manager until such Member has realized an 18% IRR; and

(c) third, (i) 75% to such Member and (ii) 25% to the Manager.

Distributions payable to the Manager under (b)(ii), (c)(ii), (d)(ii), (e)(ii) and (f)(ii) above are referred to as the Manager's "Carried Interest".

"Net Cash Flow" as used above means, with respect to any calendar month or other period, all cash revenues, released reserves and other funds received by the Fund (other than funds received as capital contributions or other funds received from third-party lenders unless the lender of such funds and the Fund intend that such funds be distributed to the Members), reduced by the sum of the following: (i) all sums paid to lenders to the Fund during such calendar month or other period and (ii) all cash expenditures and reserves made during such calendar month or other period.  Net Cash Flow shall be determined separately for each calendar month or other period, and shall not be cumulative.

From time to time, the Manager, in its sole discretion, may cause the Fund to make distributions to the Manager in order for the Manager to pay its tax liability resulting from the allocation of income and gains to the Manager.

Prior to the termination of the Fund, unless otherwise approved by a majority-in-interest of the Members, all distributions will be in cash or marketable securities. Upon termination of the Fund, distributions may also include restricted securities or other assets of the Fund.

**Required Withdrawal**

The Manager may require that a Member withdraw or redeem all or any portion of a Member's Interest.  In the event that the Manager requires withdrawal or

21

redemption, payment of the withdrawal amount will generally be made within 60 days after the date of the withdrawal notice.

**Defaulting Members**

If at any time a Member (a "Non-Contributing Member") fails to make all or any portion of its Capital Contribution (for this purpose, the "Defaulted Amount"), such Non-Contributing Member shall immediately be deemed to have transferred, a percentage of such Non-Contributing Member's entire interest in the Company equal to the Reduction Percentage (as defined below) of such interest. Accordingly, the Non-Contributing Member's Percentage Interest shall be reduced by a number of percentage points equal to the product obtained by multiplying (i) the Reduction Percentage by (ii) the Percentage Interest of the Non-Contributing Member. Also, the Reduction Percentage of Capital Contributions and distributions previously made by and to the Non-Contributing Member shall be deemed for purposes of this Agreement to have been made by and to the Members to which the interest is deemed transferred, and the Reduction Percentage of the Capital Account of the Non-Contributing Member shall be transferred to the Capital Accounts of the Members to which the interest is deemed transferred. For purposes hereof, the "Reduction Percentage" means an amount, expressed as a percentage, equal to the quotient of (i) two (2) times the Defaulted Amount divided by (ii) the aggregate Capital Contributions of the Non-Contributing Member as of the date of such calculation.

**Allocations of Income and Expense; Capital Accounts**

The Fund's income, expense, gains, losses, deductions and credits will be allocated among the Capital Accounts of the Members, and for tax purposes, as set forth in the Operating Agreement of the Fund.

**Manager's Fees**

The Fund shall pay to the Manager on the first day of each calendar quarter a quarterly fee for management services (the "Asset Management Fee") equal to .375% (1.5% on an annualized basis) of the amounts contributed to the Company that are invested in Investments. The Manager, in its discretion, may decide that the Asset Management Fee will be reduced, eliminated or rebated with respect to the Interest of the Manager or certain Members that are members of the Manager, affiliates of the Manager or its members, members of the immediate family of the members of

the Manager, trusts or similar vehicles formed for the benefit of such persons or certain other Members as determined by the Manager in its sole discretion, and contributions and distributions will be adjusted as necessary to implement such reduction, elimination or rebate of the Asset Management Fee.

The Manager, and its members, partners, officers, directors, advisors, employees, consultants and Affiliates, may receive origination or underwriting fees from the Fund and/or portfolio companies in connection with the Fund's acquisition of Investments. None of such fees shall offset the Asset Management Fee.

It is anticipated that affiliates to the Manager will be paid fees for the development, construction management, property management and leasing of Fund investment properties. All such fees are at rates and on terms that are otherwise believed to be available from an unrelated third party negotiated in arms-length transactions. As a policy matter, the Manager will hold any affiliates providing services to the Fund to the same standards as a third party vendor.

**Organizational Expenses**

The Fund will be responsible for and will pay or reimburse the Manager and its affiliates for all costs and expenses incurred by the Fund, the Manager or its affiliates in connection with the organization and formation of the Fund and any alternative investment structure and/or the offering and sale of Interests, including all legal, accounting, consulting, filing fees and expenses, and other expenses. The Manager is not entitled to retain as compensation any unused organization expenses or placement fees which are detailed in the Use of Proceeds section.

**Operating Expenses**

The Fund will bear all costs and expense incurred in maintaining the operations of the Fund and will reimburse the Manager and its affiliates for all operating expenses incurred on behalf of the Fund including legal and accounting expenses, the cost of preparing the Fund's financial statements, tax returns, and other returns and reports to the Members, insurance, litigation and indemnification expenses, taxes and other governmental fees and charges and other expenses associated with pursuing, identifying, structuring and negotiating real estate investments on

behalf of the Fund.

**Transaction Expenses**

The Fund will be responsible for and will pay and reimburse the Manager and its affiliates for all fees, costs and expenses (including travel expenses) in connection with the identification, investigation, structuring, and negotiation of investment and disposition opportunities for the Fund and monitoring of the Fund's Investments, including without limitation fees, costs and expenses payable to third parties incurred in connection with the investigation of investment or disposition opportunities.

**Other Funds**

The Manager, its Members, and their affiliates may sponsor, establish, manage, invest and otherwise participate in other investment funds and similar investment vehicles as well as managed accounts, except that the Manager may not establish a blind pool investment fund or similar vehicle with investment objectives substantially similar to those of the Fund until after at least 75% of the aggregate Subscriptions of the non-defaulting Members have been invested or committed for investment.

**Tax and Benefit Plan / ERISA Considerations**

The Fund expects to be treated as a partnership for U.S. federal income tax purposes and not as an association taxable as a corporation, and the Manager will not make an election to have the Fund treated as a corporation for U.S. federal tax purposes. Each Member will generally be required to report on such Member's U.S. federal income tax return its share of the Fund's income, gains, losses, deductions or credits for the Fund's taxable year ending within or with such Member's taxable year, whether or not cash or other property is distributed to such Member. A Member may owe taxes with respect to such Member's share of Fund income prior to the time such Member has received any cash from the Fund.

Prospective U.S. tax-exempt investors should be aware that it is expected the Fund will generate "unrelated business taxable income" ("UBTI"). A U.S. tax-exempt investor generally will be subject to tax at regular U.S. federal income tax rates on its distributive share of the Fund's UBTI. The Fund has no obligation to minimize UBTI.

Prospective foreign investors should be aware that it is expected that the Fund will make investments in U.S.

24

real property interests that generate income that is effectively connected with a U.S. trade or business ("ECI") and may make other investments that generate ECI. Accordingly, it is expected a foreign member would be required to file U.S. federal income tax returns and pay U.S. tax and would be subject to U.S. withholding tax on Fund distributions. The Fund has no obligation to minimize ECI.

Each prospective investor is advised to consult its own tax advisor as to the income tax consequences of an investment in the Fund, including the application of state and local tax laws. See *Certain Material U.S. Federal Income Tax Considerations* beginning on page 36.

Investors subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), should consult their own advisors as to the effect of ERISA on an investment in the Fund.

The Manager intends to limit the participation of benefit plan investors in the Fund to less than 25% of the Interests of the Members in the Fund. In the event that the participation of benefit plan investors exceeds 25% of the Interests of the Members in the Fund, the Fund will use reasonable efforts to conduct the affairs of the Fund so that it will qualify as a real estate operating company (as such term is defined in the Department of Labor plan asset regulations set forth in 29 C.F.R. 2510.3-101 et seq., as modified by Section 3(42) of ERISA (and any successor regulations (the "Plan Asset Regulations")). See Benefit Plan / ERISA Considerations beginning on page 42.

**Withdrawal and Transfer Of Interests**

Without the consent of the Members (except as may be required by applicable law), the Manager may withdraw as Manager and admit a new Manager at any time transferring its Manager Interest to the new Manager.

New Managers may be admitted with the unanimous consent of the other Manager(s), if any, and provided written notice is provided to the Members prior to or following such appointment but without the consent of the Members.

Members will not have the right to withdraw or redeem any Interests or withdraw any of their capital contributions from the Fund. The Members may not

transfer their Interests without the prior written consent of the Manager, which shall not be unreasonably withheld in the case of a proposed transfer by a Member to a transferee which is then currently a Member, or which is an Affiliate of the Member proposing the transfer.

**Indemnification and Exculpation**

The Fund shall indemnify each of the Manager, any of its affiliates, agents, officers, directors, shareholders, partners, employees, members, managers, advisers or consultants (each an "Indemnified Party") (subject to any limitation now or hereafter required by law) against any cost, losses, damages, expense (including legal or other expenses reasonably incurred in investigation or defense), amount paid in settlement, fines, judgment or liability incurred by or imposed upon an Indemnified Party in connection with any action, suit or proceeding (including civil, criminal, administrative or investigative proceedings) to which an Indemnified Party may be a party or otherwise involved or with which an Indemnified Party shall be threatened, arising out of or in connection with an Indemnified Party's activities or involvement with the Fund or the Manager; except that no Indemnified Party shall be indemnified to the extent that such liability arises from such Indemnified Party's fraud, bad faith or gross negligence.

**Removal of Manager**

The Manager may be removed as Manager for Cause. The determination of whether to attempt to remove the Manager for Cause shall be made only upon the vote of Members (other than the Manager and its Affiliates) whose capital contributions constitute at least 10% and in some cases 75% of the capital contributions of all Members (excluding the Manager and its Affiliates) depending on the Cause.

**Reporting**

The Fund shall use commercially reasonable efforts to cause each Member to receive within 120 days after the close of each fiscal year such tax information concerning the Fund as is necessary for a Member to complete its federal income tax return; within 120 days after the close of each Fiscal Year, audited financial statements (including a balance sheet and statement of income) of the Fund for the fiscal year then ended; and not later than thirty (30) days after the end of each fiscal quarter of the Fund, unaudited reports on the Fund's operations, including a summary report on each

Investment held by the Fund.

**Accountants**

Moore Stephens Frost Financial Group
425 West Capitol, Suite 3300
Little Rock, AR 72201
501-975-0103, 800-766-9241, Fax 501-975-0185

**Legal Counsel**

Stephen Bilheimer, Esq.
1061 Interstate Highway 30
Little Rock, AR 72209
501-376-2919, Fax 866-243-3512

## INVESTMENT CONSIDERATIONS AND RISK FACTORS

*The Interests are speculative and illiquid securities involving substantial risk of loss and are suitable for investment only by sophisticated persons who fully understand and are capable of assuming the risks of an investment in the Fund.  The following considerations, which do not purport to be a complete list of all risks involved in an investment in the Fund, should be carefully evaluated before investing in the Fund.  As a result of the occurrence of one or more of these risks, as well as other risks inherent in any investment, there can be no assurance that the Fund will achieve its investment objective or otherwise be able to successfully carry out its investment program.*

Prospective investor should carefully consider, among other factors, the risks described below, each of which could have an adverse effect on the value of their interests in the Fund.  As a result of these risk factors, as well as other risks inherent in any investment or set forth elsewhere in this Memorandum, there can be no assurance that the Fund will meet its investment objectives or otherwise be able to successfully carry out its investment program.  The Fund returns may be unpredictable and, accordingly, the Fund's investment program is not suitable as the sole investment vehicle for an investor.  An investor should only invest in the Fund as part of an overall investment strategy and only if the investor is able to withstand a total loss of his investment.  Although the Manager believes that substantial returns can be achieved by investing in the Fund, there can be no assurance that the Fund's investment objective will be achieved, and a Member must be prepared to bear capital losses that might result from the Fund's investments.

In considering any information contained herein regarding prior performance of financial markets or any investments in which the Fund, the Manager, DCG, UGOC or any of their affiliates have been involved or in relation to which any such person may have provided investment advisory or management services, prospective investors should bear in mind that past performance is not indicative of future results, and there can be no assurance that comparable results will be achieved by the Fund or that the Fund will have access to comparable investment opportunities.

### High Risk of Loss

An investment in the Interests is highly speculative and involves significant risks, including the possible loss of the entire amount invested.

### No Participation in Management

The holders of the Interests will have a limited ability to participate in the control, management, direction, or operation of the affairs of the Fund.

### No Operating History

The Fund will be a newly formed entity and has no operating history.

## Future Investments Unspecified

The Manager will be solely responsible for the management, control and investment strategy of the Fund. Consequently, investors will not be able to evaluate for themselves the merits of a particular investment prior to the investor's decision to invest in the Fund, or prior to the Fund's investment in a particular investment, nor will investors be entitled to participate in any manner in the decisions regarding selection, development, financing, refinancing, operation or sale of a particular investment. Investors will be relying solely on the ability of the Manager with respect to the investments to be made. Because such investments will occur over time, the Fund faces the risks of changes in interest rates and adverse changes in the real estate market generally and in the location of its investments.

While no specific investments have been firmly committed, UGOC is currently actively developing four (4) student housing properties in the State University System of New York State and three (3) senior independent living properties, one in Florida and two in New York. These properties, together with a pipeline of potential future acquisition candidate developments of UGOC are listed on the attached Schedule A – List of Potential Investments by the Fund. In addition, DCG is actively seeking development opportunities in the southeastern United States. The closings of the investments listed on Schedule A are subject to certain conditions, some beyond the control of the Manager and its affiliates, and there can be no assurance that such closings will occur.

## Risks of Real Estate Ownership

There can be no assurance that the operations of the Fund will be profitable or that cash from operations will be available for distribution to Members. Because real estate, like many other types of long-term investments, historically has experienced significant fluctuations and cycles in value, specific market conditions may result in occasional or permanent reductions in the value of real property interests. The marketability and value of the Fund's real property investments will depend on many factors beyond the control of the Fund or the Manager, including, without limitation: changes in general or local economic conditions; changes in supply of or demand for competing properties in an area (e.g., as a result of over-building); changes in interest rates and the availability of financing; the enactment and enforcement of governmental regulations relating to land-use and zoning restrictions, environmental protection and occupational safety; unavailability of mortgage funds, which may render the sale of a property difficult; the financial condition of tenants, buyers and sellers or properties; changes in real estate tax rates and other operating expenses; and acts of God and uninsurable losses. Since investments in real estate generally are not liquid, there can be no assurance that there will be a ready market for real property interests held by the Fund. In addition, general economic conditions in the United States and abroad, as well as conditions of domestic and international financial markets, may adversely affect operations of the Fund.

## Highly Competitive Market for Investment Opportunities

The business of identifying, developing, completing, and leasing attractive real estate investments is highly competitive and involves a high degree of uncertainty. The Fund will be competing for investments with many other real estate investors including

individuals, publicly traded REITs, financial institutions, and other institutional investors. Competition for investments may have the effect of increasing the price of an investment thereby reducing potential investment returns to the Fund. Further, over the past several years, an ever-increasing number of real estate funds have been formed for the purpose of investing in real estate properties. There can be no assurance that the Fund will be able to locate, purchase and develop real estate investments at a reasonable price and return relative to the risk and which meet the Fund's investment objectives.

## Development, Redevelopment and Construction Costs

The development and construction of real estate assets is subject to timing, budgeting and other risks that may adversely affect the Fund's operating results. The Fund may acquire newly developed and redeveloped properties as suitable investment opportunities arise, taking into consideration general economic conditions. Any renovation, redevelopment, development and related construction activities could subject the Fund to a number of risks, including risks associated with:

- Construction delays or cost overruns that may increase project costs;
- Receipt of zoning, occupancy and other required governmental permits and authorizations;
- Development costs incurred for projects that are not pursued to completion;
- Acts of God such as earthquakes, hurricanes, floods or fires that could adversely impact a project;
- Ability to raise capital; and
- Governmental restrictions on the nature or size of a project.

The Fund's inability to complete a project on time or within budget may adversely affect its operating results.

## Geographic Concentration and Fluctuations in Local Markets May Adversely Impact Investments

The Fund expects its investments to be concentrated in the major metropolitan areas along the eastern seaboard regional markets. As a result of this geographic concentration, if a local property market performs poorly, the income from the Fund's investments in that market could decrease. The performance of the economy in the Fund's target markets affects occupancy, market rental rates and expenses, and consequently could impact the income generated by the Fund's investments and their underlying values. The financial results of major local employers may also impact the cash flow and value of certain of the Fund's investments.

## Possible Lack of Diversification

Investors have no assurance as to the degree of diversification in the Fund's investments. The Fund may make investments in some transactions with the intent of refinancing or selling a portion thereof, and, in such cases, there will be the risk that the Fund will be unable to complete the refinancing or sale which could lead to increased

30

risk as a result of the Fund having an unintended long-term investment and reduced diversification. In the event that the Fund is not able to sell $30,000,000 of Subscriptions, the Fund will provide investors with limited diversity thereby increasing an investor's risk.

## Leverage of Investments

The Fund will likely incur recourse and non-recourse debt to finance the acquisition and/or development or redevelopment of real property investments. However, market and interest rate fluctuations will affect the availability and cost of real estate mortgage loans. Volatility in the capital markets (e.g., recent volatility related to problems with the sub-prime debt markets) may have a negative impact on the Fund's ability to obtain debt financing. There can be no assurance that financing needed to acquire and develop portfolio investments will be available on acceptable terms, or at all. Any increase in interest rates on debt financing available to finance portfolio investments will have a negative impact on the return on the Fund's investments.

While such leveraging will increase the funds available for investment by the Fund, it will also increase the risk of loss on a leveraged property. If the Fund defaults on non-recourse indebtedness secured by a given property, the lender may foreclose and the Fund could lose its entire investment in the given property. If the Fund defaults on recourse debt or portfolio financing whereby several of the Fund's properties are cross collateralized, all or multiple Fund properties may be subject to risk of loss. Foreclosure could also have adverse tax consequences to Members. In addition, if the Manager makes the determination to cause the special purpose entity ("SPE") holding a particular portfolio investment to loan funds to another SPE holding a different portfolio investment, default on the loan by the borrower SPE would lower the return that would otherwise have been achieved on the portfolio investment held by the lender SPE.

## Lack of Liquidity

Interests in the Fund represent a highly illiquid investment and should be acquired only by investors able to commit their Funds for an indefinite period of time. Interests may not be resold unless they are subsequently registered under federal and state securities laws or an exemption from such registration is available and the Fund has no obligation to, and does not intend to, register any Interests. Transfers of Interests (other than to certain affiliates) are also subject to the approval of the Manager (which may be granted or denied in the sole and absolute discretion of the Manager) and the satisfaction of certain other conditions. The purchase of Interests in the Fund should be considered only as a long-term and illiquid investment.

The real estate investments to be made by the Fund are also likely to be illiquid. Dispositions of such investments also may be subject to limitations on transfer imposed by mortgage lenders or other restrictions that would interfere with the subsequent sale of such investments or adversely affect the terms that could be obtained upon any disposition thereof

31

## Targeted Returns

There can be no assurance that the Fund will achieve its targeted internal rate of return objectives or its annual distribution objectives. On any given portfolio investment, a complete loss of the Fund's capital investment is possible.

## U.S. Federal Income Tax Risks

Due to differences in the timing of the recognition of income by the Fund and cash distributions to the Members, a Member's tax liability for a year may exceed such Member's cash distributions for such year and may exceed all prior cash distributions to such Member. The Fund may generate ordinary income, capital gain, ordinary losses or capital losses and prospective Members should not invest with the expectation of receiving a certain character of income, gain, loss or deduction. The deductibility of losses and expenses is subject to various limitations that may prevent Members from fully utilizing losses and deductions allocated to them by the Fund. The Fund is expected to generate UBTI and ECI.

See the "*Certain Material U.S. Federal Income Tax Considerations*" section of this Memorandum for a discussion of certain material U.S. federal income tax consequences of an investment in the Fund.

## Investment Company Act of 1940

The Manager Fund will not be registered under the Investment Company Act of 1940, as amended (the "Investment Company Act") in reliance on an exemption from registration as an investment company. Accordingly, the Fund does not expect to be subject to the restrictive provisions of the Investment Company Act. If the Fund fails to qualify for exemption from registration as an investment company, its ability to use leverage would be substantially reduced and it may be unable to conduct its business as described herein. Any such failure to qualify for such exemption could have a material adverse effect on the Fund.

## Investment Advisers Act of 1940

Neither the Fund nor the Manager will be registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"). Accordingly, investors will not be afforded any of the protections of the Advisers Act applicable to registered investment advisers in relation to the Fund or the Manager.

## General Real Estate Investment Risks

Real estate investments, like many other types of long-term investments, have historically experienced significant fluctuations in value, and specific market conditions and cycles may result in occasional or permanent reductions in the value of the Fund's investments. Property cash flows and the marketability and value of real property will depend on many factors beyond the control of the Fund, including, without limitation:

- Adverse changes in international, national, regional and local economic and market conditions;

- Changes in interest rates or financial markets;
- Fluctuating local real estate conditions;
- Competition from other available properties;
- Changes or promulgation and enforcement of governmental regulations relating to land use and zoning, environmental, occupational and safety matters;
- Changes in real estate tax rates and other operating expenses;
- Existence of uninsured or uninsurable risks; and
- Natural disasters, acts of war or terrorism.

Investments of the Fund will be subject to the risks incident to a passive investment in income-producing real estate properties in the particular markets in which the Fund operates. Generally, there will be no readily available market for a substantial amount of the Fund's investments. Market illiquidity could prevent the Fund from effecting dispositions of its properties at desired times or require the Fund to accept "in kind consideration" and consequently result in distributions "in kind" to investors, all of which could negatively impact the IRR achieved on such investments.

**Potential Environmental Liability**

Under various federal, state and local laws, ordinances and regulations, an owner of real property may be liable for the costs of removal or remediation of certain hazardous or toxic substances on or in such property. Such laws often impose such liability without regard to whether the owner knew of, or was responsible for, the presence of such hazardous or toxic substances. The cost of any required remediation and the owner's liability therefor as to any property are generally not limited under such laws and could exceed the value of the property and/or the aggregate assets of the owner. The presence of such substances, or the failure to properly remediate contamination from such substances, may adversely affect the owner's ability to sell the real estate or to borrow using such property as collateral. The costs associated with compliance with or the liability resulting from the foregoing may adversely affect the return of the Fund.

**No Market for Membership Interests**

Interests will not be registered under the Securities Act or traded on any securities exchange or other market and will be subject to substantial restrictions on transfer. Because there is no right to redeem the Interests and the Interests are not freely tradable, an investment in the Fund is illiquid and involves a high degree of risk. Irrespective of the success or failure of the Manager's investment strategy, Members' inability to withdraw from the Fund materially increases the risk of an investment in the Interests because it is not possible to redeem Interests in order to recognize profits or mitigate losses before such profits may have been eliminated or such losses significantly accelerated.

**Limited Number and Diversification of Investments**

While diversification is an objective of the Fund, there is no assurance as to the degree of diversification that will actually be achieved in the Fund's investments either by

33

geographic region or the type of the underlying issuers or projects. In the event that the Fund is not able to significantly diversify its investments, the aggregate return of the Fund may be substantially adversely affected by the unfavorable performance of even a single investment.

## Loss of Key Personnel

The ability of the Manager to manage the affairs of the Fund currently depends on its management, the investment professionals of DCG and UGOC. The Manager will be relying extensively on the experience, relationships and expertise of its management and the investment professionals of DCG and UGOC. There can be no assurance that these individuals will remain employed with DCG or UGOC or their affiliates or otherwise continue to be able to carry on their current duties throughout the term of the Fund.

In addition, disputes between DCG and UGOC may result in litigation or arbitration that would increase the Fund's expenses and prevent the Manager from focusing its time and effort on the Fund's business and investments. Consequently, actions by, or disputes with, partners or co-venturers might result in subjecting properties owned by the Fund to additional risk. The Fund may also, in certain circumstances, be liable for the actions of third party partners or co-venturers.

## Limitation of Recourse and Indemnification of Manager

The Operating Agreement limits the circumstances under which the Manager or its agents, officers, directors, partners, employees, members, managers, advisers or consultants will be held liable to the Fund. As a result, investors may have a more limited right of action in certain cases than they would have in the absence of this provision. In addition, the Operating Agreement provides that the Fund will indemnify the Manager and its agents, officers, directors, partners, employees, members, managers, advisers or consultants for certain claims, losses, damages and expenses arising out of their activities on behalf of the Fund. Such indemnification obligations could materially affect the returns to investors.

## Conflicts of Interest

Investors should be aware that there could be occasions when the Manager and its affiliates encounter conflicts of interest in connection with the Fund. The following discussion enumerates certain potential conflicts of interest, which should be carefully evaluated before making an investment in the Fund.

### *Competing Objectives of Principal*

The Principal manages a variety of investment funds and engages in other business and investment activities outside of the Fund, which may involve, among other things, investing in investment funds that compete or may compete with the Fund for investment opportunities. Accordingly, conflicts of interest regarding business objectives may arise between such investment funds and the

34

Fund in connection with the voting of such equity securities especially in workout modes or under Chapter 11.

## *Carried Interest*

The Manager will receive a Carried Interest as described in the section entitled "Summary of Selected Terms - Distributions." The existence of the Manager's Carried Interest may create an incentive for the Manager to propose to make higher risk investments on behalf of the Fund than it would otherwise in the absence of such Carried Interest.

## *Management and Resources of the Manager*

The Principal will devote such time as the Manager deems necessary to conduct the business affairs of the Fund in an appropriate manner. The Principal has substantial responsibilities to the Manager and its affiliates not involving the Fund and is expected to spend a significant portion of its time on the business activities of the Manager and its affiliates not involving the Fund. Accordingly, conflicts of interest may arise in the allocation of management resources between the Fund and other activities of the Manager.

## Side Agreements

In accordance with common industry practice, the Manager may enter into one or more "side letters" or similar agreements with certain Members pursuant to which the Manager grants to such Members specific rights, benefits or privileges that are not made available to Members generally. Such agreements will be disclosed only to those actual or potential Members that have separately negotiated with the Manager for the right to review such agreements. Except to the extent permitted by the Operating Agreement, the Manager will have no authority to enter into side letters or similar agreements that are materially detrimental to the Fund.

## Projections; Opinions

Statements contained in this Memorandum that are not historical facts are based on current expectations, estimates, projections and beliefs. Such forward looking statements involve known and unknown risks, uncertainties, assumptions and other factors, including, without limitation, those identified herein under the "Investment Considerations and Risk Factors" section and elsewhere in this Memorandum. In considering forward looking statements contained in this Memorandum, prospective investors should bear in mind that past or projected performance of the Investments or the investments made by the Manager is not necessarily indicative of future results, and there can be no assurance that projected returns will be achieved or that the Fund will achieve comparable results. While these forward looking statements are based on assumptions that the Manager believes are reasonable under the current circumstances, the actual results will depend on, among other factors, future operating results, market conditions and the value of the assets at the time of disposition, any related transaction

35

costs and the timing and manner of sale, all of which may differ from the assumptions on which the projections are based. Accordingly, the actual results may differ materially from the projections indicated herein.

## Legal Counsel

Legal counsel has been engaged to act as counsel to the Manager and the Fund in connection with the organization of the Fund. Such counsel has not been engaged to protect the interests of other subscribers or Members. Investors should consult with and rely upon their own counsel concerning investments in the Fund.

## CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion is a summary of certain U.S. federal income tax considerations relating to an investment in the Fund. This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations, administrative rulings, court cases, and other applicable law, all of which are subject to change, possibly with retroactive effect. No assurances can be given that future legislation, administrative rulings, or court decisions will not affect the conclusions set forth in this discussion. This discussion does not address all the federal income tax consequences of an investment in the Fund, since these depend upon each particular investor's situation. This discussion omits discussion of special rules applicable to certain investors, such as foreign investors, bank holding companies, thrifts, insurance companies, real estate investment trusts, regulated investment companies, brokers and dealers and traders in securities that elect to mark their securities portfolios to market and other investors that do not own their Interests as capital assets. In addition, this discussion does not address the tax consequences of investing in the Fund through a partnership, limited liability company, or other pass-through entity for U.S. federal income tax purposes, or the application of non-U.S., state, local, estate, gift or alternative minimum tax to an investment in the Fund.

The Fund will not seek any tax rulings from any tax authorities or any opinions of counsel in respect of any of the matters discussed herein. Each prospective investor is urged to consult its own tax advisors with respect to the federal, state, local and other tax consequences of the purchase and ownership of Interests in the Fund.

## INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE

**To ensure compliance with requirements imposed by the Internal Revenue Service ("IRS"), you are hereby notified that the U.S. tax information contained herein (i) is written in connection with the promotion or marketing by the Fund of the transactions or matters addressed herein, and (ii) is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding U.S. tax penalties. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

**Fund Status**

Under current U.S. Treasury regulations, a domestic entity such as the Fund will generally be classified as a partnership for U.S. federal income tax purposes unless it elects to be treated as a corporation. The Manager will not elect for the Fund to be treated as an association taxable as a corporation for U.S. federal income tax purposes. The classification of an entity as a partnership for U.S. federal income tax purposes may not be respected for state or local income tax purposes. An organization that is classified as a partnership for U.S. federal income tax purposes is not subject to U.S. federal income tax itself, although it must file an annual information return and may be subject to other kinds of taxes.

An entity that would otherwise be classified as a partnership for federal income tax purposes may nonetheless be taxable as a corporation if it is a "publicly traded partnership." The Manager intends to operate the Fund in a manner such that it does not expect that the Fund will be treated as a publicly traded partnership. An entity that is a "taxable mortgage pool" will also be treated as a corporation subject to U.S. federal income tax. The Manager does not expect that the Fund will constitute a "taxable mortgage pool". Thus, the Fund expects to be treated as a partnership (and hence a "pass through entity") for U.S. federal income tax purposes.

If the Fund were classified as a corporation, it would be required to pay federal income tax at the corporate tax rate on its taxable income. In such case, the amount of cash available for reinvestment or distribution to the Members would be substantially less than if the Fund were classified as a partnership for federal income tax purposes. Moreover, any distributions by the Fund to a Member generally would be taxable to that Member as a dividend.

The following discussion assumes that the Fund will be treated as a partnership for U.S. federal income tax purposes and accordingly, will not be subject to U.S. federal income taxation as an entity but rather that all items of income, loss, deductions and credits will pass through the Fund and will be taken into account at the Member level.

**Taxation of Members**

Provided that the Fund is classified as a partnership for federal income tax purposes, each Member will be required to report on its federal income tax return, and will be subject to tax in respect of, its share of each item of the Fund's income, gains, losses, deductions and credits for each taxable year of the Fund ending with or within the Member's taxable year, whether or not the Fund distributes cash or other property to such Member. Accordingly, Members may be required to pay taxes on their share of the Fund's income prior to the time that any distributions are made. Each item generally will have the same character and source, as if the Member had realized the item directly.

The Fund may make investments (including debt investments) which could result in the recognition of substantial amounts of taxable income (including ordinary income) prior to the receipt of cash or when little or no economic income is realized. The Fund may

37

also make investments (including debt investments) any return from which consists in whole or in part of ordinary income rather than capital again. The Fund may also make investments with respect to which the tax consequences are unclear. It is possible that the IRS may challenge the Fund's reporting of such investments, and such a challenge could result in adverse tax consequences for Members.

Although this summary does not generally address state, local, or foreign taxation, it should be noted that an investment in the Fund may result in Members being required to pay taxes and file tax returns in state or local jurisdictions.

**Fund Distributions**

Cash distributions from the Fund to Members are generally not taxable. Instead, a Member's adjusted basis in its Interest will generally be reduced by the amount of such distribution. However, to the extent cash distributions (or in many circumstances, distributions of marketable securities), including constructive cash distributions resulting from the reduction of a Member's share of Fund debt, exceed the adjusted basis of a Member's Interest, the Member will recognize gain. A Member may also recognize gain if the distribution alters a Member's interest in certain ordinary income property. Distributions (other than liquidating distributions) of property other than cash or marketable securities generally will reduce the adjusted basis (but not below zero) of a Member's Interest by the adjusted basis of such property immediately before its distribution. If the contributions of new Members admitted to the Fund subsequent to the Initial Closing Date are distributed to the existing Members, such transaction is likely to be treated as a taxable sale of a portion of the existing Members' Interest to such new Member.

**Allocations of Income, Gain, Loss, Deduction and Credits**

Items of the Fund's taxable income, gains, losses, deductions and credits will be allocated pursuant to the Operating Agreement of the Fund. Section 704(b) of the Code provides that a Member's distributive share of items of the Fund's income, gain, loss, deduction and credits will be determined in accordance with the Operating Agreement if such allocations have "substantial economic effect" but must otherwise be determined in accordance with the Member's economic interest in the Fund. It is possible that the IRS will challenge the Fund's allocations as lacking "substantial economic effect." Any such reallocation of tax items may have adverse tax and financial consequences to a Member.

**Deductibility of Fund Investment Expenditures; Limitations on Losses**

Subject to certain exceptions, itemized deductions of an individual taxpayer are deductible only to the extent that such deductions exceed two percent (2%) of the taxpayer's adjusted gross income. The organizational and operating expenses of the Fund, including the Asset Management Fee and any other amounts treated as compensation paid to the Manager, may be treated as itemized deductions subject to the foregoing rule or may be required to be capitalized. In addition, in the case of a Member who is an individual whose adjusted gross income exceeds a certain inflation-adjusted

threshold, the aggregate itemized deductions allowable for the year may be further reduced.

The ability of a Member to deduct losses and expenses incurred by the Fund or by the Member from its taxable income may be subject to a number of limitations under the Code, including the basis limitations under Section 704, the "at risk" rules under Section 465 and the loss limitation rules of Section 470. Additionally, Members may be subject to limitations on interest deductions and may be subject to the limitations on passive activity losses under Section 469 to the extent such losses arise. Other limitations on the deductibility of losses and expenses may also apply. Because of some of these limitations, it is possible that Members may not be able to use losses from the Fund, if any, to offset taxable income from other sources or offset taxable income from the Fund.

It is expected that a portion of the income of the Fund will consist of net long-term capital gain. Also, the Fund may incur capital losses. Individuals can deduct capital losses only to the extent of capital gains and $3,000 of ordinary income. Unused capital losses of individuals can be carried over, subject to the same limitations, to subsequent years. Unused losses may not be carried back. Corporations may deduct capital losses only to the extent of capital gains. Unused capital losses of corporations may be carried back three years and carried over five years.

**Organization and Syndication Expenses**

In general, neither the Fund nor any Member may deduct organization or syndication expenses. Syndication expenses (i.e., amounts paid or incurred to promote the sales of membership interests) must be capitalized and cannot be amortized or otherwise deducted. The Fund may deduct a portion of organizational expenses (not to exceed $5,000) and to amortize the remainder of such organizational expenses over a 180-month period, provided an election is made or deemed to be made.

**Basis Adjustment of Fund Assets**

Under Section 754 of the Code, a partnership may make an election to adjust the basis of the partnership's assets in the event of a distribution of partnership property to a partner or a transfer of a partnership interest. Depending upon the particular facts at the time of a transfer of a partnership interest, such an election could either increase or decrease the value of a partnership interest to the transferee because the election would increase or decrease the basis of the partnership's assets for the purpose of computing the transferee's distributive share of partnership income, gains, deductions and losses. The Operating Agreement authorizes the Manager to make such an election. However, the Manager does not presently intend to make such an election because (1) the election, once made, cannot be revoked without obtaining the consent of the Commissioner of Internal Revenue, (2) the election may not necessarily be advantageous to all Members and (3) accounting complexities result from having an election in effect. Under Section 754 of the Code, the Fund may also be required to adjust the basis of its assets under certain circumstances in the absence of an election, and Members may be required to provide additional information to the Manager in connection with these rules.

**U.S. Tax Shelter Rules**

The Fund may engage in transactions or make investments that would subject the Fund, its investors and/or its advisors to special rules requiring such transactions or investments by the Fund or investments in the Fund to be reported and/or otherwise disclosed to the IRS, including to the IRS's Office of Tax Shelter Analysis (the "Tax Shelter Rules"). A transaction may be subject to reporting or disclosure if it is described in any of several categories of transactions, which include, among others, transactions that result in the incurrence of a loss or losses exceeding certain thresholds. Although the Fund does not expect to engage in transactions solely or principally for the purpose of achieving a particular tax consequence, there can be no assurance that the Fund will not engage in transactions that trigger the Tax Shelter Rules. In addition, an investor may have disclosure obligations with respect to its interest in the Fund if the investor (or the Fund in certain cases) participates in a reportable transaction. **Investors should consult their own tax advisors about their obligation to report or disclose to the IRS information about their investment in the Fund and participation in the Fund's income, gain, loss or deduction with respect to transactions or investments subject to these rules.** In addition, pursuant to these rules, the Fund may provide to its advisors identifying information about the Fund's investors and their participation in the Fund and the Fund's income, gain, loss or deduction from those transactions or investments, and the Fund or its advisors may disclose this information to the IRS upon its request.

In addition, under recently enacted tax legislation, if the Fund engages in certain tax shelter transactions, certain tax-exempt Members could be subject to an excise tax equal to the highest corporate tax rate times the greater of (i) such Member's net income from the transactions or (ii) seventy-five percent of the proceeds attributable to such Members from the transactions. A higher excise tax could apply to a tax-exempt Member that knew or had reason to know that a transaction was a prohibited tax shelter transaction. Managers of a tax-exempt entity may also be liable for an excise tax if they knowingly approve a prohibited tax shelter transaction. In addition, tax-exempt Members could be subject to certain disclosure requirements and penalties could apply if such tax-exempt Members do not comply with such disclosure requirements. There can be no assurance that the Fund will not engage in prohibited tax shelter transactions. The excise tax does not apply to tax-exempt Members that are pension plans (although such investors may still be subject to certain disclosure requirements).

**No Tax Benefit Expected**

Because it is expected that an investment in the Fund will not reduce the cumulative tax liability of an investor in any year as a result of tax losses, deductions or credits, prospective members should not invest with the expectation of receiving any such tax benefit.

## Audits and Adjustments to Tax Liability

Although an entity classified as a partnership is not required to pay any U.S. federal income tax, such an entity must file U.S. federal income tax information returns that are subject to audit by the IRS. If the Fund were audited, any disputed partnership items would be determined in a unified partnership proceeding, which the Manager as tax matters partner (the "Tax Matters Partner") would control, rather than in a separate proceeding for each Member. These procedures for a unified partnership proceeding make it easier for the IRS to eliminate many administrative difficulties in auditing a partnership with many partners and could therefore increase the risk that the IRS will seek to adjust items on audit. If the Fund were audited and the IRS were successful in adjusting items of income, gain, loss or deduction, such adjustments would change the U.S. federal income tax liability of each Member, might require filing amended returns or claims for refund and could result in the imposition of interest and penalties on the Members. Because Members will be affected by the outcome of any administrative or court proceeding with regard to the Fund, the Tax Matters Partner is required by the Partnership Agreement to notify all Members of any audit of the Fund. The Operating Agreement provides for the indemnification and reimbursement of the Tax Matters Partner by the Fund for any expenses it incurs.

## Certain Considerations for Tax-Exempt Investors

If an entity exempt from taxation under Section 501 of the Code (a "tax-exempt entity") is a partner in a partnership (or member of a limited liability company treated as a partnership for federal income tax purposes) which is engaged in a trade or business not substantially related to the tax-exempt entity's exempt function (or if that partnership invests in a pass-through entity engaged in such trade or business), the tax-exempt entity will be subject to income tax on its distributive share of partnership income (other than dividends, interests, royalties, certain rents, capital gains and certain other items) treated as unrelated business taxable income ("UBTI"). In addition, if a tax-exempt entity is a partner in a partnership that owns property acquired with borrowed funds (or if that partnership invests in a pass-through entity that owns property acquired with borrowed funds), or if the tax-exempt entity borrows to fund its investment in the partnership, the tax-exempt entity's share of partnership income (including dividends, interests, royalties, rents and capital gains) may be taxed as UBTI.

It is expected the Fund will make investments that generate UBTI. It is also expected that the Fund will borrow in order to make investments and that income and gain from such investments will constitute UBTI in whole or in part. If the Fund were to make debt-financed distributions, tax-exempt Members could incur UBTI if the distributed funds are used to make investments. The potential for having income characterized as UBTI may have a significant effect on any investment by a tax-exempt entity in the Fund and may make investment in the Fund unsuitable for some tax-exempt entities. As discussed above, tax-exempt investors in certain tax shelter transactions may be subject to excise taxes and disclosure requirements. EACH TAX-EXEMPT INVESTOR IS URGED TO CONSULT WITH ITS OWN TAX ADVISORS REGARDING THE

FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.

### Certain Considerations for Non-U.S. Investors.

The federal income tax treatment of a nonresident alien, foreign corporation, foreign partnership, foreign estate or foreign trust ("non-U.S. investor") investing as a member in the Fund is complex and will vary depending upon the circumstances of the member and the activities of the Fund and the Manager. The Fund is not intended for non-U.S. investors.

It is expected the Fund will make investments that generate income that is effectively connected with a U.S. trade or business, including investments in U.S. real property. Accordingly, it is expected that non-U.S. investors in the Fund would be required to file U.S. federal income tax returns and be subject to U.S. taxation at graduated rates (and certain corporate non-U.S. investors could be subject to an additional 30% "branch profits" tax). A non-U.S. investor's distributive share of Fund income could also be subject to U.S. withholding tax. As a result, an investment in the Fund may not be appropriate for non-U.S. investors.

Each non-U.S. investor is urged to consult with its own tax advisor regarding the federal, state, local and foreign tax treatment of an investment in the Fund.

### State and Local Taxes

Although this tax discussion does not generally address state or local taxation, prospective investors should also consider the potential state and local tax consequences of an investment in the Fund. In addition to being taxed in its own state or locality of residence, a Member and/or the Fund may be subject to tax return filing obligations, withholding obligations and income, franchise and other taxes in jurisdictions in which the Fund operates or holds investments, either directly or indirectly. Further, the Fund may be subject to state and/or local tax.

Potential investors should consult their own tax advisors regarding the state and local tax consequences of an investment in the Fund.

### Filing of Returns

The Fund will file an information return on IRS Form 1065 and will provide information on Schedule K-1 to each Member following the close of the Fund's taxable year. Note that it is possible that the Fund may be late in providing K-1s to Members, in which case Members should be prepared to file for extensions with the relevant federal and state taxing authorities.

The foregoing discussion should not be considered to describe fully the U.S. federal income tax consequences of an investment in the Fund. Prospective investors are strongly advised to consult with their tax advisors with respect to the U.S. federal, state and local income and other tax consequences of an investment in the Fund.

## BENEFIT PLAN / ERISA CONSIDERATIONS

Fiduciaries of employee benefit plans should consider those rules and restrictions that govern the investments and operations of such plans, including, where applicable, but not limited to, certain considerations under ERISA and the Code. before acquiring any Interests in the Fund. Rules applicable to plans subject to ERISA ("ERISA Plans") and the Code are summarized below; certain plans, including church plans, government plans and plans maintained outside the United States, may be subject to other similar rules and restrictions not summarized below. Section 404(a)(1) of ERISA requires a fiduciary subject to ERISA to consider, among other things: (i) whether the investment satisfies the diversification requirements of ERISA; (ii) whether the investment is in accordance with the documents governing the plan; (iii) whether the investment is prudent, considering the nature of the Fund's proposed operations, the compensation structure, the absence of any operating history for the Fund and the risks concomitant to an investment in the Fund, including those described in this Memorandum, (iv) whether the investment is solely in the interest of participants and beneficiaries, and (v) whether the investment is being made for the exclusive purpose of providing benefits to participants and their beneficiaries and whether reasonable costs of administering the plan have been defrayed. In addition, the fiduciary of a an ERISA Plan must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the ERISA Plan's portfolio, taking into consideration whether the investment is reasonably designed to further the ERISA Plan's purposes, an examination of the risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's objectives and the limited right of Members to withdraw all or any part of their capital accounts or to transfer their interests in the Fund.

It is the current intent of the Manager to monitor the investments in the Fund to ensure that the aggregate investment by benefit plan investors within the meaning of the United States Department of Labor Regulations, 29 C.F.R. § 2510.3-101 (the "Plan Asset Regulations), as modified by the Pension Protection Act of 2006 (the "PPA"), is limited under the so-called "25 percent rule", so that equity participation in the Fund by benefit plan investors will not be considered "significant" under the Plan Asset Regulations, as modified by the PPA, and, as a result, the underlying assets of the Fund will not be deemed "plan assets." Under the Plan Asset Regulations, as modified by the PPA, the term "benefit plan investor" generally means an ERISA Plan, any plan described in Section 4975(e)(1) of the Code to which Section 4975 of the Code applies, and any entity whose underlying assets include plan assets by reason of such a plan's investment in the entity. In addition, under these regulations, as modified, an entity generally shall be considered to hold plan assets only to the extent of the percentage of equity interests held by benefit plan investors. Without limiting any of the foregoing, the Manager reserves the right to, but is under no obligation to, satisfy the 25 percent rule by requiring the withdrawal of any Member (in whole or in part) at any time.

If participation in the Fund by benefit plan investors is significant within the meaning of the Plan Asset Regulations, the Fund nevertheless will not be deemed to hold "plan

43

assets" if the Fund qualifies as a real estate operating company within the meaning of those regulations. The Plan Asset Regulations provide that when a plan invests in a limited liability company qualifying as a real estate operating company, the plan's assets generally do not, solely by reason of such investment, include the underlying assets of the limited liability company. Real estate operating companies are defined to include a limited liability company that has the majority of its assets invested in real estate which is managed or developed and with respect to which the limited liability company has the right to substantially participate directly in the management or development activities, provided the limited liability company in the ordinary course of its business is engaged directly in real estate management or development activities each year with respect to properties in its portfolio.

If participation in the Fund by benefit plans is significant within the meaning of the Plan Asset Regulations, the Manager intends to use reasonable efforts to conduct the affairs of the Fund so that it will qualify as a real estate operating company.

If the assets of the Fund were determined to be plan assets, in whole or in part, the Manager would be a fiduciary (as defined in ERISA) with respect to such plan and would be subject to the obligations and liabilities imposed upon fiduciaries by ERISA and the Code. Moreover, the Fund would be subject to various other requirements of ERISA and the Code.

EACH PLAN CONSIDERING INVESTING IN THE FUND, WHETHER OR NOT SUBJECT TO ERISA, SHOULD CONSULT WITH ITS COUNSEL REGARDING SUCH INVESTMENT, INCLUDING IN PARTICULAR WITH RESPECT TO QUESTIONS ARISING UNDER ERISA OR SIMILAR APPLICABLE LAW.

## SUBSCRIPTION FOR INTERESTS; PLAN OF DISTRIBUTION

In order to subscribe for an Interest, each prospective investor will be required to follow the instructions contained in the Subscription Booklet and complete, execute and deliver to DCG/UCOG Equity Fund, LLC, c/o DCG/UGOC Funds Management, LLC, 19315 West Catawba Avenue, Suite 200, Cornelius, North Carolina 28031: (i) the Subscription Agreement, the Questionnaire and the signature page to the Subscription Agreement contained in the Subscription Booklet; and (ii) 100% of the full amount of their Subscription by certified check or wire transfer of immediately available funds made payable to the Fund. The minimum initial investment in the Fund from each investor is $500,000.00, unless the Manager, in its sole discretion, determines to accept a subscription for a lesser amount.

The Subscription Agreement recites the amount of initial or additional capital that a prospective investor desires to contribute to the Fund and contains other customary provisions, including a representation by the investor relating to whether the investor qualifies as an "accredited investor" and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Fund. The decision whether to accept a subscription for an Interest by a person who is not a Member or a subscription to make an additional Subscription

44

by a Member will be made by the Manager in its sole discretion. The Manager may terminate the offering of Interests at any time in its sole and absolute discretion.

Generally, Interests will be offered and sold by the Fund. However, the Manager may cause the Fund to engage one or more registered broker-dealers to distribute Interests to investors. Any fees payable by the Fund to such broker-dealers shall be borne by the Manager.

## INVESTOR SUITABILITY

The Interests are offered exclusively on a private placement basis to a limited number of sophisticated investors. Investors in the Fund (a) must be "accredited investors" as defined under the Securities Act, and (b) must have a high level of sophistication to enable the investor to understand the risks involved in an investment in the Fund. The Manager, in its sole discretion, may decline to admit any investor for any or no reason. Since the Fund is offering the Interests pursuant to an exemption from registration as an investment company under Section 3(c)(1) of the Investment Company Act, the Fund may not have more than 99 Members.

As set forth in Regulation D under the Securities Act, (a) an individual is an "accredited investor" if (i) the individual's net worth, or joint net worth with spouse, exceeds \$1,000,000 or (ii) the individual's income in each of the two most recent calendar years individually exceeded \$200,000 (or jointly with such person's spouse exceeded \$300,000) and the individual reasonably expects reaching the same income level in the current year, and (b) an entity is an "accredited investor" if it is (i) an organization described in Section 501(c)(3) of the Code, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring an interest in the Fund, with total assets in excess of \$5,000,000, (ii) a trust with total assets in excess of \$5,000,000, not formed for the specific purpose of acquiring an interest in the Fund and whose purchase is directed by a person having such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of an investment in the Fund, (iii) an entity in which all of the equity owners are "accredited investors" or (iv) one of the other specific types of entities listed in Regulation D that fits the criteria set forth therein, as set forth in detail in the Questionnaire.

Existing Members who subscribe for additional Interests will be required to meet the foregoing eligibility criteria at the time of the additional subscription.

## MONEY LAUNDERING PREVENTION

Federal regulations and executive orders administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC web site at www.treas.gov/ofac. Each prospective investor must represent and warrant in the

45

Subscription Agreement that, among other things, neither the prospective investor, nor any person controlling, controlled by, or under common control with, the prospective investor, nor any person having a beneficial interest in the prospective investor, or for whom the prospective investor is acting as agent or nominee in connection with its investment in the Fund, is a country, territory, person or entity named on an OFAC list, or is a person or entity that resides or has a place of business in a country or territory named on such lists.  The Manager will not accept any investment from an investor if it cannot make the representation described in the preceding sentence.  In addition to OFAC restrictions, prospective investors and Members will be required to provide all information and documentation requested by the Fund or the Manager to comply with U.S. anti-money laundering laws and regulations as well as, possibly, comparable laws and regulations in other jurisdictions.  This is an evolving area of the law, and the full extent of the disclosures that may be required cannot be predicted.

## SCHEDULE A - List of Potential Investments by the Fund

The projects listed herein have been identified by the Manager for possible acquisition by the DCG/UGOC Equity Fund, LLC.  They are currently being developed by an affiliate of the Manager.

| Project Description | Development/ Acquisition Cost | Equity Portion |
|---|---|---|
| 1.  Plattsburg College Suites - 397 beds<br>New Development - College Student Housing | $ 22,999,484 | $ 6,300,000 |
| 2.  Courtland College Suites – 360 beds<br>New Development - College Student Housing | 21,655,766 | 5,600,000 |
| 3.  Brockport College Suites – 400 beds<br>New Development - College Student Housing | 24,416,740 | 6,400,000 |
| 4.  Oswego College Suites – 405 beds<br>New Development - College Student Housing | 25,083,697 | 5,800,000 |
| 5.  Sandalwood Village – 163 apartment units<br>New Development – Senior Apartments | 40,200,000 | 5,750,000 |
| 6.  Glenwood Village – 150 apartment units<br>New Development – Senior Apartments | 37,000,000 | 5,200,000 |
| 7.  Orchard Village – 170 apartment units<br>New Development – Senior Apartments | 42,000,000 | 6,000,000 |

**EXHIBIT A**

**OPERATING AGREEMENT**

**OF**

**DCG/UGOC EQUITY FUND, LLC**

**A NORTH CAROLINA LIMITED LIABILITY COMPANY**

**Dated as of July 22, 2008**

**Amended March 23,2009**

THE LIMITED LIABILITY COMPANY MEMBERSHIP INTERESTS ISSUED IN ACCORDANCE WITH AND REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, UNDER THE NORTH CAROLINA SECURITIES ACT OR UNDER SIMILAR LAWS OR ACTS OF OTHER STATES IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THESE MEMBERSHIP INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER (A) THIS AGREEMENT AND (B) THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## TABLE OF CONTENTS

**Page**

ARTICLE 1 GENERAL PROVISIONS ...................................................................................... 1

   1.1    Formation ........................................................................................................... 1

   1.2    Name................................................................................................................... 1

   1.3    Fiscal Year ......................................................................................................... 1

   1.4    Purpose of the Company ................................................................................... 1

   1.5    Certificates ......................................................................................................... 2

   1.6    Registered Office and Agent; Principal Place of Business ............................... 2

   1.7    Term of Company .............................................................................................. 2

   1.8    Manager and Members; Names and Addresses ................................................. 2

ARTICLE 2 DEFINITIONS ..................................................................................................... 3

ARTICLE 3 INVESTMENTS AND LIMITATIONS ............................................................... 7

   3.1    Investment Objective ......................................................................................... 7

   3.2    Reinvestment ..................................................................................................... 8

   3.3    Subscriptions and Capital Contributions .......................................................... 8

   3.4    Defaulting Members .......................................................................................... 9

   3.5    Members ........................................................................................................... 10

   3.6    Maximum Commitments of Members .............................................................. 11

   3.7    No Interest and No Return ................................................................................. 11

   3.8    Withdrawal ....................................................................................................... 11

   3.9    Subscriptions ................................................................................................... 11

   3.10  Vehicles ........................................................................................................... 11

ARTICLE 4 CAPITAL ACCOUNTS; ALLOCATIONS OF PROFIT AND LOSS ................. 12

   4.1    Capital Accounts .............................................................................................. 12

   4.2    Allocations of Income, Gain, Loss, Deduction and Credit .............................. 12

   4.3    Regulatory Allocations .................................................................................... 13

   4.4    Tax Allocations; Code Section 704(c) and Unrealized Appreciation or
        Depreciation. ..................................................................................................... 13

   4.5    Changes in Members' Interest ........................................................................... 14

i

4.6     Withholding .................................................................................................. 14

4.7     Tax Matters .................................................................................................. 14

4.8     Determination by Manager of Certain Matters ...................................... 15

ARTICLE 5 DISTRIBUTIONS AND WITHDRAWALS ........................................ 15

5.1     Distributions ................................................................................................ 15

5.2     Voluntary Withdrawal ................................................................................ 16

5.3     Required Withdrawals ................................................................................ 16

5.4     Limitations on Distributions ...................................................................... 17

5.5     Distributions Upon Liquidation and Winding-Up ................................... 17

ARTICLE 6 MANAGEMENT OF THE COMPANY .............................................. 17

6.1     Management by the Manager ..................................................................... 17

6.2     Reliance by Third Parties ........................................................................... 18

6.3     No Management by Members ..................................................................... 18

6.4     Consent by Members ................................................................................... 18

6.5     Limitations on the Power of the Manager ............................................... 18

6.6     Activities of the Manager ........................................................................... 18

6.7     Co-Investment Opportunities .................................................................... 19

6.8     Reimbursement of the Manager ................................................................ 19

6.9     Transactions with Other Members and Affiliates ................................... 19

6.10    Standard of Care .......................................................................................... 20

6.11    Indemnification ............................................................................................ 20

6.12    Costs and Expenses ..................................................................................... 21

6.13    Limits on Indemnification .......................................................................... 22

6.14    No Guaranty of Profits ............................................................................... 22

6.15    Not Exclusive ............................................................................................... 22

6.16    Insurance ...................................................................................................... 22

6.17    Removal ......................................................................................................... 22

ARTICLE 7 EXPENSES AND ASSET MANAGEMENT FEE .............................. 23

7.1     Pre-organization Expenses ......................................................................... 23

7.2     Expenses ....................................................................................................... 23

7.3     Asset Management Fee ................................................................................ 23

7.4     Fees Related to Investments ....................................................................... 24

7.5   Property Management Fee .................................................................... 24

7.6   Development Fee ................................................................................... 24

7.7   Placement Agent Fee ............................................................................ 24

ARTICLE 8 POWERS AND DUTIES OF AND LIMITATIONS UPON THE MEMBERS ... 25

8.1   Rights of the Members ......................................................................... 25

8.2   Limitations on the Rights of Members ................................................. 25

8.3   Limited Liabilities of the Members ..................................................... 25

8.4   Procedures to Obtain Member Approvals ............................................ 26

8.5   Member Representations ...................................................................... 27

8.6   Transfers by a Member ........................................................................ 27

8.7   Transfers by a Manager ....................................................................... 28

ARTICLE 9 DISSOLUTION AND LIQUIDATION OF THE COMPANY ..................... 28

9.1   Dissolution ............................................................................................ 28

9.2   Existence of Members .......................................................................... 29

9.3   Winding-Up and Liquidation of the Company ..................................... 29

9.4   Time for Winding-Up ........................................................................... 30

9.5   Final Accounting .................................................................................. 30

ARTICLE 10 BOOKS AND RECORDS AND ACCOUNTING ...................................... 31

10.1  Books and Records ............................................................................... 31

10.2  Accounting ........................................................................................... 31

10.3  Reports ................................................................................................. 31

ARTICLE 11 MISCELLANEOUS ................................................................................. 31

11.1  General ................................................................................................. 31

11.2  Amendments to this Agreement ........................................................... 32

11.3  Special Powers of Attorney ................................................................. 32

11.4  Transfer of Interests ............................................................................. 32

11.5  Notices ................................................................................................. 33

11.6  Waiver .................................................................................................. 33

11.7  Notice of Tax Examinations ................................................................ 33

11.8  Whole Agreement ................................................................................ 33

11.9  Governing Law ..................................................................................... 33

11.10 Binding Nature ..................................................................................................34

11.11 Invalidity.........................................................................................................34

11.12 Counterparts; Facsimile Signatures .........................................................34

11.13 Further Assurances ........................................................................................34

11.14 Reliance upon Books, Reports and Records.............................................34

11.15 Construction ...................................................................................................34

11.16 Consent to Jurisdiction and Service of Process.......................................35

11.17 Confidentiality ...............................................................................................35

11.18 Goodwill ..........................................................................................................35

11.19 Individual Members; Community Property...............................................35

**OPERATING AGREEMENT
OF
DCG/UGOC EQUITY FUND, LLC**

THIS OPERATING AGREEMENT of DCG/UGOC Equity Fund, LLC, a North Carolina limited liability company (the "Agreement"), amends and restates in its entirety the Operating Agreement of DCG/UGOC Equity Fund dated as of June 13, 2008, and is entered into, and shall be effective as of July 22, 2008, by and among DCG/UGOC Funds Management, LLC, a North Carolina limited liability company, and all other Persons who are or shall in the future become Managers, Members or assignees in accordance with the provisions hereof and who are listed as such on the books and records of the Company.

In consideration of the mutual covenants and subject to the terms and conditions of this Agreement, the parties hereto agree as follows:

### ARTICLE 1
### GENERAL PROVISIONS

1.1     Formation

The Company has been formed by the execution and filing with the Secretary of State of North Carolina of Articles of Organization on June 13, 2008.

1.2     Name

The name of the Company is: DCG/UGOC Equity Fund, LLC. The Company's business shall be conducted under such names as the Manager may, from time to time, deem necessary or advisable, provided that appropriate amendments to this Agreement and to the Articles of Organization and all necessary filings under applicable assumed or fictitious name statutes, if any, are first obtained. No consent of the Members is required to make such amendments. The Company shall have the exclusive ownership and right to use the Company's name until the dissolution of the Company.

1.3     Fiscal Year

The fiscal year of the Company shall be the calendar year. Tax information regarding a Members participation in the Company will be provided within ninety (90) days of the end of the fiscal year.

1.4     Purpose of the Company

Subject to all of the provisions of this Agreement, and in furtherance of the investment objectives set forth in Article 3.1, the Company may engage in any lawful activity for which limited liability companies may be organized under the laws of the State of North Carolina and shall have all the powers available to it as a limited liability company organized under the laws of the State of North Carolina.

## 1.5    Certificates

The Manager shall, from time to time, file such certificates of amendment, certificates of cancellation, or other certificates as the Manager reasonably deems necessary under the Act or under the laws of any jurisdiction in which the Company is doing business to establish and continue the Company as a limited liability company or to protect the limited liability of the Members.

## 1.6    Registered Office and Agent; Principal Place of Business

The initial address of the Company's registered office in the State of North Carolina is c/o DCG/UGOC Funds Management, LLC, 19315 West Catawba Avenue, Suite 200, Cornelius, North Carolina 28031. The principal place of business of the Company and office where the records described in Article 10 shall be kept shall be located at 19315 West Catawba Avenue, Suite 200, Cornelius, North Carolina 28031 or at such other location as shall be specified from time to time by the Manager. The Manager may from time to time change the registered office or agent or the principal place of business of the Company or establish additional places of business or offices of the Company as the Manager may determine are necessary or appropriate. The Manager shall notify each Member of any change in the principal place of business of the Company.

## 1.7    Term of Company

The Company shall continue until the fifth anniversary of the Final Closing Date, unless its term is extended by the Manager in its reasonable discretion, for up to two (2) consecutive one-year periods. In addition, the Company will terminate upon (a) the withdrawal of the Manager, if there is no additional or successor Manager, (b) the election of the Manager to terminate the Company, or (c) certain other events affecting the Company or the Manager specified in this Agreement.

## 1.8    Manager and Members; Names and Addresses

The Manager and the Members shall be identified as such on the books and records of the Company. The initial Manager shall be DCG/UGOC Funds Management, LLC. The Manager shall maintain at the Company's principal place of business a list that sets forth the names and business or residence addresses of the Manager and the Members, separately identified as such. The Manager shall not be subject to election by the Members and the Members shall have no right to remove the Person serving as Manager, except as specified in Article 6.17. New Managers may be admitted with the unanimous consent of the other Manager(s), if any, and provided written notice is provided to the Members prior to or following such appointment but without the consent of the Members. Except as required under the Act, changes in partners, officers, members, managers, directors or employees of the Manager shall not require the consent of the Members and will not dissolve the Company.

## ARTICLE 2
## DEFINITIONS

Unless the context otherwise requires, the following terms (and the singular or plural thereof) used in this Agreement shall have the meanings set forth below:

"1940 Act" means the Investment Company Act of 1940, as amended from time to time, or any successor statute thereto.

"Act" means the North Carolina Limited Liability Company Act, as amended from time to time, or any successor statute thereto.

"Affiliate" means with respect to a Person:

(i)     any Person directly or indirectly owning, controlling or holding, with power to vote, 10% or more of the outstanding voting securities of such Person;

(ii)    any Person 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled or held, with power to vote, by such Person;

(iii)   any Person directly or indirectly controlling, controlled by, or under common control with, such Person;

(iv)    any officer, director, partner or member of such Person, and

(v)     if such Person is an officer, director, partner or member, any company for which such Person acts in any capacity.

"Agreement" means this Amended and Restated Operating Agreement, as amended from time to time.

"Approval of the Members" means approval of those Members holding more than 75% of the Percentage Interests of all of the Members. Successors in interest to Members who have not been admitted as substitute Members and the Interests to which they have succeeded shall be ignored in determining whether the Approval of the Members has been given. For this purpose, Percentage Interest shall be determined as of the beginning of the Fiscal Period during which the Approval of the Members is required.

"Articles" means the Articles of Organization of the Company filed with the Secretary of State, as they may be amended and restated from time to time.

"Asset Management Fee" shall have the meaning set forth in Article 7.3.

"Bankruptcy" means, with respect to any Person, such Person's filing a petition or otherwise voluntarily commencing a case or proceeding or filing an answer or other pleading in any proceeding seeking relief under any federal or state bankruptcy, insolvency or debtors'

reorganization law, being the voluntary or involuntary subject of an order for relief by any court under any such law, or being adjudicated a "bankrupt", "debtor" or "insolvent" under any such law, or there being appointed under any such law a "trustee", "receiver" or "custodian" to manage his or its business or properties, or there being commenced under any such law a case or proceeding proposing such an order for relief; adjudication or appointment with respect to such Person or his or its business, which proceeding is consented to by such Person or which is not dismissed within ninety (90) days after being commenced.

"Business Day" means any day that is not a Saturday or Sunday or a day on which state or national banking institutions are authorized or obligated by law or executive order to remain closed in the State of North Carolina.

"Capital Account" means the capital account of a Member maintained by the Company under Article 4.1.

"Capital Contribution" of a Member means each Member's initial capital contribution together with any additional capital contributions by such Member to the Company.

"Carried Interest Distributions" means Distributions payable to the Manager under Article 5.1(a)(ii-vi).

"Cash Equivalents" means temporary cash balances in any reasonably safe (conservative) and liquid instruments or accounts (including without limitation certificates of deposit or money market accounts).

"Cause" means, with respect to the Manager, any of the following unless within fifteen (15) Business Days of such occurrence the Manager cause the Company to be reimbursed for the losses incurred with respect of the occurrence:

(a)     the commission by such Person or any of its employees or agents of an act of gross negligence, willful misconduct (including, without limitation, an act of fraud, theft or dishonesty), or material violation of law, including federal and state securities laws and regulations and laws and regulations applying to lenders or investment professionals, in each case as determined by a final decision (after all appeals and the expiration of time to appeal) by a court of competent jurisdiction; or

(b)     the commission by such Person or any of its employees or agents of a felony involving the misuse or misapplication of funds, resulting in a conviction by a court of competent jurisdiction or the entry of a plea of guilty or nolo contendere, and materially injurious to the Company, any Member, any Manager or any Affiliate thereof;

(c)     the taking of any action by such Person or any of its employees or agents on behalf of the Company that materially violates any provision of this Agreement (other than by reason of inaction due to Disability), which is materially injurious to the Company, any Member, any Manager or any Affiliate thereof; or

(d)     the Bankruptcy or dissolution of such Person.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company" means DCG/UGOC Equity Fund, LLC, a North Carolina limited liability company formed under the Act, or any successor limited liability company.

"Contributing Members" shall have the meaning set forth in Article 3.4(a).

"Development Fee" shall have the meaning set forth in Article 7.6.

"Defaulted Amount" shall have the meaning set forth in Article 3.4(b).

"Disability" means an illness or incapacity (mental or physical or both) of a character, nature, degree or effect that renders a Person incapable of actively participating in the day-to-day business of the Company for more than 120 days in any period of 180 consecutive days.

"Distribution" means, with respect to a Member, the amount of cash and fair market value (as determined by the Manager) of Property other than cash (net of any liabilities secured by such Property, or to which such Property is subject as provided by Treasury Regulations Section 1.704-1(b)(2)(iv)(b)(5)) distributed to such Member by the Company on account of that Member's Interest as provided in Article 5 or Article 9.3.

"Distribute" means to make one or more Distributions.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Final Closing Date" shall have the meaning set forth in Article 3.3(a).

"Fiscal Year" shall have the meaning set forth in Article 1.3.

"Indemnified Party" shall have the meaning set forth in Article 6.10.

"Initial Closing Date" means the date on which investors will first be admitted to the Company as Members.

"Interest" means the entire ownership interest of a Member in the Company at any particular time, including any and all benefits to which the Member may be entitled under this Agreement and the obligations of the Member under this Agreement, whether as a Manager or Member.

"Investment" shall have the meaning set forth in Article 3.1.

"Majority-in-Interest" means, as of any particular time, those Members then having an aggregate Percentage Interest that is greater than 50%.

"Manager" means DCG/UGOC Funds Management, LLC, a North Carolina limited liability company, or such other Person as shall be the Manager of the Company in accordance with this Agreement.

"Member" means each Person admitted to the Company as a Member so long as that Person holds an Interest as a Member in the Company and any successor to a Member who has been admitted as a Member to the Company. A Manager having or acquiring an Interest as a Member shall also be a Member.

"Minimum Subscription" shall have the meaning set forth in Article 3.3(a).

"Net Assets" means the excess of the Company's assets over its liabilities.

"Net Cash Flow" means, with respect to any calendar month or other period, all cash revenues, released Reserves and other funds received by the Company (other than funds received as Capital Contributions or other funds received from third-party lenders unless the lender of such funds and the Company intend that such funds be distributed to the Members), reduced by the sum of the following: (i) all sums paid to lenders to the Company during such calendar month or other period and (ii) all cash expenditures and reserves made during such calendar month or other period. Net Cash Flow shall be determined separately for each calendar month or other period, and shall not be cumulative.

"Net Profit" or "Net Loss" means the net profit or net loss of the Company as determined in accordance with the principles of Treasury Regulation Section 1.704-1(b)(2)(iv).

"Non Contributing Members" shall have the meaning set forth in Article 3.4(a).

"Percentage Interest" means, with respect to each Member, a representation of such Member's Interest as of the applicable date of determination, expressed as a percentage of all Members' Interests and based on relative Subscriptions. The Company shall keep an up-to-date Schedule of Members which shall include a statement of each Member's Percentage Interest. The sum of the Percentage Interests shall equal 100 percent.

"Person" means any individual, partnership, corporation, trust, estate, association or other entity.

"Placement Agents" shall have the meaning set forth in Article 7.7.

"Placement Agent Fees" shall have the meaning set forth in Article 7.7.

"Plan Asset Regulations" means the Department of Labor plan asset regulations set forth in 29 C.F.R. 2510.3-101 et seq., as modified by Section 3(42) of ERISA (and any successor regulations).

"Portfolio Company" means any entity in which the Company has made an Investment.

"Private Placement Memorandum" means the confidential private placement memorandum of DCG/UGOC Equity Fund, LLC dated July 22, 2008.

"Property" means all (or such lesser amount as indicated by the context used herein) property (real, personal, tangible or intangible) owned from time to time by the Company as a result of Capital Contributions, operations or otherwise.

"Property Management Fee" shall have the meaning set forth in Article 7.5.

"Reduction Percentage" shall have the meaning set forth in Article 3.4(b).

"Reserves" means the reasonable reserves established from time to time by the Manager in amounts reasonably determined by the Manager to be adequate and sufficient for current and future operating and working capital and to pay for taxes, insurance, service of indebtedness, Asset Management Fees or other costs and expenses incident to the Company's business or otherwise to provide for the long-term goals of the Company or any other purpose, including reserves for unforeseen or contingent liabilities, debts or obligations.

"Secretary of State" means the Secretary of State of the state of North Carolina.

"Securities Act" means the Securities Act of 1933 as amended from time to time, or any successor statute thereto.

"Subscription" shall have the meaning set forth in Article 3.3(a).

"Subscription Agreement" shall have the meaning set forth in Article 3.3(a).

"Subscription Documents" means the Subscription Agreement, along with an investor questionnaire and any other documents that the Manager determines the Members must execute and deliver to the Manager in order to become a Member.

"Transfer" means, as applicable, a sale, exchange, transfer, assignment, pledge, hypothecation, encumbrance, gift or attempt to create or grant a security interest in, any Interest or interest therein or portion thereof; excepting only a pledge limited to a Member's claim as a creditor to receive cash distributions payable on account of its Interest to the extent such Member is the beneficial owner of such Interest at the time such distributions are payable.

"Transfer Notice" shall have the meaning set forth in Article 3.4(d).

"Treasury Regulations" means the income tax regulations, including any temporary and proposed regulations, from time to time promulgated under the Code.

"Withholding Member" shall have the meaning set forth in Article 3.6(b).

## ARTICLE 3
## INVESTMENTS AND LIMITATIONS

### 3.1    Investment Objective

The Company's investment objective is to acquire, develop, reposition, manage and operate real estate and real estate related assets in the United States, with a primary focus on the eastern United States and to invest in debt securities (hereinafter, such real estate and real estate assets and debt securities, the "Investments"). The Company intends to limit the amount of leverage used to acquire Portfolio Companies to more than 75% of the entities "as built" or "as approved" appraised value as determined by an independent third party appraiser.  The purchase

price of Portfolio Companies which have been developed by affiliates of the Manager will be restricted to no more than the appraised value plus costs associated with the equity investment by the Company. The Company may invest cash not otherwise used to make Investments in Cash Equivalents.

## 3.2 Reinvestment

The Manager may cause the Company to retain proceeds from Investments and Cash Equivalents to the extent such proceeds represent a return of capital or principal (as determined by the Manager in good faith), and to reinvest such retained proceeds in new Investments and Cash Equivalents, or may distribute to Members proceeds from Investments subject to the maintenance of Reserves as determined by the Manager in its sole discretion. For purposes of determining distribution priorities, any distributable proceeds that are retained for reinvestment by the Company shall be deemed to have been Distributed to the Members and then re-contributed to the Company by the Members. Any such retained proceeds shall not reduce Subscriptions. The Manager shall give the Members notice of any retained proceeds at least thirty (30) days following the date of determination.

## 3.3 Subscriptions and Capital Contributions

(a) Until the date which is 18 months following the Initial Closing Date or until the Company has secured $30,000,000 of Subscriptions (defined below) (the "Final Closing Date"), the Company may accept additional Subscriptions by any existing Member, and new Members may be admitted pursuant to this Article 3, as of the first Business Day of any calendar quarter, or at other times in the sole discretion of the Manager. The Manager shall have the sole discretion to accept or reject any subscription for any or no reason. The Manager may terminate the offering of Interests at any time in its sole and absolute discretion. Each Member, other than the Manager, agrees to initially subscribe for at least $500,000 (the "Minimum Subscription"); provided, however, that a Member may subscribe for less than $500,000 with the consent of the Manager. All subscriptions (the "Subscriptions") for Interests must be on the form of subscription agreement provided by the Manager (the "Subscription Agreement"). Each Member must meet the suitability requirements set forth in the Subscription Documents and each Member's executed Subscription Documents must be approved by the Manager. The Manager will draw down Subscriptions in installments. Except as provided elsewhere in this Agreement, any such draw down of Subscriptions shall apply to all Members such that all Capital Contributions are made in accordance with Percentage Interests. The Manager shall give the Members at least thirty (30) days' notice of any required Capital Contribution. The obligation of each Member to contribute the balance of its unpaid Subscription shall accrue regardless of whether one or more other Members fail to pay all or any portion of their unpaid Subscriptions when required.

(b) In the discretion of the Manager, each new Member, and each existing Member increasing its Subscription, may be required to reimburse the Company concurrently with such contribution for such expenses as the Manager may reasonably require in order to defray extraordinary expenses incurred by the Company in connection with acceptance of such additional Subscription. Additional Subscriptions generally will be accepted only in increments

of $50,000, although the Manager has complete discretion to accept investments of a lesser amount or in different increments.

(c)     Members admitted to the Company subsequent to the Initial Closing Date and Members who increase their Subscriptions after the Initial Closing Date will contribute to the Company upon their admission as a Member an amount equal to (i) their Percentage Interest of all drawn Subscriptions less (ii) their Percentage Interest of all Distributions, if any, made to the Members admitted at any prior Closings. The amount so contributed by the incoming Members will be refunded to the existing Members pro rata in accordance with drawn and unreturned Subscriptions. Each Member's portion of these refunds will be added back to such Member's Subscriptions and will be subject to recall.

(d)     The investment period for the Company (the "Investment Period") will commence on the Initial Closing Date and end on the fifth anniversary of the Initial Closing Date or, if earlier, the dissolution of the Company. After the expiration of the Investment Period, the Company will not make Investments other than: (a) to fund investments expected to close within 90 days after the expiration of the Investment Period, (b) to fund investments that were in process (i.e. pursuant to a signed letter of intent or definitive agreement) at the end of the Investment Period, (c) to fund existing investment commitments in existing Portfolio Companies, or (d) to fund the exercise of any options, warrants, or convertible securities held by the Company.

3.4     Defaulting Members

(a)     *Adjustment of Company Interests*. In the event that Capital Contributions are required to be made by the Members under Article 3.3, and one or more Members (the "Contributing Members") have tendered their entire share of the required Capital Contributions, and one or more other Members (the "Non Contributing Members") have failed to tender their entire share of the required Capital Contributions, interests of the Members shall be adjusted in accordance with this Article.

(b)     *Reduction of Non-Contributing Members' Interests*. If at any time a Non-Contributing Member fails to make all or any portion of its Capital Contribution required of such Member pursuant to Article 3.3 (for this purpose, the "Defaulted Amount"), such Non-Contributing Member shall immediately be deemed to have transferred, a percentage of such Non-Contributing Member's entire interest in the Company equal to the Reduction Percentage (as defined below) of such interest. Accordingly, the Non-Contributing Member's Percentage Interest shall be reduced by a number of percentage points equal to the product obtained by multiplying (i) the Reduction Percentage by (ii) the Percentage Interest of the Non-Contributing Member. Also, the Reduction Percentage of Capital Contributions and distributions previously made by and to the Non-Contributing Member shall be deemed for purposes of this Agreement to have been made by and to the Members to which the interest is deemed transferred, and the Reduction Percentage of the Capital Account of the Non-Contributing Member shall be transferred to the Capital Accounts of the Members to which the interest is deemed transferred. For purposes hereof, the "Reduction Percentage" means an amount, expressed as a percentage, equal to the quotient of (i) two (2) times the Defaulted Amount divided by (ii) the aggregate Capital Contributions of the Non-Contributing Member as of the date of such calculation.

As an example, assume (i) that Member X's Percentage Interest is ten percent (10%), and that Member X has made aggregate Capital Contributions to the Company as of such date of $500,000, (ii) that a (first-ever) call is made for additional Capital Contributions of $500,000, (iii) that Member X is obligated to advance ten percent (10%) of the additional Capital Contributions, (iv) that Member X does not make any portion of its required additional Capital Contributions, and (v) that all the other Members make their required additional Capital Contributions. Under the preceding paragraph, the Non-Contributing Member's (Member X's) Capital Account in the Company would be reduced by an amount equal to the product of (x) [(2 x $500,000)÷$500,000], multiplied by (y) Member X's Capital Account, or 20% of Member X's Capital Account. Member X's Percentage Interest would be reduced by an amount equal to the product of (x) [(2 x $50,000)÷$500,000], multiplied by (y) 10%, or 2%. Accordingly, Member X's Percentage Interest would be reduced from 10% to 8%.

(c)     *Transfer of a Non-Contributing Member's Interest.*  Any reduction in the interest of a Non-Contributing Member under this Article shall be reflected in a simultaneous increase of the aggregate interests of the Contributing Members in a like amount. Any such aggregate increase in interests of the Contributing Members shall (i) be shared among the Contributing Members in proportion to their respective Percentage Interests immediately prior to such increase, and (ii) be automatic and without the necessity of any further action by any Member. Notwithstanding the foregoing, each Member agrees to execute such documents and take such additional actions as may be necessary to effectuate or evidence such adjustments, and each such Member hereby constitutes and appoints the Manager, its successors and permitted assigns, including, if applicable, the officers and directors of the Manager or the general partner of the Manager (and its officers and directors), to act alone as the attorney-in-fact of each such Member with full power of substitution in the names and stead of each such Member to execute, acknowledge, swear to and deliver such instruments as may be necessary or appropriate to carry out the foregoing provisions of this Article. The grant of power of attorney by each of the Members under this Article is coupled with an interest and is and shall be irrevocable, whether by reason of such Member's dissolution or for any reason whatsoever.

(d)     *Notice of Transfer of Interest.*  The Manager shall give Notice (a "Transfer Notice") to all the Members within thirty (30) days of the transfer of any Member's interest pursuant to this Article, informing the Members of such transfer, and of their revised Percentage Interests after giving effect to such dilution.

3.5     Members

The Members are the Persons listed as Members of the Company in the Company's records, as amended from time to time, and their addresses and other information for receipt of notices and the amounts of their respective Capital Contributions are set forth in such records. A Member will cease to be a Member when such Person (and such Person's estate and heirs) ceases to own any Interest and is no longer reflected as a Member in the Company's records.

The Manager will make a list of Members of the Company, including name and address, to any Member upon receipt of a written request by the Member.

3.6     Maximum Commitments of Members

(a)     No Member shall be obligated to restore a deficit balance in such Member's Capital Account or to make Capital Contributions under this Agreement in excess of the amount set out in the Subscription Documents executed by that Member.

(b)     If the Manager reasonably determines that with respect to any Member the Company has an obligation to withhold amounts to satisfy any potential tax liability, such Member (a "Withholding Member") shall be unconditionally obligated to contribute to the Company, as and when requested from time to time by the Manager, an amount equal to the amount that the Company is required to withhold and remit to the relevant taxing authority if the Manager has not otherwise withheld amounts otherwise distributable to the Member to satisfy such obligation (which the Manager is hereby authorized to do). Each Member shall provide to the Manager from time to time any information requested by the Manager to assist the Company in determining whether or not the Member is a Withholding Member or the Company's withholding obligations with respect to such Member, including providing the Manager with a Taxpayer Identification Number. Each Member hereby agrees to indemnify and hold harmless the Company, the Manager and the other Members from and against any liability (including any liability for taxes, penalties, additions to tax or interest) with respect to income attributable to or distributions or other payments to such Member.

3.7     No Interest and No Return

Except as provided in this Agreement or by law, no Member shall have any right to demand or receive the return of any Capital Contribution from the Company. Members shall not be entitled to interest on funds contributed to the capital of the Company.

3.8     Withdrawal

No Member shall be entitled to withdraw any portion of its Capital Contributions, and no Member shall have any right to a return of capital except through Distributions as provided in Article 5 or Article 9 of this Agreement.

3.9     Subscriptions

There will be an escrow account for the Company for subscribers whose Subscription amounts have been received and accepted prior to acceptance by the Manager. If accepted by the Manager as a Member, the investor's Subscription amounts will be transferred to the Company on the Business Day prior to the first Business Day of the calendar quarter. Any interest earned by the Company on accepted Subscription amounts while in the escrow account will belong to the Member. The Manager may also permit funds to be wired, upon acceptance of the subscriber as a Member, straight into the Company's account by wire on the Business Day prior to the first Business Day of the calendar quarter.

3.10     Vehicles

The Company may own Investments through corporations, limited liability companies, limited partnerships or other entities, organized in the United States of America or any foreign

jurisdictions, substantially all of the interests in which are, directly or indirectly, owned by the Company, or in joint ventures and other co-ownership vehicles organized in the United States of America or any foreign jurisdictions with third parties (any such entities through which the Company may own Investments, "Vehicles").

### 3.11  Manager Investment

The Manager, and or its affiliates will agree to limit their ownership of Interests in the Company to no more than 25% of the Interests in the Company.

## ARTICLE 4
## CAPITAL ACCOUNTS; ALLOCATIONS OF PROFIT AND LOSS

### 4.1  Capital Accounts

(a)  The Company shall maintain capital accounts for each Member in accordance with Section 704 of the Code and the Treasury Regulations promulgated thereunder (each, a "Capital Account"). The Capital Account of each Member shall be (a) increased by (i) the amount of cash and the fair market value of any other property contributed by such Member to the Company as a capital contribution (net of liabilities secured by such property or that the Company assumes or takes the property subject to) and (ii) such Member's share of the Net Profit (and other items of income and gain) of the Company and (b) decreased by (i) the amount of cash and the fair market value of any other property distributed to such Member (net of liabilities secured by such property or that the Member assumes or takes the property subject to) and (ii) such Member's share of the Net Loss (and other items of loss and deduction) of the Company. The Capital Accounts may also be adjusted as otherwise provided by Section 704 of the Code and the Treasury Regulations thereunder.

(b)  *Additional Capital Account Adjustments.* Any income of the Company that is exempt from U.S. federal income tax shall be credited to the Capital Accounts of the Members in the same manner as Net Profits are credited under Article 4.2 when such income is realized. Any expenses or expenditures of the Company which may neither be deducted nor capitalized for tax purposes (or are so treated for tax purposes) shall be charged to the Capital Accounts of the Members in the same manner as Net Losses are charged under Article 4.2. If the Company has in effect an election under Section 754 of the Code to provide a special basis adjustment upon the transfer of Units or the distribution of property by the Company, Capital Accounts shall be adjusted to the limited extent required by the Treasury Regulations under Section 704 of the Code following such transfer or distribution.

### 4.2  Allocations of Income, Gain, Loss, Deduction and Credit

The Net Profit or Net Loss of the Company for any relevant period shall be allocated to the Capital Accounts of the Members so as to ensure, to the extent possible, that the Capital Accounts of the Members as of the end of such period reflect, in the reasonable judgment of the Manager, the economics of this Agreement in accordance with Articles 5.1 and 9.3. The allocations made pursuant to this Article 4.2 are intended to comply with the provisions of Section 704(b) of the Code and the Treasury Regulations thereunder and, in particular, to reflect the Members' economic interests in the Company as set forth in Articles 5.1 and 9.3, and this

Article 4.2 shall be interpreted in a manner consistent with such intention. The Manager is entitled to make adjustments to the allocation provisions of this Agreement to the extent it determines such adjustments to be necessary or appropriate to reflect the Members' economic interests in the Company. The Manager shall have the power to make all accounting, tax and financial determinations and decisions with respect to the Company.

### 4.3    Regulatory Allocations

Although the Members do not anticipate that events will arise that will require application of this Article 4.3, provisions governing the allocation of income, gain, loss, deduction and credit (and items thereof) are included in this Agreement as may be necessary to provide that the Company's allocation provisions contain a so-called "Qualified Income Offset" and comply with all provisions relating to the allocation of so-called "Non-recourse Deductions" and "Partner Non-recourse Deductions" and the chargeback thereof as set forth in the Treasury Regulations under Section 704(b) of the Code.

### 4.4    Tax Allocations; Code Section 704(c) and Unrealized Appreciation or Depreciation.

(a)    *Generally.* Items of taxable income, gain, loss, deduction and credit of the Company shall be allocated for U.S. federal, state and local income tax purposes in the same manner as for Capital Account purposes except as otherwise provided by law.

(b)    *Contributed Assets.* In accordance with Section 704(c) of the Code, income, gain, loss and deduction with respect to any property contributed to the Company with an adjusted basis for U.S. federal income tax purposes different from the initial asset value at which such property was accepted by the Company shall, solely for tax purposes, be allocated among the Members so as to take into account such difference in the manner required by Section 704(c) of the Code and the applicable Treasury Regulations.

(c)    *Revalued Assets.* If the asset value of any assets of the Company is adjusted to reflect the issuance or redemption of interests, subsequent allocations of income, gain, loss and deduction with respect to such assets shall, solely for tax purposes, be allocated among the Members so as to take into account such adjustment in the same manner as under Section 704(c) of the Code and the applicable Treasury Regulations.

(d)    *Elections and Limitations.* The allocations required by this Article 4.4 are solely for purposes of U.S. federal, state and local income taxes and shall not affect the allocation of Net Profit or Net Loss as between Members or any Member's Capital Account. All tax allocations required by this Article 4.4 shall be made using the so-called "traditional method" described in Treasury Regulation Section 1.704-3(b); *provided, however,* that the Manager, with the advice of the Company's auditors or tax counsel, may elect to use the so-called "traditional method with curative allocations"

described in Treasury Regulation Section 1.704-3(c) or the so-called "remedial method" described in Treasury Regulation Section 1.704-3(d).

## 4.5 Changes in Members' Interest

If during any year of the Company there is a change in any Member's Interest in the Company, the Board of Managers shall confer with the tax advisors to the Company and, in conformity with such advice, allocate the Net Profit or Net Loss to the Members so as to take into account the varying Interests of the Members in the Company in a manner that complies with the provisions of Section 706 of the Code and the Treasury Regulations thereunder.

## 4.6 Withholding

(a) Notwithstanding any other provision of this Agreement, the Manager is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any withholding requirements established under the Code or any other foreign, federal, state or local law including, without limitation, pursuant to Sections 1441, 1442, 1445 and 1446 of the Code. To the extent that the Company is required to withhold and pay over to any taxing authority any amount resulting from the allocation or distribution of income to any Member or assignee (including by reason of Section 1446 of the Code), the amount withheld shall be treated as a distribution of cash in the amount of such withholding to such Interest.

(b) All amounts withheld pursuant to the Code or any provisions of any foreign, federal, state or local tax law with respect to any payment or distribution to the Company shall be treated as amounts distributed to the Members pursuant to Article 5.1 for all purposes under this Agreement. The Manager may allocate any such amounts withheld with respect to the Company among the Members in any manner that is in accordance with applicable law (taking into account the extent to which the amount withheld may vary among the Members based upon the identity and tax status of each Member). The Members shall be required, upon request by the Company, to fund their share of any applicable withholding taxes with respect to the Company.

## 4.7 Tax Matters

The Manager (or such Member as is designated by the Manager) shall be the "tax matters partner" of the Company as provided in the regulations under Section 6231 of the Code and any analogous provisions of state law, and in such capacity is referred to as the "Tax Matters Member". The Tax Matters Member, on behalf of the Company and the Members, shall be permitted to make any election under the Code and Treasury Regulations or other legal requirements relating to taxes that it in good faith believes to be in the best interests of the Company or the Members. The Tax Matters Member shall represent the Company, at the Company's expense, in connection with all examinations of the Company's affairs by tax authorities including any resulting administrative or judicial proceedings. Any Partner that receives a notice of an administrative proceeding under Section 6223 of the Code relating to the Company shall promptly notify the Tax Matters Member of such notice. No Member shall, on its United States tax return, treat any Company item in a manner that is or may be inconsistent

with the treatment of that item on the Company's return. Any Member that enters into a settlement agreement with the Secretary of the Treasury with respect to any Company item shall notify the Tax Matters Member of such agreement and its terms within sixty days after entering into such agreement. The Company shall reimburse the Manager for all costs and expenses incurred by the Manager in its capacity as Tax Matters Member. The Manager may, in its sole discretion, make or refrain from making any election under the Code or Treasury Regulations or other legal requirements related to taxes, including (but not limited to) the election contemplated by Section 754 of the Code, on behalf of the Company, and determine how to classify items of income, gain, expense or profit for federal or state income tax purposes on the Company's tax returns and the Form K-1s (or any successor form) transmitted to the Members.

### 4.8    Determination by Manager of Certain Matters

All matters concerning the valuation of Investments and other assets of the Company, the determination and allocation of expenses, the allocation of profits, gains and losses among the Members including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the Manager, whose determination shall be final and conclusive as to all of the Members. Whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion," or under a similar grant of authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires and may consider its own interests and the interests of its Affiliates, but shall have no duty or obligation to give any consideration to any interest of its Affiliates, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or the Members, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement or by law or any other agreement contemplated herein. Each Member hereby agrees that any standard of care or duty imposed in this Agreement or any other agreement contemplated herein or under the Act or any other applicable law, rule or regulation shall be modified, waived or limited in each case as required to permit the Manager to act under this Agreement or any other agreement contemplated herein and to make any decision pursuant to the authority prescribed in this Agreement so long as such action or decision does not constitute willful misconduct and is reasonably believed by the Manager to be consistent with the overall purpose of the Company.

### ARTICLE 5
### DISTRIBUTIONS AND WITHDRAWALS

### 5.1    Distributions

(a)    Net Cash Flow of the Company for each fiscal year shall be calculated and distributed not less frequently than annually. Net Cash Flow to be distributed shall initially be apportioned among the Members in proportion to their Percentage Interests and then immediately reapportioned between each Member on the one hand and the Manager on the other hand, as follows:

(i)    first, one hundred percent (100%) to such Member until such Member has received a return of such Member's Capital Contribution (net of

amounts previously returned) plus a return sufficient to cause such Member to have realized a 12% internal rate of return ("IRR");

(ii)     second, (i) 85% to such Member and (ii) 15% to the Manager until such Member has realized an 18% IRR; and

(iii )   third (i) 75% to such Member and (ii) 25% to the Manager.

(b)     From time to time, the Manager, in its sole discretion, may cause the Company to make Distributions to the Manager in amounts necessary for the Manager to pay its income tax liability resulting from the allocation of income or gains to the Manager under this Agreement. Any amount distributed to the Manager pursuant to this Article 5.1(b) shall be treated as an advance against future distributions to which the Manager is entitled pursuant to Articles 5.1(a) or 9.3(c).

(c)     Prior to the termination of the Company, unless otherwise approved by a Majority-in-Interest of the Members, all distributions will be in cash or marketable securities. Upon dissolution of the Company, distributions may also include restricted securities or other assets of the Company.

## 5.2     Voluntary Withdrawal

(a)     No Member shall have the right to withdraw or redeem any of its Interest or withdraw any of its Capital Contributions from the Company, or to demand and receive Company property in exchange for such Members' Interest.

(b)     The withdrawal, death, Disability, incapacity, adjudication of incompetency, termination, Bankruptcy, insolvency or dissolution of a Member shall not dissolve the Company; provided, however, that the Manager shall have the discretion to require the withdrawal of any such Member. The legal representatives of a Member shall succeed as assignee to the Member's Interest in the Company upon the death, Disability, incapacity, incompetency, termination, Bankruptcy, insolvency or dissolution of such Member, but shall not be admitted as a substituted Member without the consent of the Manager.

## 5.3     Required Withdrawals

(a)     At any time, the Manager, in its sole discretion, has the right to require a Member to withdraw completely from, or reduce its Interest in, the Company at any time by delivering written notice thereof to such Member (the "Withdrawal Notice"), including (but not limited to) if (i) such Member has transferred or attempted to transfer any portion of its Interest in the Company in violation of this Agreement; (ii) ownership of such Member's Interest by such Member will cause the Company to be in violation of, or require registration of any Interest in the Company under, or subject the Company or the Manager to additional regulation under, the securities or commodities laws of the United States or any other relevant jurisdiction or the rules of any self-regulatory organization applicable to the Company or the Manager; (iii) continued ownership of such Member's Interest by such Member may be harmful or injurious to the business or reputation of the Company or the Manager, or may subject the Company or any of the Members to an undue risk of adverse tax or other fiscal consequences, including

without limitation, any risk that the Company will be deemed to hold "plan assets" (as such term is defined in the Plan Asset Regulations); (iv) any of the representations and warranties made by such Member in connection with the acquisition of such Member's Interest was not true when made or has ceased to be true; (v) such Member's Interest has vested in any other person by reason of the Bankruptcy, dissolution, incompetency or death of such Member; or (vi) it would not be in the best interests of the Company for any reason, as determined by the Manager in its sole and absolute discretion, for such Member to continue ownership of such Member's Interest.

      (b)    In the event the Manager requires the withdrawal or redemption of all or a portion of a Member's Interest, then subject to provisions for the payment and discharge when due of all Company liabilities and the establishment of such Reserves for contingencies as the Manager may determine, Distribution of an amount equal to 100% of the fair market value of the Interest to be Distributed, after adjusting for the payment of the Asset Management Fee and any fees, expenses or other allocation or redemption charges, will generally be made within sixty (60) days following the date of the Withdrawal Notice. The Manager may make Distributions with respect to a required withdrawal in such other manner as it may determine, in its sole discretion. If the redemption of a Member would have an adverse or disproportionate effect on the Company's assets or performance because of illiquidity of the Company's investments or the magnitude of the withdrawal compared with the total Capital Accounts for all Members, the Manager shall have the sole discretion to delay Distribution of all or part of the redemption for a reasonable time.

    5.4    Limitations on Distributions

    Distributions to the Members are subject to the provision by the Manager for all Company liabilities in accordance with Section 57C-4-06 of the Act and for Reserves, whether or not in accordance with generally accepted accounting principles.

    5.5    Distributions Upon Liquidation and Winding-Up

    During the winding-up period the Company and through the final liquidation of its assets, the Manager, after payment or provision for payment of all amounts contemplated by Article 9.3(c)(i) through (iii), shall Distribute cash and other assets of the Company as provided in Article 9.3(c)(iv). Assets Distributed in-kind shall be Distributed pro rata in-kind as well as value unless the Manager proposes and obtains Approval of the Members for Distribution of assets pro rata in value but not in-kind.

## ARTICLE 6
## MANAGEMENT OF THE COMPANY

    6.1    Management by the Manager

    Subject to the terms and conditions of this Agreement, including without limitation, the limitations in Article 6.5, the Manager shall be the limited liability company manager of the Company and shall have complete authority over and the exclusive control and management of the business and affairs of the Company. Except as otherwise explicitly provided herein, the Manager shall have the power on behalf and in the name of the Company to implement any and

all of the objectives of the Company and to exercise any and all rights and powers the Company may possess including the power to cause the Company to make any elections available to the Company under applicable tax or other laws and the power to evaluate, make, monitor and liquidate the Company's Investments. None of the powers granted in this Article 6.1 shall be interpreted as broadening or extending powers which are specifically limited by other provisions of this Agreement, including, without limitation, those in Article 6.5.

### 6.2    Reliance by Third Parties

Persons dealing with the Company are entitled to rely conclusively upon the certificate of the Manager to the effect that it is then acting as the Manager and upon the power and authority of the Manager as herein set forth.

### 6.3    No Management by Members

The Members shall take no part in, or at any time interfere in any manner with, the management, conduct or control of the Company's business and operations and shall have no right or authority to act for or bind the Company in any manner whatsoever. The Manager shall have the authority to bind the Company.

### 6.4    Consent by Members

By their execution of the Member Signature Pages to this Agreement, the Members expressly consent to the exercise by the Manager of the rights, powers and authority conferred on the Managers by this Agreement. Where this Agreement shall be in conflict with the Act, this Agreement shall be deemed to control, where permitted.

### 6.5    Limitations on the Power of the Manager

Notwithstanding Article 6.1, without the consent of the other Managers, if any, and the Approval of the Members to the specific act, the Manager shall have no authority to cause the Company to acquire any general partner or similar unlimited liability interest in any Person.

### 6.6    Activities of the Manager

The Manager, its members and Affiliates shall devote to the Company such time as the Manager believes to be reasonably necessary for the proper supervision and management of the business of the Company and will use all reasonable efforts to promote the interests of the Company. It is expressly understood and agreed that neither the Manager nor any of its officers, directors or shareholders shall be required to devote its or their entire time or attention to the business of the Company nor shall any of them be restricted in any manner from participating in other businesses or activities. Nothing contained in this Article 6.6 shall be deemed to preclude the Manager, its members or Affiliates from exercising investment responsibility, from engaging directly or indirectly in any other business or from directly or indirectly purchasing, selling, holding or otherwise dealing with any Investments for the account of any such other business, for their own accounts, for the account of any of their family members or for the account of other clients. The investment strategies for such other accounts or clients may differ from those of the Company. The Manager and its Affiliates may give advice and recommend securities to other

managed accounts or funds which may differ from advice given to, or securities recommended or bought for, the Company even though their investment objectives may be the same or similar. The Manager and its Affiliates are not required to refrain from any other activity or to share any profits from any such activity, including acting as a general partner, managing member or investment adviser for entities with investment objectives identical or similar to those of the Company except that the Manager may not establish a blind pool investment fund or similar vehicle with investment objectives substantially similar to those of the Company until after at least 75% of the aggregate Subscriptions have been invested or committed for investment. No Member shall by reason of being a Member in the Company, have any right to participate in any manner in any profits or income earned or derived by or accruing to the Manager or any Affiliate from the conduct of any business other than the business of the Company or from any transaction in Investments effected by the Manager or such Affiliate for any account other than that of the Company.

### 6.7   Co-Investment Opportunities

The Manager, in its sole discretion, may offer to one or more of the Members the opportunity to co-invest with the Company in Investments from time to time, in such proportions as the Manager may determine in its sole discretion. The Manager may offer such co-investment opportunities to certain Members without offering the opportunity to all of the Members. The terms of any co-investment opportunity for the Members shall be no more favorable to the Members than they are to the Company.

### 6.8   Reimbursement of the Manager

Any amounts paid by the Manager, its members or Affiliates from its own funds on behalf of the Company shall be deemed an advance by such Persons to the Company if such amounts were used to pay a Company expense, outside of those expenses paid by the Manager or the Asset Management Fee (defined in Article 7.3 below). Each such advance shall accrue interest, compounded annually, at the prime rate as published by the Wall Street Journal on the date of such advance. The Manager shall be entitled, in addition to all distributions to which it is entitled hereunder by reason of its Interest in the Company, to repayment for all advances made by the Manager to the Company. Amounts paid to the Manager, its members or Affiliates pursuant to this Article 6.8 shall be treated for all purposes as amounts paid to non-Members.

### 6.9   Transactions with Other Members and Affiliates

(a)     The Manager may, on behalf of the Company, purchase or sell goods or services from, to, or enter into any arrangement or agreement with, any Member, any Affiliate, any of their respective partners, shareholders, officers, directors, members, managers or employees, or any Affiliate of any of such persons on terms and conditions which are commercially reasonable or are not materially less favorable than those available from unaffiliated third parties offering similar goods or services of good quality in the same geographic area. All profits and income earned by any such Person as a result of any such transaction shall belong to such Person and not to the Company.

(b) The Manager shall provide the Company with office space, general administrative services, professional personnel, book and record-keeping and generally meet certain day-to-day requirements of the Company. These include, without limitation, providing (and paying for or paying its allocable portion of) office space, furniture and supplies, salaries for professional, operating and management personnel of the Manager, telephone lines and other communication equipment, travel and entertainment expenses (including travel and related expenses in connection with the offer and sale of the Interests) and other "general overhead expenses" associated with the operation of the Company. As compensation for the services provided by the Manager, the Company will pay Asset Management Fee equal to 1.5% per annum (which equals the aggregate quarterly balances of the Capital Accounts multiplied by one-fourth of 1.5%) to the Manager payable at the beginning of each calendar quarter as described in Article 7.3. It is anticipated that the Manager will also, from time to time, utilize certain investment professionals to provide services, including back office and investment advisory services, to the Company. Such professionals shall be compensated by the Company or the Manager, in the Manager's sole discretion.

### 6.10 Standard of Care

(a) Neither the Manager, nor any of its Affiliates, nor its agents, officers, directors, shareholders, partners, employees, members, managers, advisers or consultants (each an "Indemnified Party") shall be liable to the Company or any Member for (i) any act or omission performed or omitted by them, including without limitation, acts performed or omitted on advice of legal counsel, accountants, brokers or consultants of the Company, any mistakes of judgment or for action or inaction which such "Indemnified Party" reasonably believed to be in the best interests of the Company, or for any costs, damages or liabilities arising therefrom or by law, unless that act or omission was performed or omitted fraudulently or in bad faith or constituted gross negligence, (ii) any tax liability imposed on the Company or any Member or (iii) any loss due to the negligence, dishonesty or bad faith of any employee, officer, broker, consultant or other agent of the Company selected, engaged or retained in good faith by the Manager.

(b) No Indemnified Party shall be liable for costs, liabilities or damages to the Company or any present or former Member with respect to claims relating to its conduct for or on behalf of the Company, except to the extent that his or its conduct (i) was not taken in good faith or (ii) constitutes willful misconduct or (iii) was grossly negligent or (iv) with respect to any criminal action, proceeding or investigation, he or it had no reasonable cause to believe his or its conduct was unlawful.

### 6.11 Indemnification

(a) The Company shall indemnify each Indemnified Party (subject to any limitation now or hereafter required by law) against any cost, losses, damages, expense (including legal or other expenses reasonably incurred in investigation or defense), amount paid in settlement, fines, judgment or liability incurred by or imposed upon an Indemnified Party in connection with any action, suit or proceeding (including civil, criminal, administrative or investigative proceedings) to which an Indemnified Party may be a party or otherwise involved or with which an Indemnified Party shall be threatened, arising out of or in connection with an

Indemnified Party's activities or involvement with the Company or the Manager; except that no Indemnified Party shall be indemnified to the extent that such liability arises from such Indemnified Party's fraud, bad faith or gross negligence. The termination of any action, suit or proceeding by judgment, order, settlement or conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party did not act in good faith. Notwithstanding the foregoing, payments shall be made pursuant to this Article 6 only to the extent that any Indemnified Party has not been made whole by the proceeds of insurance maintained by the Company or the Manager.

(b)     Indemnification under this Article 6.11 shall not be deemed exclusive of any other rights to which an Indemnified Party may be entitled under any rule of law (whether common law or statutory), agreement or arrangement, whether as to action in an official capacity or as to action in another capacity while holding such position or while employed by or acting as agent for the Company. Indemnification under this Article 6.11 shall continue as to an Indemnified Party who has ceased to serve in any capacity on behalf of the Company and shall inure to the benefit of the heirs, successors, executors and administrators of such Indemnified Party.

(c)     The Company may indemnify any employee or agent of the Company and any employee or agent of the Manager serving in any capacity on behalf of or at the request of the Manager or the Company upon such terms and conditions as the Manager considers appropriate.

(d)     The Company may purchase and maintain insurance for the benefit of any Person entitled to indemnification under Article 6.11(a) or to whom the Manager may extend rights of indemnification under Article 6.11(c) against any liability asserted against and incurred by such Person or on his or its behalf in any such capacity, or arising out of his or its status as such, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Article 6.11.

(e)     The provisions of this Article providing for indemnification of the Manager shall also apply to a liquidating trustee appointed to act and acting as a temporary general partner pursuant to Article 9 of this Agreement, as if such liquidating trustee were the Manager, and to each former Manager to the extent that an actual or alleged cause of action relates to the business of the Company during the period such former Manager was a Manager or to the performance or status of such former Manager as Manager.

6.12    Costs and Expenses

Subject to any mandatory requirements of law to the contrary, any costs and expenses for which indemnification may be provided hereunder may be paid by the Company in advance of the final disposition of any action, suit or proceeding upon receipt of an undertaking by or on behalf of an Indemnified Party to repay such costs and expenses if it should ultimately be determined that such person is not entitled to indemnification under this Article 6.

### 6.13    Limits on Indemnification

Any indemnification under this Article 6 shall be provided only out of Company assets, and no Member shall have any personal liability for the indemnification.

### 6.14    No Guaranty of Profits

The Manager is in no respect making any guaranty to the Company of profits or of protection against loss. All purchases and sales of Investments shall be for the account and risk of the Company, and the Manager shall not incur liability for trading losses resulting therefrom, except as a result of its own gross negligence or willful misconduct.

### 6.15    Not Exclusive

The indemnification and advancement of expenses provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any by-law, agreement, vote of Members or otherwise, both as to action in such Person's official capacity and as to action in another capacity while holding such office, and shall continue as to a Person who has ceased to be a Manager, officer, employee or agent and shall inure to the benefit of the successors, assigns, heirs, executors and administrators of such a Person.

### 6.16    Insurance

The Company may, but is not required to, purchase and maintain insurance on behalf of any Person who is or was a Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a director, trustee, member, Manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as such, whether or not such Person would be entitled to indemnity against such liability under the provisions of this Article.

### 6.17    Removal

(a)     The Manager may not be removed as Manager except for Cause. The determination of whether to attempt to remove the Manager for Cause shall be made only upon the vote of Members (other than the Manager and its Affiliates) whose Capital Contributions constitute at least 10% of the Capital Contributions of all Members (excluding the Manager and its Affiliates)with respect to paragraphs (a) and (b) under the definition of Cause and 75% of the Capital Contributions of all Members (excluding the Manager and its Affiliate) with respect to paragraphs (c) and (d) under the definition of Cause.

(b)     In the event of the removal of the Manager for Cause, the Manager shall retain its interest, if any, as a Member. Upon the removal of the Manager, the Members, subject to obtaining Approval, may, but shall not be required to, elect to dissolve and terminate the Company. In the event the Members do not elect to dissolve and terminate the Company, within ninety (90) days of the date of removal of the Manager, the Members, acting upon the vote of at least a Majority-in-Interest of them, shall appoint a substitute Manager.

## ARTICLE 7
## EXPENSES AND ASSET MANAGEMENT FEE

### 7.1    Pre-organization Expenses

The Company shall bear the pre-organization and on-going expenses of the Company and shall reimburse the Manager for expenses incurred by it in the name of the Company. The Members, by their execution of this Agreement, acknowledge and agree that such expenses were incurred on behalf of the Company and are hereby accepted by the Company, which ratifies and adopts any and all actions of the Manager heretofore taken in the name of or on behalf of the Company. The Manager's ascertainment of any expenses incurred by it on behalf of the Company shall be conclusive. The organizational expenses of the Company shall be expensed or amortized over such period and in such manner as the Manager shall determine.

### 7.2    Expenses

The Members acknowledge that the Company may share facilities with the Manager and its Affiliates and with other entities with which the Manager is associated and agree that certain expenses including, but not limited to, office equipment, office supplies, telephone and telex equipment, and computer access equipment may be allocated by the Manager among the Company and those entities in a manner the Manager determines in its sole discretion to be fair and equitable to the Company. The Company shall be responsible for, and the Manager shall have no responsibility for, the following items: the Company's own direct expenses, including investment and operating expenses (e.g., expenses which the Manager reasonably determines to be related to the offer and sale of Interests and the investment of the Company's assets or of portfolio transactions and positions, such as brokerage commissions, clearing and settlement charges, custodial fees, bank service fees, withholding and transfer taxes, and interest expenses), legal expenses, professional fees (including, without limitation, expenses of consultants and experts) relating to investments, accounting expenses (including the cost of accounting software packages), auditing and tax preparation expenses, organizational expenses (which shall be expensed or amortized over such period and in such manner as the Manager shall determine), government fees and taxes, expenses incurred in connection with the offering and sale of the Interests and other similar expenses related to the Company and extraordinary expenses. The Company will be responsible for and will pay and reimburse the Manager and its Affiliates for all fees, costs and expenses (including travel expenses) in connection with the identification, investigation, structuring, and negotiation of investment and disposition opportunities for the Company and monitoring of the Company's Investments, including without limitation fees, costs and expenses payable to third parties incurred in connection with the investigation of investment or disposition opportunities.

### 7.3    Asset Management Fee

The Company shall pay to the Manager on the first day of each calendar quarter a quarterly fee for management services (the "Asset Management Fee") equal to.375% (1.5% on an annualized basis) of the amounts contributed to the Company that are invested in Investments. The Manager, in its discretion, may decide that the Asset Management Fee will be reduced, eliminated or rebated with respect to the Interest of the Manager or certain Members that are

members of the Manager, affiliates of the Manager or its members, members of the immediate family of the members of the Manager, trusts or similar vehicles formed for the benefit of such persons or certain other Members as determined by the Manager in its sole discretion. The Manager is authorized to cause adjustments to contributions, distributions and allocations to effect any such reduction, elimination or rebate.

### 7.4    Fees Related to Investments

The Manager, and its members, partners, officers, directors, advisors, employees, consultants and Affiliates, may receive origination or underwriting fees from the Fund and/or Portfolio Companies in connection with the Company's acquisition of Investments. Such fees in the aggregate will not exceed 100 basis points times the purchase price of the Investment, net of any sales commissions received by the Manager. None of such fees shall offset the Asset Management Fee.

The Manager, and its members, partners, officers, directors, advisors, employees, consultants and Affiliates, may receive a disposition fee or sales commission in the amount of 3% of the sales prices of each of the Company's real estate investments, inclusive of any payment to third party brokers involved in the sale, exchange or disposition of the Investment. Should the commissions due third parties exceed that level no additional payment will be due the Manager.

### 7.5    Property Management Fee

As compensation for its services provided regarding property management, the Manager or such other third party as the Manager deems appropriate in its sole discretion, shall be entitled to be paid a fee (the "Property Management Fee") by the Company. The Property Management Fee shall be payable in accordance with the terms of a property management agreement. All such fees will be at rates and on terms that are otherwise believed to be available from an unrelated third party negotiated in arms-length transactions. The Manager will hold any Affiliates providing services to the Fund to the same standards as a third party vendor.

### 7.6    Development Fee

As compensation for its services provided regarding property development, the Manager or such other third party developer as the Manager deems appropriate in its sole discretion, shall be entitled to be paid a fee (the "Development Fee") by the Company. The Development Fee shall be payable in accordance with the terms of a development agreement. All such fees will be at rates and on terms that are otherwise believed to be available from an unrelated third party negotiated in arms-length transactions. The Manager will hold any Affiliates providing services to the Fund to the same standards as a third party vendor.

### 7.7    Placement Agent Fee

The Manager may retain placement agents (the "Placement Agents") to assist in the private placement of Interests in the Company. The Company will be responsible for paying the placement agent fees of the Placement Agents (the "Placement Agent Fees"). Such payments will not reduce the contribution to the Company by the investor, unless the investor agrees to

such an arrangement. Investors solicited by such persons will be advised of, and asked to consent to, any such compensation arrangement. In addition, the Placement Agents may, from time to time and in their sole discretion, waive all or part of the Placement Agent Fees in respect of certain other investors. The Manager is authorized to cause adjustments to contributions, distributions and allocations to effect any such waiver.

## ARTICLE 8
## POWERS AND DUTIES OF AND LIMITATIONS UPON THE MEMBERS

### 8.1    Rights of the Members

Each Member shall be entitled (i) at its expense, personally or through one or more representatives, upon five (10) Business Days' prior written notice, during regular business hours at the office of the Company maintained under Article 1.6, to obtain from time to time and upon reasonable demand subject to such confidentiality provisions as the Manager reasonably considers appropriate, true and full information regarding the state of the business and the financial condition of the Company and, promptly after becoming available, copies of the Company's federal, state and local income tax returns and reports for each calendar year; (ii) to engage in activities related and/or competitive with the Company; and (iii) to have such additional rights as are elsewhere provided in this Agreement or by mandatory requirements of applicable law.

### 8.2    Limitations on the Rights of Members

Subject to any mandatory requirements of applicable law and except as otherwise provided in this Agreement, no Member shall have the right to (i) take any part whatsoever in the management and control of the ordinary business of the Company; (ii) sign for or bind the Company; (iii) require partition of Company property or compel any sales or appraisals of Company assets or of a deceased Member's Interest (despite any provisions of law to the contrary); (iv) sell or assign such Member's Interest in the Company or constitute the buyer or assignee thereof a substituted Member; (v) require the Manager or its Affiliates to disclose the positions comprising the Company's investment portfolio; or (vi) except as specifically provided in this Agreement, have such Member's Capital Contributions repaid, demand property other than cash in payment of such Member's Capital Contributions or receive interest on such Member's Capital Contributions. No Member shall be deemed to participate in the management or control of the ordinary business of the Company by virtue of possessing or exercising any of the rights of a Member hereunder.

### 8.3    Limited Liabilities of the Members

(a)    The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or the Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or the Manager. The Members and former Members shall be liable for the repayment and discharge of all debts and obligations of the Company (all losses, liabilities or expenses) attributable to any Fiscal Year (or relevant portion thereof) during which they are or were Members only to the extent of their respective

Interests in the Company in the Fiscal Year (or relevant portion thereof) to which any such debts and obligations are attributable. A Member's or former Member's share of all losses, liabilities or expenses shall not be greater than its respective Interest for such Fiscal Year (or relevant portion thereof).

(b)    No Member has any obligation to present business opportunities to the Company.

### 8.4    Procedures to Obtain Member Approvals

(a)    The Approval of the Members may be given by a vote taken at a meeting of the Members duly called, convened and held in accordance with this Agreement or by written action that may consist of one or more counterparts delivered to the Manager or to the Members requesting such action, which counterpart or counterparts shall set forth the proposed action to be taken and contain signature sufficient to constitute Approval of the Members at such time (which may be by facsimile transmission). The Manager shall keep complete and accurate records and notify all Members of the substance of any such written action.

(b)    All Members shall be bound to all other Members by any action taken or authorized with the Approval of the Members. Each Member shall exercise all of his or its rights and powers as a Member under this Agreement and applicable law in a manner designed to effectuate the action taken or authorized by the Members and shall execute, acknowledge and deliver such consents, approvals, agreements or other documents or instruments as may be furnished from time to time by the Manager in order to effectuate the actions taken or authorized pursuant to such Approval of the Members.

(c)    Meetings of the Members may be called by the Manager. Notice of the time and place of a special meeting of the Members shall be effective if given in accordance with Article 11.5 at least five (5) Business Days prior to the date of the special meeting. Notices of such meeting shall identify the purpose of the meeting or the business to be transacted at the meeting, but the failure to specifically identify an action to be taken or business to be transacted shall not invalidate any action taken or business transacted at a meeting.

(d)    Meetings of the Members may be held at any location, within or without the United States. Members may participate in a meeting by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

(e)    Whenever notice is required to be given under this Article 8.4, a waiver of notice, signed by the Member entitled to notice, whether before or after the time of the meeting, shall be deemed equivalent to notice. A Member's attendance at a meeting shall constitute a waiver of notice of that meeting, except when the Member attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

(f)    Each Member entitled to vote at a meeting or to express consent or dissent to any Company action in writing without a meeting may authorize another Person to act for

11219191_3 DOC                                    26

him by proxy, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if; and only so long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the Interest itself or an interest in the Company generally.

(g)     Successors in interest to Members who have not been admitted as substitute Members (and the Percentage Interest attributable to the Interests to which they have succeeded) shall be ignored in determining whether any percentage required by this Article 8.4 has been achieved. The Manager or its members who also hold interests as Members shall also be ignored in determining whether any percentage required by this Article 8.4 has been achieved.

(h)     Each Member shall be entitled to notice in accordance with the provisions of Article 11.5 of any meeting of the Members and to attend and participate at any such meeting. If any Approval of the Members has been obtained by written action, each Member shall be furnished promptly with a copy of the writing by which such Approval of the Members was given.

8.5     Member Representations

(a)     Each Member represents and warrants to the Company and to each other Member that its Interest has been acquired for investment for its own account and not as nominee or agent of a principal undisclosed to the Manager or with a view toward the distribution thereof in a manner which would require the registration of the offer and sale of such Interest under the Securities Act. Such representation and warranty shall not be deemed to be limited or qualified in any way by any other provision of this Agreement.

(b)     Each Member represents and warrants to the Company and to each other Member either (i) that (A) it is entitled to be treated as the sole beneficial owner of its Interest in the Company under Section 3(c)(1)(A) of the 1940 Act and (B) it is not an investment company as such term is defined under the 1940 Act or relies on the exclusion from such definition under Sections 3(c)(1) or 3(c)(7) of the 1940 Act; or (ii) that it has notified the Manager that it cannot make the representation in clause (b)(i)(A) of this Article and has accurately represented to the Manager the number of beneficial owners that should be counted as beneficial owners of interests in the Company for purposes of Section 3(c)(1) of the 1940 Act.

8.6     Transfers by a Member

A Member may not Transfer all or any portion of its Interest, and no assignee, purchaser, or transferee may be admitted as a substitute Member, except with the prior written consent of the Manager, which consent may be given or withheld in its sole and absolute discretion. Any attempted action in contravention of this Article shall be void and of no force or effect. An assignment of an Interest shall not entitle the assignee to become or to exercise any rights or powers of a Member until such assignee is admitted as a Member in accordance with this

Agreement. The Company and the Manager shall be entitled to treat the record owner of an Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash or other property made to such owner. No Transfer of all or any portion of a Member's Interest may be made to the extent that such transfer could reasonably be expected to (i) subject the Company to U.S. federal income taxation at the entity level, (ii) result in the Company having to register as an investment company under the 1940 Act or violate applicable state or federal securities laws and such legal fees incurred shall be paid by the Member attempting such action. In addition, the following transfer restrictions will apply:

(a)     No Transfer of all or any portion or interest in the Interest of a Member in compliance with this Article 8, even if it results in the substitution of the transferee as a Member, shall release the transferor from those liabilities to the Company that survive such Transfer.

(b)     In the event of any purported or attempted Transfer of an Interest which is not made in accordance with, or which violates any of the provisions of this Agreement, the purported purchaser, assignee, transferee or successor by operation of law and shall have none of the powers or rights of a Member.

(c)     Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Member, and no transfer (or purported transfer) of all or any part of a Member's interest in the Company shall be effective and such transfer (or purported transfer) shall be void _ab_ _initio_ if, immediately following such admission or transfer, the assets of the Company would be treated as plan assets (as defined in the Plan Asset Regulations), unless otherwise determined by the Manager in its sole discretion.

(d)     Expenses of transfer, including legal fees, of the Manager and the Company shall be covered by the transferor and/or transferee. The transferor and/or transferee will indemnify the Manager and the Company for all losses or liabilities of the Manager and the Company. The transferor and/or transferee will indemnify the Manager and the Company for all losses, liabilities or expenses of the Manager and the Company attributable to inaccuracy of a representation or breach of covenant made in connection with a transfer.

8.7     Transfers by a Manager

Without the consent of the Members (except as may be required by applicable law), the Manager may withdraw as Manager and admit a new Manager at any time transferring its Manager interest to the new Manager. Except as required under the Act, changes in the members, manager, partners, officers, directors, or employees of the Manager shall not require the consent of the Members and will not dissolve the Company.

## ARTICLE 9
## DISSOLUTION AND LIQUIDATION OF THE COMPANY

9.1     Dissolution

The Company shall be dissolved upon the occurrence of any of the following events, whether or not such occurrences would cause dissolution pursuant to the Act:

(a)     the fifth anniversary of the Final Closing Date; provided, that the Manager may determine in its reasonable discretion to extend the term of the Company for up to two (2) additional one year periods by delivering ninety (90) days advance written notice thereof to the Members;

(b)     at the election of the Manager at such time as the Company holds no Investments;

(c)     the withdrawal or removal of the Manager from the Company, the Bankruptcy of the Manager or the insolvency, liquidation or dissolution or other termination of existence of the Manager if there is no additional or successor Manager elected by a Majority-in-Interest of the Members that elects to continue the Company within ninety (90) days following such event; or

(d)     the entry of a decree of judicial dissolution.

## 9.2     Existence of Members

The death, Bankruptcy, Disability, dissolution or cessation of existence of a Member shall not dissolve or terminate the Company.

## 9.3     Winding-Up and Liquidation of the Company

(a)     Upon a dissolution caused by an event described in Article 9.1(c), (i) the Manager shall cease to be authorized to act as the Manager under this Agreement (although it shall remain a Manager for all other purposes) and (ii) the Members may appoint a liquidating trustee (who may be a Member) with the Approval of the Members. The Company shall then be continued as a continuing limited liability company bound by the terms of this Agreement, the continuing limited liability company shall succeed to all Company assets and liabilities, the business of the Company shall be continued, and the liquidating trustee shall have all the rights and powers of the Manager under this Agreement (except that liquidating trustee, as such, shall have no Capital Account and no right to allocations or distributions), and shall have the right to do all acts authorized by law in this Agreement for the purposes of winding-up the affairs of the Company. The liquidation trustee shall diligently proceed to wind-up the affairs of the Company.

(b)     If Article 9.3(a) does not apply to a dissolution, the Manager, without the necessity for obtaining any consents or approvals from the Members, shall be the liquidating trustee and shall diligently proceed to wind-up the affairs of the Company, liquidate its assets, apply and distribute the assets in accordance with this Agreement and cause the cancellation of the Articles of Organization of the Company. During the time prior to the final liquidating distribution, the Company shall be continued as a continuing limited liability company bound by the terms of this Agreement, the continuing limited liability company shall succeed to all Company assets and liabilities, the business of the Company shall be continued, and the Manager shall have the right to do all acts authorized by law and this Agreement for the purpose of winding-up the affairs of the Company.

(c)     The proceeds from the liquidation of the assets of the Company shall be Distributed as follows:

(i)     to pay the debts and liabilities of the Company, including those to Members having the status of creditors other than on account of any Distributions owed to such Members pursuant to Article 5;

(ii)    to pay the expenses of liquidation;

(iii)   to establish any Reserves or other provisions deemed necessary by the Manager or the liquidating trustee, as the case may be; and

(iv)    apportioned among the Members in proportion to their Percentage Interests and then immediately reapportioned between each Member on the one hand and the Manager on the other hand, as follows:

(1)     first, one hundred percent (100%) to such Member until such Member has received a return of such Member's Capital Contribution (net of amounts previously returned) plus a return sufficient to cause such Member to have realized a 12% IRR;

(2)     second, (i) 85% to such Member and (ii) 15% to the Manager until such Member has realized an 18% IRR; and

(3)     third, (i) 75% to such Member and (ii) 25% to the Manager. until such Member has realized a 25% IRR;

(d)     If any Reserves are established pursuant to paragraph (c)(iii) of this Article 9.3, the Manager or the liquidating trustee, as the case may be, may pay over such amounts to an escrow agent to be held for payment of any contingencies which may arise and, at the expiration of such period as the Manager or the liquidating trustee, as the case may be, may specify, for distribution of any amounts remaining in the Reserve pursuant to Article 9.3(c). The Members shall look solely to the assets of the Company for the return of their contributions.

9.4     Time for Winding-Up

A reasonable time shall be allowed for the orderly liquidation of assets of the Company and the discharge or other provision of liabilities to creditors so as to enable the Manager or the liquidating trustee, as the case may be, to minimize the normal losses attendant upon a liquidation.

9.5     Final Accounting

Each of the Members shall be furnished with a statement, prepared by the Company's independent certified public accountant, setting forth the assets and liabilities of the Company as of the date of the complete liquidation. Upon the compliance by the Manager or the liquidating trustee, as the case may be, with the foregoing distribution plan, the Members shall cease to be

such, and the Manager or the liquidating trustee, as the case may be, shall execute and cause to be filed any and all documents necessary with respect to the termination and cancellation of the Company.

## ARTICLE 10
## BOOKS AND RECORDS AND ACCOUNTING

### 10.1   Books and Records

The Company shall maintain complete and accurate books and records of the Company's business and affairs in accordance with generally accepted accounting principles, consistently applied. The books and records shall be maintained at the principal place of business of the Company and shall be accessible to the Members in accordance with the Act.

### 10.2   Accounting

The accounting methods and principles to be followed by the Company shall be selected from time to time by the Manager.

### 10.3   Reports

The Company shall use commercially reasonable efforts to cause each Member to receive (i) any reports required by any governmental authority which has jurisdiction over the activities of the Company, in such detail and with such frequency as required by such governmental authority; (ii) as soon as practicable after (but in no event later than 120 days after) the close of each Fiscal Year such tax information concerning the Company as is necessary for a Member to complete its U.S. federal income tax return; (iii) as soon as practicable after (but in no event later than 120 days after) the close of each Fiscal Year, audited financial statements (including a balance sheet and statement of income) of the Company for the Fiscal Year then ended; and (iv) not later than thirty (30) days after the end of each fiscal quarter of the Company, unaudited reports on the Company's operations, including a summary report on each Investment held by the Company.

## ARTICLE 11
## MISCELLANEOUS

### 11.1   General

This Agreement (i) shall be binding on and inure to the benefit of the Members and their devises, guardians, assigns, executors, administrators, estates, heirs, and legal successors and representatives; and (ii) may be executed, by facsimile or original signature, through the use of separate signature pages or supplemental agreements in any number of counterparts with the same effect as if the parties executing such counterparts had all executed one counterpart; provided, however, that each such counterpart shall have been executed by the Manager and that the counterparts, in the aggregate, shall have been signed by all of the Members.

### 11.2    Amendments to this Agreement

Subject to the last sentence of this Article, the terms and provisions of this Agreement, including all schedules hereto, may be amended, modified or supplemented from time to time by the Manager. This Agreement may also be amended by Approval of the Members by either affirmative vote or written consent and the affirmative vote of the Manager. Any amendment that alters the limited liability of the Members under North Carolina law, raises the Asset Management Fee or alters the status of the Company as a partnership for U.S. federal income tax purposes must have the Approval of the Members or such other approvals as required by law.

### 11.3    Special Powers of Attorney

Each Member by the execution of this Agreement does irrevocably constitute and appoint the Manager, with power of substitution, as its true and lawful attorney-in-fact, in its name, place and stead, to make, execute, acknowledge, swear to, file and record in its behalf in the appropriate public offices and publish (i) this Agreement and Articles of Organization, including amendments thereto; (ii) all instruments which the Manager deems necessary or appropriate to reflect any amendment, change or modification of the Company in accordance with the terms of this Agreement; (iii) any business certificate, certificates of assumed name, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable federal, state or local law; (iv) any and all instruments, certificates, and other documents that may be deemed necessary or desirable to effect the dissolution and winding up of the Company; and (v) customer agreements with any dealers, brokerage firms, or banks. The power-of-attorney granted herein shall be irrevocable and deemed to be a power coupled with an interest and shall survive, and shall not be affected by, the subsequent death, Disability, incapacity, incompetency, termination, Bankruptcy, insolvency or dissolution of a Member provided, however, that such power of attorney will terminate upon the substitution of another member for all of such Member's Interest in the Company or upon the complete withdrawal of such Member from participation in the Company. Each Member hereby agrees to be bound by any representation made by the Manager and by any successor thereto, acting in good faith pursuant to this power-of-attorney, and each Member hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the Manager and any successor thereto, taken in good faith under this power-of-attorney. Each Member agrees, if requested, to execute a special power-of-attorney on a document separate from this Agreement. In the event of any conflict between this Agreement and any instruments filed pursuant to the Power-of-Attorney granted in this Article 11.3, this Agreement shall control.

### 11.4    Transfer of Interests

The foregoing power of attorney shall survive the delivery of an instrument of Transfer by any Member of the whole or any portion of or interest in its Interest, except that where a transferee of such Interest has been approved as a substituted or successor Member and the transferor shall thereupon cease being a partner (all in accordance with this Agreement), then the power of attorney of the transferor Member shall survive the delivery of such instrument of Transfer for the sole purpose of enabling the attorneys-in-fact for such transferor Member (or

any of them) to execute, swear to, acknowledge and file any and all instruments necessary to effectuate such Transfer and substitution or succession.

### 11.5 Notices

All notices to the Company shall be sent to the Manager at the Company's principal place of business as set forth in Article 1.6 or to such other address as the Manager may designate as the Company's principal place of business. All notices to a Member shall be sent to such Member at the address indicated in its Subscription Documents or such other address as may be specified by the Member from time to time in a notice to the Company. All notices shall be deemed given or served (i) when sent, if sent by facsimile, electronic transmission, hand delivery or by reliable overnight courier or (ii) five (5) days after being deposited in the United States mail, postage prepaid, properly addressed.

### 11.6 Waiver

Each of the Members hereby irrevocably waives any and all rights, duties, obligations and benefits with respect to any action for partition of Company property or to compel any sale or appraisal thereof or any deceased Member's interest therein. Further, all rights, duties, benefits and obligations including inventory and appraisal of the Company assets or sale of a deceased Member's interest therein, provision for which is made in the laws of North Carolina, or on account of the operation of any other rule or law of any other jurisdiction to compel any sale or appraisal of Company assets or sale or appraisal of a deceased Member's interest therein, are hereby irrevocably waived and dispensed with. The Interest of a deceased Member shall be subject to the provisions of this Agreement.

### 11.7 Notice of Tax Examinations

Any Member receiving indication that the Internal Revenue Service intends to examine any income tax return of the Company shall promptly notify the Company.

### 11.8 Whole Agreement

This Agreement, together with the Subscription Agreement and any other written agreement between the Company, the Manager and any Member concurrently with or after becoming a Member and relating to the subject matter or this Agreement (it being acknowledged and agreed that the Manager, on its own behalf or on behalf of the Company, without the consent of any other Member may enter into other written agreements (or side letters) affecting the terms hereof in order to meet certain requirements of such Member), constitutes the entire agreement between the parties pertaining to that subject matter and fully supersedes any and all prior agreements or understandings between them pertaining to that subject matter. Any provisions of any Side Letter with a Member will govern with respect to such Member, and no other Member notwithstanding the provisions of this Agreement.

### 11.9 Governing Law

This Agreement shall be governed and construed in accordance with the internal, substantive laws of the State of North Carolina, without regard to its conflict of law rules.

### 11.10  Binding Nature

Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members and their successors, personal representatives, heirs, devises, guardians and assigns.

### 11.11  Invalidity

In the event that any provision of this Agreement shall be held to be invalid, the validity of the remaining provisions of the Agreement shall not in any way be affected.

### 11.12  Counterparts; Facsimile Signatures

This Agreement and any amendment hereto may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement or amendment, as the case may be, notwithstanding that all of the parties are not signatories to the original or the same counterpart, or that signature pages from different counterparts are combined.  The signature of any party to any counterpart shall be deemed to be a signature to and may be appended to any other counterpart. The facsimile signature of the Members may be used at all times and for all purposes in place of an original signature.

### 11.13  Further Assurances

The Members shall execute and deliver such further instruments and do such further acts and things, as may be required to carry out the intent and purposes of this Agreement. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

### 11.14  Reliance upon Books, Reports and Records

Unless it has knowledge concerning the matter in question which makes its reliance unwarranted, the Manager and each Member shall, in the performance of its duties hereunder, be entitled to rely on information, opinions, reports or statements, including, without limitation, financial statements and other financial data, if prepared or presented by one or more employees of the Company or by legal counsel, accountants or other Persons as to matters such Manager or Member reasonably believes to be within such Person's professional or expert competence.

### 11.15  Construction

The headings contained in this Agreement are for reference only and shall not affect the meaning or interpretation of this Agreement.  All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.  Unless otherwise specifically stated, references to Appendices or Articles refer to the Appendices or Articles of this Agreement.

### 11.16 Consent to Jurisdiction and Service of Process

Each Member irrevocably consents to the jurisdiction of the state and federal courts located in North Carolina, agrees that any action, suit or proceeding by or among the Members (or any of them) or the Company and any Member may be brought in any court in North Carolina, and waives any objection which the Member may now or hereafter have the choice of forum whether personal jurisdiction, venue, forum non conveniens or on any other ground. Each Member hereby irrevocably designates, appoints and empowers the Secretary of State of North Carolina to receive for and on behalf of such Member service of process in the State of North Carolina and further irrevocably consents to the service of process outside of the territorial jurisdiction of said courts by mailing copies thereof by registered or certified United States mail, postage prepaid, to such Member's last known address as shown in the records of the Company with the same effect as if the Member were a resident of the State of North Carolina and had been lawfully served in such state. Nothing in this Agreement shall affect the right to service of process in any other manner permitted by law. Each Member further agrees that final judgment against it in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction within or outside the State of North Carolina by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and the amount of such judgment.

### 11.17 Confidentiality

Notwithstanding anything to the contrary in this Agreement or the Private Placement Memorandum, each Member (and each employee, representative, or other agent of a Member) may disclose to any and all Persons, without limitation of any kind, the tax treatment, tax structure and tax strategies of the Company, transactions entered into by the Company and all materials of any kind (including opinions or other tax analyses) that are provided to such Member relating to such tax treatment, tax structure and tax strategies. For this purpose, "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the Company and does not include any information relating to the identity and capital subscriptions of the Members. For the avoidance of doubt, this Article 11.17 does not impose any obligation on the Manager to disclose any information to a Member.

### 11.18 Goodwill

No value shall be placed on the name or goodwill of the Company, which shall belong exclusively to the Manager.

### 11.19 Individual Members; Community Property

Each individual Member or transferee required to become a party hereto whose Interests now are to become "community property," shall at the later of the date of this Agreement or the time when his or her spouse first has a "community property" interest in any of such Interests, cause such spouse to execute a counterpart of this Agreement and any amendment hereto executed by such Member, or another writing in form and substance satisfactory to the Company, subjecting such spouse and the spouse's "community property" interest in such Interest to the applicable provisions of this Agreement and such amendment. No spouse

11219191_3.DOC                                    35

executing this Agreement or any such writing solely by reason of his or her "community property" interest in Interests and the immediately preceding sentence, shall be considered to be a Member for any purposes whatsoever.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of the date first set forth above.

MANAGER:                                    MEMBERS:

DCG/UGOC FUNDS MANAGEMENT, LLC              Pursuant to the Power of Attorney granted to
                                            the Manager in each Member's Subscription
                                            Agreement, the Manager hereby executes this
By: _____                agreement for and on behalf of each Member.
Name:

                                            DCG/UGOC Funds Management, LLC, as
Title:                                      Attorney-in-Fact      for      each      Member

                                            By: DCG/UGOC FUNDS MANAGEMENT,
                                            LLC


                                            By: _____

                                                 Name:
                                                 Title:

**The Lodge at Bridgemill**
*a case study*



If you have any questions or need additional information about the DCG/UGOC Equity Fund, please contact any one of the following:

**From DCG (Davis Capital Group):**

Zachary J. Schuman, Director of Investor Relations
Davis Capital Group, Inc.
19315 West Catawba Ave, Suite 200
Cornelius, North Carolina 28031
704-973-9462, m 704-369-6212

**From UGOC (United Group of Companies, Inc.):**

Michael Dowd, Senior VP
UGOC
300 Jordan Road
Troy, New York 12180
518-687-7386, m 781-264-2678

John Peterson, Senior VP
UGOC
300 Jordan Road
Troy, New York 12180
518-687-7308

Bryan Harrison, Senior VP
UGOC
300 Jordan Road
Troy, New York 12180
518-687-7387, m 518-421-5751

# Exhibit "B"

# DCG/UGOC EQUITY FUND, LLC
## SUBSCRIPTION AGREEMENT

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. THE SECURITIES PURCHASED HEREUNDER MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAWS PURSUANT TO REGISTRATION OR EXEMPTION FROM REGISTRATION REQUIREMENTS THEREUNDER.

This Subscription Agreement (the "Agreement") is entered into by and between the undersigned investor (the "Investor") and DCG/UGOC Equity Fund, LLC, a North Carolina Limited Liability Company (the "Fund"), in connection with a private offering (the "Offering") of Limited Liability Company Interests in the Fund (referred to as "Units") offered through that certain Private Placement Memorandum of the Fund dated July 22, 2008, as the same may be supplemented from time to time (the "Memorandum"). The Investor understands that the minimum investment in the Fund is one (1) Unit for a total investment of $500,000.00, but that the Investor may invest more than $500,000.00. Additionally, the Manager may, in its discretion, accept a subscription for less than one (1) Unit. The Investor understands that he or it must be an "accredited investor," as such term is defined in Rule 501(a) under the Securities Act of 1933, as amended (the "Securities Act").

The Fund and the Investor hereby agree as follows:

**Sale and Purchase of Units.** The Investor hereby subscribes for and will purchase from the Fund the number of Units set forth on the signature page hereto at the total purchase price set forth thereon (the "Purchase Price"). Subject to the terms and conditions set forth herein and in the Limited Liability Company Operating Agreement of the Fund (the "Operating Agreement"), the Investor's obligation to subscribe and pay for the Units shall be complete and binding upon the execution and delivery of this Subscription Agreement.

**Payment.** The Purchase Price subscribed for by the Investor in this Subscription Agreement shall be payable upon the call of DCG/UGOC Funds Management, LLC (the "Manager") which such call shall coincide with the capital requirements of the Fund as it elects to make real estate investments and/or on the Scheduled Drawdown dates, all as more fully described in the Memorandum. All installments of the Purchase Price for Units shall be paid by cash, by check or by wire transfer to the Fund. Upon acceptance of the subscription by the Manager on behalf of the Fund the Investor will be admitted as a Member of the Fund.

2

**Representations and Warranties.** The Fund and Investor hereby represent, warrant, and agree as follows:

Representations and Warranties of the Fund.

(a) The Fund is duly formed, validly existing and in good standing under the laws of the State of North Carolina. The Fund has made available to the Investors true and complete copies of the Fund's certificate of formation (the "Certificate"), the Placement Memorandum (the "Memorandum") and the Operating Agreement (the "Operating Agreement"). Such documents will be in effect in such form on the Closing Date. The Fund has qualified to do business in all jurisdictions where the conduct of its business makes it necessary to so qualify.

(b) The Fund has or prior to the Closing Date will have taken all action required to authorize the execution and delivery of this Agreement and the issuance of the Subscription Securities. This Agreement is a legal, valid and binding obligation of the Fund, enforceable in accordance with its terms.

(c) The Subscription Securities, when issued and upon payment of the purchase price therefore, will be duly authorized and validly issued. The issuance of limited liability interest(s) is not subject to preemptive rights of any equity holder of the Fund.

Representations and Warranties of Investor.

(a) If the Investor is a natural person, he or she is twenty-one (21) years of age or older. If the Investor is a corporation, trust, partnership or other entity, it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization or formation, it has the power and authority to own its property and carry on its business as presently conducted and as contemplated by this Agreement and the Operating Agreement, and it is duly qualified to do business and is in good standing in each of the jurisdictions in which the nature of its business so requires or in which it is required for the performance of its obligations under this Agreement and the Operating Agreement.

(b) The Investor has the full right, power and authority to execute and deliver this Agreement and the Operating Agreement and to perform all of the Investor's obligations hereunder and, if the Investor is a corporation, trust, partnership or other entity, the execution, delivery, and performance of this Agreement and the Operating Agreement has been duly authorized by all necessary organizational action.

(c) Each of this Agreement and the Operating Agreement constitutes the legal, valid and binding obligation of the Investor and is enforceable in accordance with its terms, and neither the execution and delivery of this Agreement or the Operating Agreement, the consummation of the transactions contemplated hereby or thereby, nor the compliance by the Investor with any of the provisions hereof or thereof will constitute a breach or default under any agreement or other instrument or obligation to which the Investor is a party or is otherwise bound.

3

11206944 3.DOC

(d)  The Investor and its purchaser representative (if any) have received copies of the Memorandum and the Operating Agreement, and the Investor and its purchaser representative (if any) currently have, and (unless the Investor has a purchaser representative) the Investor had immediately prior to receipt of the any offer regarding the Fund, such knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of an investment in the Fund. The Investor or its purchaser representative (if any) understands the nature of an investment in the Fund and the risks associated with such an investment.  The Investor understands that there is no guarantee of any financial return on such Investor's investment in the Fund and that the Investor runs the risk of losing his or its entire investment.

(e)  The Investor is able now, and was able at the time of receipt of any offer regarding the Fund, to bear the economic risks of the Investor's investment in the Fund, including the complete loss of the investment, and the Investor's overall commitment to investments that are not readily marketable, including Units, is not disproportionate to the Investor's overall net worth.

(f)  The Investor or its purchaser representative (if any) has had the opportunity to ask questions of and receive answers from representatives of the Fund concerning the Fund and the terms and conditions of the Offering and to obtain any additional information necessary to verify the accuracy of the information furnished to the Investor concerning the Fund and the Offering.

(g)  The Investor is acquiring the Units for his or its own account and not with an intent to resell or distribute all or any part of such Units and the Investor agrees that the Investor will not resell, distribute or otherwise dispose of all or any part of the Units except in compliance with the terms of the Operating Agreement and as permitted by law, including without limitation the Securities Act. If the Investor is a corporation, trust, partnership, limited liability company or other organization, it was not organized or re-capitalized for the specific purpose of acquiring Units of the Fund, nor is it intended to be re-capitalized for such purpose.

(h)  If the Investor is a corporation, trust, partnership, limited liability company or other organization and immediately after the final closing of the Offering its commitment to contribute capital to the Fund will represent 10% or more of the total commitments of all Members to the Fund, the Investor is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act"), or an entity which would be such an "investment company" but for the exceptions provided for in Sections 3(c)(1) and (7) of the Investment Company Act.

(i)  If the Investor is a corporation, trust, partnership, limited liability company or other organization, (i) it is "one person" for purpose of Section 3(c)(1) of the Investment Company Act, and (ii) its stockholders, partners, members or other beneficial owners have no individual discretion as to their participation or non-participation in the Fund.

(j)  If the Investor is treated as a partnership, grantor trust or S corporation under U.S. federal income tax classification rules, then either (i) less than substantially all of the value of the

4

interest of each beneficial owner (direct or indirect) in the Investor is attributable to the Investor's interest in the Company or (ii) permitting the Company to satisfy the 100-partner limitation under Treas. Reg. §1.7704-1(h) is not a principal purpose of the use of the tiered arrangement involving the Investor.

(k)  If the Investor has utilized a purchaser representative, the Investor has previously given the Manager notice in writing of such fact, specifying in such notice that such investment representative would be acting as the Investor's "purchaser representative" as defined in Rule 501(h) of Regulation D under the Securities Act.

(l) The Investor understands that, in addition to the substantial restrictions on transfer of the Units contained in the Operating Agreement, the Investor must bear the economic risks of this investment for an indefinite period of time because the Units have not been registered under the Securities Act and therefore may not be sold or otherwise transferred unless they are registered under the Securities Act or unless an exemption from such registration is available. The Investor also understands that the Fund does not intend to register the Units under the Securities Act or to supply the information that may be necessary to enable the Investor to sell the Units pursuant to Rule 144 under the Securities Act. The Investor understands that the Fund is not registered, and does not intend to register, as an "investment company" under the Investment Company Act.

(m)  The Investor has been informed that the Offering is being made pursuant to an exemption from the registration requirements of the Securities Act relating to transactions by an issuer not involving any public offering, and that, consequently, the materials relating to the Offering have not been subject to the review and comment of the staff of the Securities and Exchange Commission, the National Association of Securities Dealers, Inc. or any state securities regulatory agency.

(n)  The Investor has fully and accurately completed the "Plan Asset Questionnaire" (the "Plan Asset Questionnaire") attached hereto as Exhibit B.  The Investor (i) acknowledges that in view of developments in the law and applicable regulations, or other circumstances, the Manager may require additional information from the Investor to comply with the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Internal Revenue Code of 1986, as amended (the "Code") and (ii) agrees to provide additional information reasonably requested by the Manager from time to time to determine whether the Fund is treated as holding plan assets subject to ERISA or the Code.  The Investor acknowledges that the Manager will rely on the information and representations given by the Investor, including those set forth herein and in the Plan Asset Questionnaire and those that may hereafter by given by the Investor, in determining whether assets of the Fund include assets subject to ERISA or the Code.  If the Investor has checked "yes" under either the caption "Plan Assets" or the caption "Similar Regulatory Requirements" on the Plan Asset Questionnaire, the Investor represents that:  (i) it is aware of and has taken into consideration its fiduciary duties including the diversification requirements of Section 404(a)(1)(c) of ERISA or any applicable similar law; (ii) it has concluded that its proposed investment in the Fund is a prudent one; and (iii) this subscription and the investment contemplated hereby are in accordance with all requirements

5

applicable to the Investor under its governing instruments, ERISA, the Code, and any similar laws.  The Investor hereby acknowledges and agrees that, for so long as the Fund is not deemed to hold "plan assets" (within the meaning of the Department of Labor's plan asset regulations, 29 C.F.R. § 2510.3-101, (the "Plan Asset Regulations"), as modified by the Pension Protection Act of 2006), the Manager is not a fiduciary (within the meaning of Section 3(21) of ERISA or any similar law) under ERISA or such similar law with respect to any assets of the Investor by reason of the Investor's investment in the Fund and that the Investor has not and is not relying on the Manager to provide, and that the Manager has not provided, any kind of investment advice with respect to the Investor's purchase or commitment to purchase an interest in the Fund.

(o)  The Investor is a resident of, or if an entity has its principal place of business in, the state or territory or other jurisdiction identified in the address set forth under his or its signature attached hereto and the offer of the Units in the Fund was made to the Investor either in North Carolina or in such state, territory or other jurisdiction.

(p)  The Investor, if a "U.S. Person" as defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended, has fully and accurately completed and delivered to the Company Form W-9.  The Investor, if not a U.S. Person, has fully and accurately completed and delivered to the Company Form W-8BEN, Form W-8ECI, Form W-8EXP or Form W-8IMY, as applicable, and will complete and deliver the applicable Form W-8 (or successor form) upon the expiration of any previously submitted Form W-8.  The Investor has accurately set forth such Investor's jurisdiction of organization, or if a natural person, his tax residence and country of citizenship, on the signature page hereto where indicated.

(q)  The Investor acknowledges that the Manager has advised the Investor to consult his or its own legal and tax advisors in connection with its investment.

(r)  **Investor Representation - Investors should check the OFAC website at <http://www.treas.gov/offices/enforcement/ofac> before making the following representations.**

The Investor represents that the amounts contributed by it to the Fund were not and are not directly or indirectly derived from activities that contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.

Federal regulations and Executive Orders administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals.[a]  The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <http://www.treas.gov/offices/enforcement/ofac>.  In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

---

[a] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

6

The Investor represents and warrants that, to the best of its knowledge, none of:

1) the Investor;

2) any person controlling or controlled by the Investor;

3) if the Investor is a privately held entity, any person having a beneficial interest in the Investor; or

4) any person for whom the Investor is acting as agent or nominee in connection with this investment

is a country, territory, individual or entity named on an OFAC list, nor is a person or entity prohibited under the OFAC Programs, and/or is a senior foreign political figure,[b] or any immediate family member[c] or close associate[d] of a senior foreign political figure as such terms are defined in the footnotes below.

Please be advised that the Fund may not accept any amounts from an Investor if it cannot make the representation set forth in the preceding paragraph. If an existing Investor cannot make these representations, the Fund may require the redemption of such limited partner's Interests or take such other actions as may be required under applicable law.

The Investor agrees promptly to notify the Fund should the Investor become aware of any change in the information set forth in these representations. The Investor is advised that, by law, the Fund may be obligated to "freeze the account" of such Investor, either by prohibiting additional investments from the Investor, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and the Fund may also be required to report such action and to disclose the Investor's identity to OFAC, or other applicable governmental or regulatory authorities. The Investor further acknowledges that the Fund may, by written notice to the Investor, suspend the payment of redemption proceeds payable to such Investor if the Fund reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

---

[b] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, or a senior executive of a non-U.S. government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[c] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[d] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial U.S. and non-U.S. financial transactions on behalf of the senior foreign political figure.

(s)  **THE INVESTOR HAS CAREFULLY READ AND UNDERSTANDS THE MEMORANDUM, THE OPERATING AGREEMENT, AND THIS AGREEMENT AND HAS CONSULTED HIS OR ITS OWN ATTORNEY, ACCOUNTANT, OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED BY THIS AGREEMENT AND ITS SUITABILITY FOR THE INVESTOR. NO OTHER ACKNOWLEDGMENT, REPRESENTATION, WARRANTY, OR AGREEMENT BY THE INVESTOR SHALL BE DEEMED TO LIMIT THE GENERALITY OF THIS REPRESENTATION AND WARRANTY. THE INVESTOR UNDERSTANDS THAT THE REAL ESTATE INVESTMENTS TO BE PURSUED BY THE FUND HAVE NOT BEEN IDENTIFIED AT THIS TIME AND CONSEQUENTLY INVESTORS WILL NOT BE ABLE TO EVALUATE FOR THEMSELVES THE MERITS OF A PARTICULAR REAL PROPERTY INVESTMENT PRIOR TO THE FUND INVESTING IN THE SAME. THE MANAGER WILL BE SOLELY RESPONSIBLE FOR DETERMINING FUND INVESTMENTS.**

## ACCREDITED INVESTOR STATUS

**Investor Representations as to Accredited Investor Status. One or more of the following categories of "accredited investor" (as defined in Rule 501 (a) of the Securities and Exchange Commission) correctly and in all respects describes the Investor, and the Investor has indicated in the appropriate place on the signature pane hereto which provision(s) of this Section 3.2 so describe(s) it:**

(a)  A natural person whose net worth (either individually or jointly with such person's spouse) as of the date hereof exceeds $1,000,000.

(b)  A natural person who had an individual income in excess of $200,000 or joint income with such person's spouse in excess of $300,000 in each of the last two calendar years and who reasonably expects to reach the same income level in the current calendar year.

(c)  A corporation, Massachusetts or similar business trust, partnership, limited liability company, or organization described in Section 501(c) (3) of the Code, not formed for the specific purpose of acquiring Units in the Fund, with total assets in excess of $5,000,000.

(d)  A bank (as defined in Section 3(a)(2) of the Securities Act) or a savings and loan association or other institution (as defined in Section 3(a)(5)(A) of the Securities Act), whether acting in regard to this investment in its individual or a fiduciary capacity.

(e)  A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

(f)  An insurance company (as defined in Section 2(a) (13) of the Securities Act).

(g)  An investment company registered under the Investment Company Act.

8

(h)  A business development company (as defined in Section 2(a)(48) of the Investment Company Act).

(i)  A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

(j)  A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5,000,000.

(k)  An employee benefit plan (an "ERISA Plan") within the meaning of Title I of ERISA whose decision to purchase the Units was made by a plan fiduciary (as defined in Section 3(21) of ERISA) that is either a bank, savings and loan association, insurance company or registered investment adviser.

(l)  An ERISA Plan with total assets in excess of $5,000,000.

(m)  A private business development company (as defined in Section 202(a)(22) of the Investment Advisers Act of 1940).

(n)  A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring Units in the Fund, whose purchase of such Units is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act.

(o)  An entity in which all of the equity owners fit into at least one of the categories listed under subsections (a) through (n) above.

**Adoption of Operating Agreement.** The Investor acknowledges receipt of the Operating Agreement, and hereby specifically accepts and agrees to each and every provision of such Operating Agreement as evidenced by the Investor's execution and delivery herewith of the Operating Agreement Certification attached hereto as Exhibit A.

**Default.** The Investor agrees that this Agreement shall not be revocable by the investor unless the Fund does not receive subscriptions totaling at least $3,000,000 by the Outside Closing Date of the Offering, which, in accordance with the Memorandum, shall take place no later than December 31, 2009. The Investor further agrees that this Agreement shall survive the death or disability of the Investor.

**Additional Terms.** The Investor recognizes and agrees to the additional terms and conditions of this subscription as follows:

(a)  The Manager on behalf of the Fund, in its discretion may accept all or part of this subscription.

(b)  The Manager, on behalf of the Fund, may reject, reduce or allot any or all

9

subscriptions received in such manner and in such differing proportions as the Manager in its sole discretion, shall determine.

(c) In the event of any default hereunder, or if the Manager shall determine that any representation made by the investor herein is false or is likely to be false, the Manager may, in its discretion, declare this subscription to be null and void, in which case the funds held by the Escrow Agent with respect to this subscription shall be returned to the Investor, without interest.

(d) The Investor agrees to notify the Manager by telephone and in writing if any representation or warranty of the Investor or any information pertaining to the Investor contained in this Agreement becomes untrue.

(e) The Investor agrees to indemnify and hold harmless the Fund and the Manager and its members, directors, officers, agents, affiliates and subsidiaries and any other person subject to liability because of its or his or her relationship with the foregoing persons (collectively, the "Indemnified Parties"), against all claims, losses, damages and liabilities (or actions in respect thereof) resulting from any breach by the Investor of the representations, warranties, acknowledgments or covenants set forth in this Agreement and to reimburse the Indemnified Parties for any legal and other expense incurred by the Indemnified Parties in connection with investigating and defending any such claim, loss, damage or liability; provided, however, that the Indemnified Parties shall give the Investor written notice of any such claim, loss, damage or liability upon obtaining knowledge of the same, and the Investor shall have the right to defend against the same, at his or its sole cost and expense, retaining counsel of his or its choice who is satisfactory to the Indemnified Parties, but the failure to notify the Investor shall not relieve the Investor from any indemnification obligation he or it may have hereunder to the Indemnified Parties unless such failure to give notice shall directly, materially and adversely prejudice the Investor in the defense of any such claim, loss, damage or liability.

(f) This Agreement shall be governed by and construed in accordance with the internal laws of the State of North Carolina without regard to the conflict-of-law principles thereof.

(g) The provisions of this Agreement and the Operating Agreement contain the entire agreement between the parties related to the Investor's investment in the Fund and may not be modified or waived except in writing.

(h) This Agreement and the rights, powers and duties set forth herein shall bind and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto. The Investor may not assign any of his or its rights or interests in and under this Agreement without the prior written consent of the Manager, and any attempted assignment without such consent shall be void and without effect.

(i) This Agreement may be executed in one or more counterparts and by separate parties on separate counterparts, and each of such counterparts shall constitute one and the same agreement binding on all the parties.

10

## DCG/UGOC EQUITY FUND, LLC
## SIGNATURE PAGE

Dated: **4-20** , 20**10**          INVESTOR: Most Worshipful Grand Lodge of Free

Total Number of Units **50**          Accepted Masons of Arkansas

Subscribed for herein: Printed Name(s)          Perpetual Membership Fund

Total Purchase price: **$250,000**

Social Security Number(s)/Taxpayer Identification Number: **XXXXXXXX 390**

Residence Address: **700 Scott St**

**Little Rock, AR 72201**

Telephone (home): ~~$10~~ 501-374-6408

Types(s) of Accredited Investor: **A**

(See **"Accredited Investor Status"**, page 7)

By: _____          By: _____
Print Name: **Robert Jackson**          Print Name: **James Weatherell**

Wire Transfer Instructions (if any):

Bank:_____

Account Name:_____          **$ Reinvest**

ABA Routing Number:_____

\* In addition to the representations, warranties, covenants and other agreements contained herein, by executing this Signature Page, you specifically warrant that you are an "accredited investor" as defined above.

\*\* Please notify the Fund promptly if this information changes. By executing this Signature Page, you authorize the Fund to make all distributions to you by wire transfer to the account set forth above.

11

**FOR FUND USE ONLY**

**Subscription Accepted:**     DCG/UGOC Equity Fund, LLC hereby accepts this subscription, subject to the terms and conditions herein, as of the 20ᵗʰ day of APRIL     2010

By: DCG/UGOC Equity Fund, LLC
By: DCG/UGOC Funds Management, LLC, LLC, Manager

By:
Name: MAURICE F. UCCELLIN)
Title: MANAGER

11

## EXHIBIT A

## OPERATING AGREEMENT CERTIFICATION PAGE

DCG/UGOC Equity Fund, LLC
(a North Carolina Limited Liability Company)

By signing this Operating Agreement Certification Page, the undersigned accepts and agrees to be a party to and bound by and perform all the terms and provisions of that certain Operating Agreement of DCG-UGOC Equity Fund, LLC, dated as of 4-20-2010 July 22, 2008 Amended March 11, 2009

Dated this 20th day of April, 2010.

Name(s): Robert Jackson
(please print)

Name(s): James LWeatherall

James Wertherall

13

# Exhibit "C"

## DCG/UGOC EQUITY FUND, LLC
## SUBSCRIPTION AGREEMENT

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. THE SECURITIES PURCHASED HEREUNDER MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAWS PURSUANT TO REGISTRATION OR EXEMPTION FROM REGISTRATION REQUIREMENTS THEREUNDER.

This Subscription Agreement (the "Agreement") is entered into by and between the undersigned investor (the "Investor") and DCG/UGOC Equity Fund, LLC, a North Carolina Limited Liability Company (the "Fund"), in connection with a private offering (the "Offering") of Limited Liability Company Interests in the Fund (referred to as "Units") offered through that certain Private Placement Memorandum of the Fund dated July 22, 2008, as the same may be supplemented from time to time (the "Memorandum"). The Investor understands that the minimum investment in the Fund is one (1) Unit for a total investment of $500,000.00, but that the Investor may invest more than $500,000.00. Additionally, the Manager may, in its discretion, accept a subscription for less than one (1) Unit. The Investor understands that he or it must be an "accredited investor," as such term is defined in Rule 501(a) under the Securities Act of 1933, as amended (the "Securities Act").

The Fund and the Investor hereby agree as follows:

**Sale and Purchase of Units.** The Investor hereby subscribes for and will purchase from the Fund the number of Units set forth on the signature page hereto at the total purchase price set forth thereon (the "Purchase Price"). Subject to the terms and conditions set forth herein and in the Limited Liability Company Operating Agreement of the Fund (the "Operating Agreement"), the Investor's obligation to subscribe and pay for the Units shall be complete and binding upon the execution and delivery of this Subscription Agreement.

**Payment.** The Purchase Price subscribed for by the Investor in this Subscription Agreement shall be payable upon the call of DCG/UGOC Funds Management, LLC (the "Manager") which such call shall coincide with the capital requirements of the Fund as it elects to make real estate investments and/or on the Scheduled Drawdown dates, all as more fully described in the Memorandum. All installments of the Purchase Price for Units shall be paid by cash, by check or by wire transfer to the Fund. Upon acceptance of the subscription by the Manager on behalf of the Fund the Investor will be admitted as a Member of the Fund.

2

**Representations and Warranties.** The Fund and Investor hereby represent, warrant, and agree as follows:

Representations and Warranties of the Fund.

(a) The Fund is duly formed, validly existing and in good standing under the laws of the State of North Carolina. The Fund has made available to the Investors true and complete copies of the Fund's certificate of formation (the "Certificate"), the Placement Memorandum (the "Memorandum") and the Operating Agreement (the "Operating Agreement"). Such documents will be in effect in such form on the Closing Date. The Fund has qualified to do business in all jurisdictions where the conduct of its business makes it necessary to so qualify.

(b) The Fund has or prior to the Closing Date will have taken all action required to authorize the execution and delivery of this Agreement and the issuance of the Subscription Securities. This Agreement is a legal, valid and binding obligation of the Fund, enforceable in accordance with its terms.

(c) The Subscription Securities, when issued and upon payment of the purchase price therefore, will be duly authorized and validly issued. The issuance of limited liability interest(s) is not subject to preemptive rights of any equity holder of the Fund.

Representations and Warranties of Investor.

(a) If the Investor is a natural person, he or she is twenty-one (21) years of age or older. If the Investor is a corporation, trust, partnership or other entity, it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization or formation, it has the power and authority to own its property and carry on its business as presently conducted and as contemplated by this Agreement and the Operating Agreement, and it is duly qualified to do business and is in good standing in each of the jurisdictions in which the nature of its business so requires or in which it is required for the performance of its obligations under this Agreement and the Operating Agreement.

(b) The Investor has the full right, power and authority to execute and deliver this Agreement and the Operating Agreement and to perform all of the Investor's obligations hereunder and, if the Investor is a corporation, trust, partnership or other entity, the execution, delivery, and performance of this Agreement and the Operating Agreement has been duly authorized by all necessary organizational action.

(c) Each of this Agreement and the Operating Agreement constitutes the legal, valid and binding obligation of the Investor and is enforceable in accordance with its terms, and neither the execution and delivery of this Agreement or the Operating Agreement, the consummation of the transactions contemplated hereby or thereby, nor the compliance by the Investor with any of the provisions hereof or thereof will constitute a breach or default under any agreement or other instrument or obligation to which the Investor is a party or is otherwise bound.

3

(d) The Investor and its purchaser representative (if any) have received copies of the Memorandum and the Operating Agreement, and the Investor and its purchaser representative (if any) currently have, and (unless the Investor has a purchaser representative) the Investor had immediately prior to receipt of the any offer regarding the Fund, such knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of an investment in the Fund. The Investor or its purchaser representative (if any) understands the nature of an investment in the Fund and the risks associated with such an investment. The Investor understands that there is no guarantee of any financial return on such Investor's investment in the Fund and that the Investor runs the risk of losing his or its entire investment.

(e) The Investor is able now, and was able at the time of receipt of any offer regarding the Fund, to bear the economic risks of the Investor's investment in the Fund, including the complete loss of the investment, and the Investor's overall commitment to investments that are not readily marketable, including Units, is not disproportionate to the Investor's overall net worth.

(f) The Investor or its purchaser representative (if any) has had the opportunity to ask questions of and receive answers from representatives of the Fund concerning the Fund and the terms and conditions of the Offering and to obtain any additional information necessary to verify the accuracy of the information furnished to the Investor concerning the Fund and the Offering.

(g) The Investor is acquiring the Units for his or its own account and not with an intent to resell or distribute all or any part of such Units and the Investor agrees that the Investor will not resell, distribute or otherwise dispose of all or any part of the Units except in compliance with the terms of the Operating Agreement and as permitted by law, including without limitation the Securities Act. If the Investor is a corporation, trust, partnership, limited liability company or other organization, it was not organized or re-capitalized for the specific purpose of acquiring Units of the Fund, nor is it intended to be re-capitalized for such purpose.

(h) If the Investor is a corporation, trust, partnership, limited liability company or other organization and immediately after the final closing of the Offering its commitment to contribute capital to the Fund will represent 10% or more of the total commitments of all Members to the Fund, the Investor is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act"), or an entity which would be such an "investment company" but for the exceptions provided for in Sections 3(c)(1) and (7) of the Investment Company Act.

(i) If the Investor is a corporation, trust, partnership, limited liability company or other organization, (i) it is "one person" for purpose of Section 3(c)(1) of the Investment Company Act, and (ii) its stockholders, partners, members or other beneficial owners have no individual discretion as to their participation or non-participation in the Fund.

(j) If the Investor is treated as a partnership, grantor trust or S corporation under U.S. federal income tax classification rules, then either (i) less than substantially all of the value of the

interest of each beneficial owner (direct or indirect) in the Investor is attributable to the Investor's interest in the Company or (ii) permitting the Company to satisfy the 100-partner limitation under Treas. Reg. §1.7704-1(h) is not a principal purpose of the use of the tiered arrangement involving the Investor.

(k) If the Investor has utilized a purchaser representative, the Investor has previously given the Manager notice in writing of such fact, specifying in such notice that such investment representative would be acting as the Investor's "purchaser representative" as defined in Rule 501(h) of Regulation D under the Securities Act.

(l) The Investor understands that, in addition to the substantial restrictions on transfer of the Units contained in the Operating Agreement, the Investor must bear the economic risks of this investment for an indefinite period of time because the Units have not been registered under the Securities Act and therefore may not be sold or otherwise transferred unless they are registered under the Securities Act or unless an exemption from such registration is available. The Investor also understands that the Fund does not intend to register the Units under the Securities Act or to supply the information that may be necessary to enable the Investor to sell the Units pursuant to Rule 144 under the Securities Act. The Investor understands that the Fund is not registered, and does not intend to register, as an "investment company" under the Investment Company Act.

(m) The Investor has been informed that the Offering is being made pursuant to an exemption from the registration requirements of the Securities Act relating to transactions by an issuer not involving any public offering, and that, consequently, the materials relating to the Offering have not been subject to the review and comment of the staff of the Securities and Exchange Commission, the National Association of Securities Dealers, Inc. or any state securities regulatory agency.

(n) The Investor has fully and accurately completed the "Plan Asset Questionnaire" (the "Plan Asset Questionnaire") attached hereto as Exhibit B. The Investor (i) acknowledges that in view of developments in the law and applicable regulations, or other circumstances, the Manager may require additional information from the Investor to comply with the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Internal Revenue Code of 1986, as amended (the "Code") and (ii) agrees to provide additional information reasonably requested by the Manager from time to time to determine whether the Fund is treated as holding plan assets subject to ERISA or the Code. The Investor acknowledges that the Manager will rely on the information and representations given by the Investor, including those set forth herein and in the Plan Asset Questionnaire and those that may hereafter by given by the Investor, in determining whether assets of the Fund include assets subject to ERISA or the Code. If the Investor has checked "yes" under either the caption "Plan Assets" or the caption "Similar Regulatory Requirements" on the Plan Asset Questionnaire, the Investor represents that: (i) it is aware of and has taken into consideration its fiduciary duties including the diversification requirements of Section 404(a)(1)(c) of ERISA or any applicable similar law; (ii) it has concluded that its proposed investment in the Fund is a prudent one; and (iii) this subscription and the investment contemplated hereby are in accordance with all requirements

5

applicable to the Investor under its governing instruments, ERISA, the Code, and any similar laws. The Investor hereby acknowledges and agrees that, for so long as the Fund is not deemed to hold "plan assets" (within the meaning of the Department of Labor's plan asset regulations, 29 C.F.R. § 2510.3-101, (the "Plan Asset Regulations"), as modified by the Pension Protection Act of 2006), the Manager is not a "fiduciary" (within the meaning of Section 3(21) of ERISA or any similar law) under ERISA or such similar law with respect to any assets of the Investor by reason of the Investor's investment in the Fund and that the Investor has not and is not relying on the Manager to provide, and that the Manager has not provided, any kind of investment advice with respect to the Investor's purchase or commitment to purchase an interest in the Fund.

(o)   The Investor is a resident of, or if an entity has its principal place of business in, the state or territory or other jurisdiction identified in the address set forth under his or its signature attached hereto and the offer of the Units in the Fund was made to the Investor either in North Carolina or in such state, territory or other jurisdiction.

(p)   The Investor, if a "U.S. Person" as defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended, has fully and accurately completed and delivered to the Company Form W-9.  The Investor, if not a U.S. Person, has fully and accurately completed and delivered to the Company Form W-8BEN, Form W-8ECI, Form W-8EXP or Form W-8IMY, as applicable, and will complete and deliver the applicable Form W-8 (or successor form) upon the expiration of any previously submitted Form W-8.  The Investor has accurately set forth such Investor's jurisdiction of organization, or if a natural person, his tax residence and country of citizenship, on the signature page hereto where indicated.

(q)   The Investor acknowledges that the Manager has advised the Investor to consult his or its own legal and tax advisors in connection with its investment.

(r)   **Investor Representation - Investors should check the OFAC website at <http://www.treas.gov/offices/enforcement/ofac> before making the following representations.**

The Investor represents that the amounts contributed by it to the Fund were not and are not directly or indirectly derived from activities that contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.

Federal regulations and Executive Orders administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals.[a]  The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <http://www.treas.gov/offices/enforcement/ofac>.  In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

---

[a] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

The Investor represents and warrants that, to the best of its knowledge, none of:

    1) the Investor;

    2) any person controlling or controlled by the Investor;

    3) if the Investor is a privately held entity, any person having a beneficial interest in the Investor; or

    4) any person for whom the Investor is acting as agent or nominee in connection with this investment

is a country, territory, individual or entity named on an OFAC list, nor is a person or entity prohibited under the OFAC Programs, and/or is a senior foreign political figure,[b] or any immediate family member[c] or close associate[d] of a senior foreign political figure as such terms are defined in the footnotes below.

Please be advised that the Fund may not accept any amounts from an Investor if it cannot make the representation set forth in the preceding paragraph. If an existing Investor cannot make these representations, the Fund may require the redemption of such limited partner's Interests or take such other actions as may be required under applicable law.

The Investor agrees promptly to notify the Fund should the Investor become aware of any change in the information set forth in these representations. The Investor is advised that, by law, the Fund may be obligated to "freeze the account" of such Investor, either by prohibiting additional investments from the Investor, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and the Fund may also be required to report such action and to disclose the Investor's identity to OFAC, or other applicable governmental or regulatory authorities. The Investor further acknowledges that the Fund may, by written notice to the Investor, suspend the payment of redemption proceeds payable to such Investor if the Fund reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

---

[b] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, or a senior executive of a non-U.S. government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[c] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[d] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial U.S. and non-U.S. financial transactions on behalf of the senior foreign political figure.

(s)   THE INVESTOR HAS CAREFULLY READ AND UNDERSTANDS THE MEMORANDUM, THE OPERATING AGREEMENT, AND THIS AGREEMENT AND HAS CONSULTED HIS OR ITS OWN ATTORNEY, ACCOUNTANT, OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED BY THIS AGREEMENT AND ITS SUITABILITY FOR THE INVESTOR. NO OTHER ACKNOWLEDGMENT, REPRESENTATION, WARRANTY, OR AGREEMENT BY THE INVESTOR SHALL BE DEEMED TO LIMIT THE GENERALITY OF THIS REPRESENTATION AND WARRANTY. THE INVESTOR UNDERSTANDS THAT THE REAL ESTATE INVESTMENTS TO BE PURSUED BY THE FUND HAVE NOT BEEN IDENTIFIED AT THIS TIME AND CONSEQUENTLY INVESTORS WILL NOT BE ABLE TO EVALUATE FOR THEMSELVES THE MERITS OF A PARTICULAR REAL PROPERTY INVESTMENT PRIOR TO THE FUND INVESTING IN THE SAME. THE MANAGER WILL BE SOLELY RESPONSIBLE FOR DETERMINING FUND INVESTMENTS.

## ACCREDITED INVESTOR STATUS

**Investor Representations as to Accredited Investor Status. One or more of the following categories of "accredited investor" (as defined in Rule 501 (a) of the Securities and Exchange Commission) correctly and in all respects describes the Investor, and the Investor has indicated in the appropriate place on the signature page hereto which provision(s) of this Section 3.2 so describe(s) it:**

(a)   A natural person whose net worth (either individually or jointly with such person's spouse) as of the date hereof exceeds $1,000,000.

(b)   A natural person who had an individual income in excess of $200,000 or joint income with such person's spouse in excess of $300,000 in each of the last two calendar years and who reasonably expects to reach the same income level in the current calendar year.

(c)   A corporation, Massachusetts or similar business trust, partnership, limited liability company, or organization described in Section 501(c) (3) of the Code, not formed for the specific purpose of acquiring Units in the Fund, with total assets in excess of $5,000,000.

(d)   A bank (as defined in Section 3(a)(2) of the Securities Act) or a savings and loan association or other institution (as defined in Section 3(a)(5)(A) of the Securities Act), whether acting in regard to this investment in its individual or a fiduciary capacity.

(e)   A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

(f)   An insurance company (as defined in Section 2(a) (13) of the Securities Act).

(g)   An investment company registered under the Investment Company Act.

8

(h)   A business development company (as defined in Section 2(a)(48) of the Investment Company Act).

(i)   A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

(j)   A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5,000,000.

(k)   An employee benefit plan (an "ERISA Plan") within the meaning of Title I of ERISA whose decision to purchase the Units was made by a plan fiduciary (as defined in Section 3(21) of ERISA) that is either a bank, savings and loan association, insurance company or registered investment adviser.

(l)   An ERISA Plan with total assets in excess of $5,000,000.

(m)   A private business development company (as defined in Section 202(a)(22) of the Investment Advisers Act of 1940).

(n)   A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring Units in the Fund, whose purchase of such Units is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act.

(o)   An entity in which all of the equity owners fit into at least one of the categories listed under subsections (a) through (n) above.

**Adoption of Operating Agreement.** The Investor acknowledges receipt of the Operating Agreement, and hereby specifically accepts and agrees to each and every provision of such Operating Agreement as evidenced by the Investor's execution and delivery herewith of the Operating Agreement Certification attached hereto as Exhibit A.

**Default.** The Investor agrees that this Agreement shall not be revocable by the investor unless the Fund does not receive subscriptions totaling at least $3,000,000 by the Outside Closing Date of the Offering, which, in accordance with the Memorandum, shall take place no later than December 31, 2009. The Investor further agrees that this Agreement shall survive the death or disability of the Investor.

**Additional Terms.** The Investor recognizes and agrees to the additional terms and conditions of this subscription as follows:

(a)   The Manager on behalf of the Fund, in its discretion may accept all or part of this subscription.

(b)   The Manager, on behalf of the Fund, may reject, reduce or allot any or all

9

subscriptions received in such manner and in such differing proportions as the Manager in its sole discretion, shall determine.

(c)  In the event of any default hereunder, or if the Manager shall determine that any representation made by the Investor herein is false or is likely to be false, the Manager may, in its discretion, declare this subscription to be null and void, in which case the funds held by the Escrow Agent with respect to this subscription shall be returned to the Investor, without interest.

(d)  The Investor agrees to notify the Manager by telephone and in writing if any representation or warranty of the Investor or any information pertaining to the Investor contained in this Agreement becomes untrue.

(e)  The Investor agrees to indemnify and hold harmless the Fund and the Manager and its members, directors, officers, agents, affiliates and subsidiaries and any other person subject to liability because of its or his or her relationship with the foregoing persons (collectively, the "Indemnified Parties"), against all claims, losses, damages and liabilities (or actions in respect thereof) resulting from any breach by the Investor of the representations, warranties, acknowledgments or covenants set forth in this Agreement and to reimburse the Indemnified Parties for any legal and other expense incurred by the Indemnified Parties in connection with investigating and defending any such claim, loss, damage or liability; provided, however, that the Indemnified Parties shall give the Investor written notice of any such claim, loss, damage or liability upon obtaining knowledge of the same, and the Investor shall have the right to defend against the same, at his or its sole cost and expense, retaining counsel of his or its choice who is satisfactory to the Indemnified Parties, but the failure to notify the Investor shall not relieve the Investor from any indemnification obligation he or it may have hereunder to the Indemnified Parties unless such failure to give notice shall directly, materially and adversely prejudice the Investor in the defense of any such claim, loss, damage or liability.

(f)  This Agreement shall be governed by and construed in accordance with the internal laws of the State of North Carolina without regard to the conflict-of-law principles thereof.

(g)  The provisions of this Agreement and the Operating Agreement contain the entire agreement between the parties related to the Investor's investment in the Fund and may not be modified or waived except in writing.

(h)  This Agreement and the rights, powers and duties set forth herein shall bind and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto. The Investor may not assign any of his or its rights or interests in and under this Agreement without the prior written consent of the Manager, and any attempted assignment without such consent shall be void and without effect.

(i)  This Agreement may be executed in one or more counterparts and by separate parties on separate counterparts, and each of such counterparts shall constitute one and the same agreement binding on all the parties.

10

## DCG/UGOC EQUITY FUND, LLC

### SIGNATURE PAGE

Dated: **4-20** , 20**10**

INVESTOR: Most Worshipful Grand Lodge of Free Accepted Masons of Arkansas (Board of Finance)

Total Number of Units **30**

Subscribed for herein: Printed Name(s)

Total Purchase price: **$150,000**

Social Security Number(s)/Taxpayer Identification Number: **390**

Residence Address: **700 Scott St**

**Little Rock, AR 72201**

Telephone (home): **501 - 374-6408**

Types(s) of Accredited Investor: **A**

(See **"Accredited Investor Status"**, page 7)

By: _____
Print Name: **Robert Jackson**

By: _____
Print Name: **James Weatherall**

Wire Transfer Instructions (if any):

Bank: _____

Account Name: _____

ABA Routing Number: _____

**Reinvest**

\*    In addition to the representations, warranties, covenants and other agreements contained herein, by executing this Signature Page, you specifically warrant that you are an "accredited investor" as defined above.

\*\*    Please notify the Fund promptly if this information changes. By executing this Signature Page, you authorize the Fund to make all distributions to you by wire transfer to the account set forth above.

11

**FOR FUND USE ONLY**

**Subscription Accepted:** DCG/UGOC Equity Fund, LLC hereby accepts this subscription, subject to the terms and conditions herein, as of the 20th day of __APRIL__ 2010

By: DCG/UGOC Equity Fund, LLC
By: DCG/UGOC Funds Management, LLC, LLC, Manager

By:
Name: WALTER F. VCCELLIN )
Title: MANAGER

11

## EXHIBIT A

## OPERATING AGREEMENT CERTIFICATION PAGE

DCG/UGOC Equity Fund, LLC
(a North Carolina Limited Liability Company)

By signing this Operating Agreement Certification Page, the undersigned accepts and agrees to be a party to and bound by and perform all the terms and provisions of that certain Operating Agreement of DCG-UGOC Equity Fund, LLC,
dated as of ~~4-20-2010~~ July 22, 2008 Amended March 11, 2009

Dated this _____ 20th day of April, 2010.

Name(s): **Robert Jackson**
(please print)

Name:

James Wetherall

13

# Exhibit "D"

## DCG/UGOC EQUITY FUND, LLC
## SUBSCRIPTION AGREEMENT

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. THE SECURITIES PURCHASED HEREUNDER MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAWS PURSUANT TO REGISTRATION OR EXEMPTION FROM REGISTRATION REQUIREMENTS THEREUNDER.

This Subscription Agreement (the "Agreement") is entered into by and between the undersigned investor (the "Investor") and DCG/UGOC Equity Fund, LLC, a North Carolina Limited Liability Company (the "Fund"), in connection with a private offering (the "Offering") of Limited Liability Company Interests in the Fund (referred to as "Units") offered through that certain Private Placement Memorandum of the Fund dated July 22, 2008, as the same may be supplemented from time to time (the "Memorandum"). The Investor understands that the minimum investment in the Fund is one (1) Unit for a total investment of $500,000.00, but that the Investor may invest more than $500,000.00. Additionally, the Manager may, in its discretion, accept a subscription for less than one (1) Unit. The Investor understands that he or it must be an "accredited investor," as such term is defined in Rule 501(a) under the Securities Act of 1933, as amended (the "Securities Act").

The Fund and the Investor hereby agree as follows:

**Sale and Purchase of Units.** The Investor hereby subscribes for and will purchase from the Fund the number of Units set forth on the signature page hereto at the total purchase price set forth thereon (the "Purchase Price"). Subject to the terms and conditions set forth herein and in the Limited Liability Company Operating Agreement of the Fund (the "Operating Agreement"), the Investor's obligation to subscribe and pay for the Units shall be complete and binding upon the execution and delivery of this Subscription Agreement.

**Payment.** The Purchase Price subscribed for by the Investor in this Subscription Agreement shall be payable upon the call of DCG/UGOC Funds Management, LLC (the "Manager") which such call shall coincide with the capital requirements of the Fund as it elects to make real estate investments and/or on the Scheduled Drawdown dates, all as more fully described in the Memorandum. All installments of the Purchase Price for Units shall be paid by cash, by check or by wire transfer to the Fund. Upon acceptance of the subscription by the Manager on behalf of the Fund the Investor will be admitted as a Member of the Fund.

2

**Representations and Warranties.** The Fund and Investor hereby represent, warrant, and agree as follows:

Representations and Warranties of the Fund.

(a) The Fund is duly formed, validly existing and in good standing under the laws of the State of North Carolina. The Fund has made available to the Investors true and complete copies of the Fund's certificate of formation (the "Certificate"), the Placement Memorandum (the "Memorandum") and the Operating Agreement (the "Operating Agreement"). Such documents will be in effect in such form on the Closing Date. The Fund has qualified to do business in all jurisdictions where the conduct of its business makes it necessary to so qualify.

(b) The Fund has or prior to the Closing Date will have taken all action required to authorize the execution and delivery of this Agreement and the issuance of the Subscription Securities. This Agreement is a legal, valid and binding obligation of the Fund, enforceable in accordance with its terms.

(c) The Subscription Securities, when issued and upon payment of the purchase price therefore, will be duly authorized and validly issued. The issuance of limited liability interest(s) is not subject to preemptive rights of any equity holder of the Fund.

Representations and Warranties of Investor.

(a) If the Investor is a natural person, he or she is twenty-one (21) years of age or older. If the Investor is a corporation, trust, partnership or other entity, it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization or formation, it has the power and authority to own its property and carry on its business as presently conducted and as contemplated by this Agreement and the Operating Agreement, and it is duly qualified to do business and is in good standing in each of the jurisdictions in which the nature of its business so requires or in which it is required for the performance of its obligations under this Agreement and the Operating Agreement.

(b) The Investor has the full right, power and authority to execute and deliver this Agreement and the Operating Agreement and to perform all of the Investor's obligations hereunder and, if the Investor is a corporation, trust, partnership or other entity, the execution, delivery, and performance of this Agreement and the Operating Agreement has been duly authorized by all necessary organizational action.

(c) Each of this Agreement and the Operating Agreement constitutes the legal, valid and binding obligation of the Investor and is enforceable in accordance with its terms, and neither the execution and delivery of this Agreement or the Operating Agreement, the consummation of the transactions contemplated hereby or thereby, nor the compliance by the Investor with any of the provisions hereof or thereof will constitute a breach or default under any agreement or other instrument or obligation to which the Investor is a party or is otherwise bound.

3

(d)  The Investor and its purchaser representative (if any) have received copies of the Memorandum and the Operating Agreement, and the Investor and its purchaser representative (if any) currently have, and (unless the Investor has a purchaser representative) the Investor had immediately prior to receipt of the any offer regarding the Fund, such knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of an investment in the Fund. The Investor or its purchaser representative (if any) understands the nature of an investment in the Fund and the risks associated with such an investment.  The Investor understands that there is no guarantee of any financial return on such Investor's investment in the Fund and that the Investor runs the risk of losing his or its entire investment.

(e)  The Investor is able now, and was able at the time of receipt of any offer regarding the Fund, to bear the economic risks of the Investor's investment in the Fund, including the complete loss of the investment, and the Investor's overall commitment to investments that are not readily marketable, including Units, is not disproportionate to the Investor's overall net worth.

(f)  The Investor or its purchaser representative (if any) has had the opportunity to ask questions of and receive answers from representatives of the Fund concerning the Fund and the terms and conditions of the Offering and to obtain any additional information necessary to verify the accuracy of the information furnished to the Investor concerning the Fund and the Offering.

(g)  The Investor is acquiring the Units for his or its own account and not with an intent to resell or distribute all or any part of such Units and the Investor agrees that the Investor will not resell, distribute or otherwise dispose of all or any part of the Units except in compliance with the terms of the Operating Agreement and as permitted by law, including without limitation the Securities Act. If the Investor is a corporation, trust, partnership, limited liability company or other organization, it was not organized or re-capitalized for the specific purpose of acquiring Units of the Fund, nor is it intended to be re-capitalized for such purpose.

(h)  If the Investor is a corporation, trust, partnership, limited liability company or other organization and immediately after the final closing of the Offering its commitment to contribute capital to the Fund will represent 10% or more of the total commitments of all Members to the Fund, the Investor is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act"), or an entity which would be such an "investment company" but for the exceptions provided for in Sections 3(c)(1) and (7) of the Investment Company Act.

(i)  If the Investor is a corporation, trust, partnership, limited liability company or other organization, (i) it is "one person" for purpose of Section 3(c)(1) of the Investment Company Act, and (ii) its stockholders, partners, members or other beneficial owners have no individual discretion as to their participation or non-participation in the Fund.

(j)  If the Investor is treated as a partnership, grantor trust or S corporation under U.S. federal income tax classification rules, then either (i) less than substantially all of the value of the

4

interest of each beneficial owner (direct or indirect) in the Investor is attributable to the Investor's interest in the Company or (ii) permitting the Company to satisfy the 100-partner limitation under Treas. Reg. §1.7704-1(h) is not a principal purpose of the use of the tiered arrangement involving the Investor.

(k) If the Investor has utilized a purchaser representative, the Investor has previously given the Manager notice in writing of such fact, specifying in such notice that such investment representative would be acting as the Investor's "purchaser representative" as defined in Rule 501(h) of Regulation D under the Securities Act.

(1) The Investor understands that, in addition to the substantial restrictions on transfer of the Units contained in the Operating Agreement, the Investor must bear the economic risks of this investment for an indefinite period of time because the Units have not been registered under the Securities Act and therefore may not be sold or otherwise transferred unless they are registered under the Securities Act or unless an exemption from such registration is available. The Investor also understands that the Fund does not intend to register the Units under the Securities Act or to supply the information that may be necessary to enable the Investor to sell the Units pursuant to Rule 144 under the Securities Act. The Investor understands that the Fund is not registered, and does not intend to register, as an "investment company" under the Investment Company Act.

(m) The Investor has been informed that the Offering is being made pursuant to an exemption from the registration requirements of the Securities Act relating to transactions by an issuer not involving any public offering, and that, consequently, the materials relating to the Offering have not been subject to the review and comment of the staff of the Securities and Exchange Commission, the National Association of Securities Dealers, Inc. or any state securities regulatory agency.

(n) The Investor has fully and accurately completed the "Plan Asset Questionnaire" (the "Plan Asset Questionnaire") attached hereto as Exhibit B. The Investor (i) acknowledges that in view of developments in the law and applicable regulations, or other circumstances, the Manager may require additional information from the Investor to comply with the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Internal Revenue Code of 1986, as amended (the "Code") and (ii) agrees to provide additional information reasonably requested by the Manager from time to time to determine whether the Fund is treated as holding plan assets subject to ERISA or the Code. The Investor acknowledges that the Manager will rely on the information and representations given by the Investor, including those set forth herein and in the Plan Asset Questionnaire and those that may hereafter by given by the Investor, in determining whether assets of the Fund include assets subject to ERISA or the Code. If the Investor has checked "yes" under either the caption "Plan Assets" or the caption "Similar Regulatory Requirements" on the Plan Asset Questionnaire, the Investor represents that: (i) it is aware of and has taken into consideration its fiduciary duties including the diversification requirements of Section 404(a)(1)(c) of ERISA or any applicable similar law; (ii) it has concluded that its proposed investment in the Fund is a prudent one; and (iii) this subscription and the investment contemplated hereby are in accordance with all requirements

5

applicable to the Investor under its governing instruments, ERISA, the Code, and any similar laws. The Investor hereby acknowledges and agrees that, for so long as the Fund is not deemed to hold "plan assets" (within the meaning of the Department of Labor's plan asset regulations, 29 C.F.R. § 2510.3-101, (the "Plan Asset Regulations"), as modified by the Pension Protection Act of 2006), the Manager is not a "fiduciary" (within the meaning of Section 3(21) of ERISA or any similar law) under ERISA or such similar law with respect to any assets of the Investor by reason of the Investor's investment in the Fund and that the Investor has not and is not relying on the Manager to provide, and that the Manager has not provided, any kind of investment advice with respect to the Investor's purchase or commitment to purchase an interest in the Fund.

(o) The Investor is a resident of, or if an entity has its principal place of business in, the state or territory or other jurisdiction identified in the address set forth under his or its signature attached hereto and the offer of the Units in the Fund was made to the Investor either in North Carolina or in such state, territory or other jurisdiction.

(p) The Investor, if a "U.S. Person" as defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended, has fully and accurately completed and delivered to the Company Form W-9. The Investor, if not a U.S. Person, has fully and accurately completed and delivered to the Company Form W-8BEN, Form W-8ECI, Form W-8EXP or Form W-8IMY, as applicable, and will complete and deliver the applicable Form W-8 (or successor form) upon the expiration of any previously submitted Form W-8. The Investor has accurately set forth such Investor's jurisdiction of organization, or if a natural person, his tax residence and country of citizenship, on the signature page hereto where indicated.

(q) The Investor acknowledges that the Manager has advised the Investor to consult his or its own legal and tax advisors in connection with its investment.

### (r) **Investor Representation - Investors should check the OFAC website at <http://www.treas.gov/offices/enforcement/ofac> before making the following representations.**

The Investor represents that the amounts contributed by it to the Fund were not and are not directly or indirectly derived from activities that contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.

Federal regulations and Executive Orders administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals.[a] The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <http://www.treas.gov/offices/enforcement/ofac>. In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

---

[a] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

6

The Investor represents and warrants that, to the best of its knowledge, none of:

    1) the Investor;

    2) any person controlling or controlled by the Investor;

    3) if the Investor is a privately held entity, any person having a beneficial interest in the Investor; or

    4) any person for whom the Investor is acting as agent or nominee in connection with this investment

is a country, territory, individual or entity named on an OFAC list, nor is a person or entity prohibited under the OFAC Programs, and/or is a senior foreign political figure,[b] or any immediate family member[c] or close associate[d] of a senior foreign political figure as such terms are defined in the footnotes below.

Please be advised that the Fund may not accept any amounts from an Investor if it cannot make the representation set forth in the preceding paragraph. If an existing Investor cannot make these representations, the Fund may require the redemption of such limited partner's Interests or take such other actions as may be required under applicable law.

The Investor agrees promptly to notify the Fund should the Investor become aware of any change in the information set forth in these representations. The Investor is advised that, by law, the Fund may be obligated to "freeze the account" of such Investor, either by prohibiting additional investments from the Investor, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and the Fund may also be required to report such action and to disclose the Investor's identity to OFAC, or other applicable governmental or regulatory authorities. The Investor further acknowledges that the Fund may, by written notice to the Investor, suspend the payment of redemption proceeds payable to such Investor if the Fund reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

---

[b] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, or a senior executive of a non-U.S. government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[c] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[d] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial U.S. and non-U.S. financial transactions on behalf of the senior foreign political figure.

7

(s) **THE INVESTOR HAS CAREFULLY READ AND UNDERSTANDS THE MEMORANDUM, THE OPERATING AGREEMENT, AND THIS AGREEMENT AND HAS CONSULTED HIS OR ITS OWN ATTORNEY, ACCOUNTANT, OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED BY THIS AGREEMENT AND ITS SUITABILITY FOR THE INVESTOR. NO OTHER ACKNOWLEDGMENT, REPRESENTATION, WARRANTY, OR AGREEMENT BY THE INVESTOR SHALL BE DEEMED TO LIMIT THE GENERALITY OF THIS REPRESENTATION AND WARRANTY. THE INVESTOR UNDERSTANDS THAT THE REAL ESTATE INVESTMENTS TO BE PURSUED BY THE FUND HAVE NOT BEEN IDENTIFIED AT THIS TIME AND CONSEQUENTLY INVESTORS WILL NOT BE ABLE TO EVALUATE FOR THEMSELVES THE MERITS OF A PARTICULAR REAL PROPERTY INVESTMENT PRIOR TO THE FUND INVESTING IN THE SAME. THE MANAGER WILL BE SOLELY RESPONSIBLE FOR DETERMINING FUND INVESTMENTS.**

## ACCREDITED INVESTOR STATUS

**Investor Representations as to Accredited Investor Status. One or more of the following categories of "accredited investor" (as defined in Rule 501 (a) of the Securities and Exchange Commission) correctly and in all respects describes the Investor, and the Investor has indicated in the appropriate place on the signature pane hereto which provision(s) of this Section 3.2 so describe(s) it:**

(a) A natural person whose net worth (either individually or jointly with such person's spouse) as of the date hereof exceeds $1,000,000.

(b) A natural person who had an individual income in excess of $200,000 or joint income with such person's spouse in excess of $300,000 in each of the last two calendar years and who reasonably expects to reach the same income level in the current calendar year.

(c) A corporation, Massachusetts or similar business trust, partnership, limited liability company, or organization described in Section 501(c) (3) of the Code, not formed for the specific purpose of acquiring Units in the Fund, with total assets in excess of $5,000,000.

(d) A bank (as defined in Section 3(a)(2) of the Securities Act) or a savings and loan association or other institution (as defined in Section 3(a)(5)(A) of the Securities Act), whether acting in regard to this investment in its individual or a fiduciary capacity.

(e) A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

(f) An insurance company (as defined in Section 2(a) (13) of the Securities Act).

(g) An investment company registered under the Investment Company Act.

8

(h) A business development company (as defined in Section 2(a)(48) of the Investment Company Act).

(i) A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

(j) A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5,000,000.

(k) An employee benefit plan (an "ERISA Plan") within the meaning of Title I of ERISA whose decision to purchase the Units was made by a plan fiduciary (as defined in Section 3(21) of ERISA) that is either a bank, savings and loan association, insurance company or registered investment adviser.

(l) An ERISA Plan with total assets in excess of $5,000,000.

(m) A private business development company (as defined in Section 202(a)(22) of the Investment Advisers Act of 1940).

(n) A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring Units in the Fund, whose purchase of such Units is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act.

(o) An entity in which all of the equity owners fit into at least one of the categories listed under subsections (a) through (n) above.

**Adoption of Operating Agreement.** The Investor acknowledges receipt of the Operating Agreement, and hereby specifically accepts and agrees to each and every provision of such Operating Agreement as evidenced by the Investor's execution and delivery herewith of the Operating Agreement Certification attached hereto as Exhibit A.

**Default.** The Investor agrees that this Agreement shall not be revocable by the investor unless the Fund does not receive subscriptions totaling at least $3,000,000 by the Outside Closing Date of the Offering, which, in accordance with the Memorandum, shall take place no later than December 31, 2009. The Investor further agrees that this Agreement shall survive the death or disability of the Investor.

**Additional Terms.** The Investor recognizes and agrees to the additional terms and conditions of this subscription as follows:

(a) The Manager on behalf of the Fund, in its discretion may accept all or part of this subscription.

(b) The Manager, on behalf of the Fund, may reject, reduce or allot any or all

9

subscriptions received in such manner and in such differing proportions as the Manager in its sole discretion, shall determine.

(c)  In the event of any default hereunder, or if the Manager shall determine that any representation made by the investor herein is false or is likely to be false, the Manager may, in its discretion, declare this subscription to be null and void, in which case the funds held by the Escrow Agent with respect to this subscription shall be returned to the Investor, without interest.

(d)  The Investor agrees to notify the Manager by telephone and in writing if any representation or warranty of the Investor or any information pertaining to the Investor contained in this Agreement becomes untrue.

(e)  The Investor agrees to indemnify and hold harmless the Fund and the Manager and its members, directors, officers, agents, affiliates and subsidiaries and any other person subject to liability because of its or his or her relationship with the foregoing persons (collectively, the "Indemnified Parties"), against all claims, losses, damages and liabilities (or actions in respect thereof) resulting from any breach by the Investor of the representations, warranties, acknowledgments or covenants set forth in this Agreement and to reimburse the Indemnified Parties for any legal and other expense incurred by the Indemnified Parties in connection with investigating and defending any such claim, loss, damage or liability; provided, however, that the Indemnified Parties shall give the Investor written notice of any such claim, loss, damage or liability upon obtaining knowledge of the same, and the Investor shall have the right to defend against the same, at his or its sole cost and expense, retaining counsel of his or its choice who is satisfactory to the Indemnified Parties, but the failure to notify the Investor shall not relieve the Investor from any indemnification obligation he or it may have hereunder to the Indemnified Parties unless such failure to give notice shall directly, materially and adversely prejudice the Investor in the defense of any such claim, loss, damage or liability.

(f)  This Agreement shall be governed by and construed in accordance with the internal laws of the State of North Carolina without regard to the conflict-of-law principles thereof.

(g)  The provisions of this Agreement and the Operating Agreement contain the entire agreement between the parties related to the Investor's investment in the Fund and may not be modified or waived except in writing.

(h)  This Agreement and the rights, powers and duties set forth herein shall bind and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto. The Investor may not assign any of his or its rights or interests in and under this Agreement without the prior written consent of the Manager, and any attempted assignment without such consent shall be void and without effect.

(i)  This Agreement may be executed in one or more counterparts and by separate parties on separate counterparts, and each of such counterparts shall constitute one and the same agreement binding on all the parties.

10

## DCG/UGOC EQUITY FUND, LLC
## SIGNATURE PAGE

Dated: **4-20** , 20**10**          INVESTOR: Most Worshipful Grand Lodge of Free
Total Number of Units     **10**          Accepted Masons of Arkansas
                                          Hall Memorial Fund
Subscribed for herein: Printed Name(s)

Total Purchase price:  **$50,000**

Social Security Number(s)/Taxpayer Identification Number:  **390**

Residence Address:  **700 Scott St**

           **Little Rock, AR 72201**

Telephone (home):

Types(s) of Accredited Investor:

(See **"Accredited Investor Status"**, page 7)

By:                              By: James L. Weatherall
Print Name: **Robert Jackson**    Print Name: James Weatherall

Wire Transfer Instructions (if any):

Bank:

Account Name:                    ⊞ Reinvest

ABA Routing Number:

\*      In addition to the representations, warranties, covenants and other agreements contained
herein, by executing this Signature Page, you specifically warrant that you are an "accredited
investor" as defined above.

\*\*      Please notify the Fund promptly if this information changes. By executing this Signature
Page, you authorize the Fund to make all distributions to you by wire transfer to the account set
forth above.

11

**FOR FUND USE ONLY**

**Subscription Accepted:**     DCG/UGOC Equity Fund, LLC hereby accepts this subscription, subject to the terms and conditions herein, as of the _20th_ day of _APRIL_ ____ 2010

By: DCG/UGOC Equity Fund, LLC
By: DCG/UGOC Funds Management, LLC, LLC, Manager

By: _____
Name: _WALTER F. UCCELLINI_
Title: _MANAGER_

11

## EXHIBIT A

## OPERATING AGREEMENT CERTIFICATION PAGE

DCG/UGOC Equity Fund, LLC
(a North Carolina Limited Liability Company)

By signing this Operating Agreement Certification Page, the undersigned accepts and agrees to be a party to and bound by and perform all the terms and provisions of that certain Operating Agreement of DCG-UGOC Equity Fund, LLC,
dated as of 4-20-2010 July 20, 2008 Amended March 11, 2009

Dated this ___ 20th day of April 2010.

Name(s): Robert Jackson
(please print)

Names: James Luke Thrall

James Wertherall

13

# Exhibit "E"

# DCG/UGOC EQUITY FUND, LLC
## SUBSCRIPTION AGREEMENT

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. THE SECURITIES PURCHASED HEREUNDER MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAWS PURSUANT TO REGISTRATION OR EXEMPTION FROM REGISTRATION REQUIREMENTS THEREUNDER.

This Subscription Agreement (the "Agreement") is entered into by and between the undersigned investor (the "Investor") and DCG/UGOC Equity Fund, LLC, a North Carolina Limited Liability Company (the "Fund"), in connection with a private offering (the "Offering") of Limited Liability Company Interests in the Fund (referred to as "Units") offered through that certain Private Placement Memorandum of the Fund dated July 22, 2008, as the same may be supplemented from time to time (the "Memorandum"). The Investor understands that the minimum investment in the Fund is one (1) Unit for a total investment of $500,000.00, but that the Investor may invest more than $500,000.00. Additionally, the Manager may, in its discretion, accept a subscription for less than one (1) Unit. The Investor understands that he or it must be an "accredited investor," as such term is defined in Rule 501(a) under the Securities Act of 1933, as amended (the "Securities Act").

The Fund and the Investor hereby agree as follows:

**Sale and Purchase of Units.** The Investor hereby subscribes for and will purchase from the Fund the number of Units set forth on the signature page hereto at the total purchase price set forth thereon (the "Purchase Price"). Subject to the terms and conditions set forth herein and in the Limited Liability Company Operating Agreement of the Fund (the "Operating Agreement"), the Investor's obligation to subscribe and pay for the Units shall be complete and binding upon the execution and delivery of this Subscription Agreement.

**Payment.** The Purchase Price subscribed for by the Investor in this Subscription Agreement shall be payable upon the call of DCG/UGOC Funds Management, LLC (the "Manager") which such call shall coincide with the capital requirements of the Fund as it elects to make real estate investments and/or on the Scheduled Drawdown dates, all as more fully described in the Memorandum. All installments of the Purchase Price for Units shall be paid by cash, by check or by wire transfer to the Fund. Upon acceptance of the subscription by the Manager on behalf of the Fund the Investor will be admitted as a Member of the Fund.

2

**Representations and Warranties.** The Fund and Investor hereby represent, warrant, and agree as follows:

Representations and Warranties of the Fund.

(a) The Fund is duly formed, validly existing and in good standing under the laws of the State of North Carolina. The Fund has made available to the Investors true and complete copies of the Fund's certificate of formation (the "Certificate"), the Placement Memorandum (the "Memorandum") and the Operating Agreement (the "Operating Agreement"). Such documents will be in effect in such form on the Closing Date. The Fund has qualified to do business in all jurisdictions where the conduct of its business makes it necessary to so qualify.

(b) The Fund has or prior to the Closing Date will have taken all action required to authorize the execution and delivery of this Agreement and the issuance of the Subscription Securities. This Agreement is a legal, valid and binding obligation of the Fund, enforceable in accordance with its terms.

(c) The Subscription Securities, when issued and upon payment of the purchase price therefore, will be duly authorized and validly issued. The issuance of limited liability interest(s) is not subject to preemptive rights of any equity holder of the Fund.

Representations and Warranties of Investor.

(a) If the Investor is a natural person, he or she is twenty-one (21) years of age or older. If the Investor is a corporation, trust, partnership or other entity, it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization or formation, it has the power and authority to own its property and carry on its business as presently conducted and as contemplated by this Agreement and the Operating Agreement, and it is duly qualified to do business and is in good standing in each of the jurisdictions in which the nature of its business so requires or in which it is required for the performance of its obligations under this Agreement and the Operating Agreement.

(b) The Investor has the full right, power and authority to execute and deliver this Agreement and the Operating Agreement and to perform all of the Investor's obligations hereunder and, if the Investor is a corporation, trust, partnership or other entity, the execution, delivery, and performance of this Agreement and the Operating Agreement has been duly authorized by all necessary organizational action.

(c) Each of this Agreement and the Operating Agreement constitutes the legal, valid and binding obligation of the Investor and is enforceable in accordance with its terms, and neither the execution and delivery of this Agreement or the Operating Agreement, the consummation of the transactions contemplated hereby or thereby, nor the compliance by the Investor with any of the provisions hereof or thereof will constitute a breach or default under any agreement or other instrument or obligation to which the Investor is a party or is otherwise bound.

3

(d)  The Investor and its purchaser representative (if any) have received copies of the Memorandum and the Operating Agreement, and the Investor and its purchaser representative (if any) currently have, and (unless the Investor has a purchaser representative) the Investor had immediately prior to receipt of the any offer regarding the Fund, such knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of an investment in the Fund. The Investor or its purchaser representative (if any) understands the nature of an investment in the Fund and the risks associated with such an investment.   The Investor understands that there is no guarantee of any financial return on such Investor's investment in the Fund and that the Investor runs the risk of losing his or its entire investment.

(e)  The Investor is able now, and was able at the time of receipt of any offer regarding the Fund, to bear the economic risks of the Investor's investment in the Fund, including the complete loss of the investment, and the Investor's overall commitment to investments that are not readily marketable, including Units, is not disproportionate to the Investor's overall net worth.

(f)  The Investor or its purchaser representative (if any) has had the opportunity to ask questions of and receive answers from representatives of the Fund concerning the Fund and the terms and conditions of the Offering and to obtain any additional information necessary to verify the accuracy of the information furnished to the Investor concerning the Fund and the Offering.

(g)  The Investor is acquiring the Units for his or its own account and not with an intent to resell or distribute all or any part of such Units and the Investor agrees that the Investor will not resell, distribute or otherwise dispose of all or any part of the Units except in compliance with the terms of the Operating Agreement and as permitted by law, including without limitation the Securities Act. If the Investor is a corporation, trust, partnership, limited liability company or other organization, it was not organized or re-capitalized for the specific purpose of acquiring Units of the Fund, nor is it intended to be re-capitalized for such purpose.

(h)  If the Investor is a corporation, trust, partnership, limited liability company or other organization and immediately after the final closing of the Offering its commitment to contribute capital to the Fund will represent 10% or more of the total commitments of all Members to the Fund, the Investor is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act"), or an entity which would be such an "investment company" but for the exceptions provided for in Sections 3(c)(1) and (7) of the Investment Company Act.

(i)  If the Investor is a corporation, trust, partnership, limited liability company or other organization, (i) it is "one person" for purpose of Section 3(c)(1) of the Investment Company Act, and (ii) its stockholders, partners, members or other beneficial owners have no individual discretion as to their participation or non-participation in the Fund.

(j)  If the Investor is treated as a partnership, grantor trust or S corporation under U.S. federal income tax classification rules, then either (i) less than substantially all of the value of the

4

interest of each beneficial owner (direct or indirect) in the Investor is attributable to the Investor's interest in the Company or (ii) permitting the Company to satisfy the 100-partner limitation under Treas. Reg. §1.7704-1(h) is not a principal purpose of the use of the tiered arrangement involving the Investor.

(k) If the Investor has utilized a purchaser representative, the Investor has previously given the Manager notice in writing of such fact, specifying in such notice that such investment representative would be acting as the Investor's "purchaser representative" as defined in Rule 501(h) of Regulation D under the Securities Act.

(l) The Investor understands that, in addition to the substantial restrictions on transfer of the Units contained in the Operating Agreement, the Investor must bear the economic risks of this investment for an indefinite period of time because the Units have not been registered under the Securities Act and therefore may not be sold or otherwise transferred unless they are registered under the Securities Act or unless an exemption from such registration is available. The Investor also understands that the Fund does not intend to register the Units under the Securities Act or to supply the information that may be necessary to enable the Investor to sell the Units pursuant to Rule 144 under the Securities Act. The Investor understands that the Fund is not registered, and does not intend to register, as an "investment company" under the Investment Company Act.

(m) The Investor has been informed that the Offering is being made pursuant to an exemption from the registration requirements of the Securities Act relating to transactions by an issuer not involving any public offering, and that, consequently, the materials relating to the Offering have not been subject to the review and comment of the staff of the Securities and Exchange Commission, the National Association of Securities Dealers, Inc. or any state securities regulatory agency.

(n) The Investor has fully and accurately completed the "Plan Asset Questionnaire" (the "Plan Asset Questionnaire") attached hereto as Exhibit B. The Investor (i) acknowledges that in view of developments in the law and applicable regulations, or other circumstances, the Manager may require additional information from the Investor to comply with the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Internal Revenue Code of 1986, as amended (the "Code") and (ii) agrees to provide additional information reasonably requested by the Manager from time to time to determine whether the Fund is treated as holding plan assets subject to ERISA or the Code. The Investor acknowledges that the Manager will rely on the information and representations given by the Investor, including those set forth herein and in the Plan Asset Questionnaire and those that may hereafter by given by the Investor, in determining whether assets of the Fund include assets subject to ERISA or the Code. If the Investor has checked "yes" under either the caption "Plan Assets" or the caption "Similar Regulatory Requirements" on the Plan Asset Questionnaire, the Investor represents that: (i) it is aware of and has taken into consideration its fiduciary duties including the diversification requirements of Section 404(a)(1)(c) of ERISA or any applicable similar law; (ii) it has concluded that its proposed investment in the Fund is a prudent one; and (iii) this subscription and the investment contemplated hereby are in accordance with all requirements

5

applicable to the Investor under its governing instruments, ERISA, the Code, and any similar laws. The Investor hereby acknowledges and agrees that, for so long as the Fund is not deemed to hold "plan assets" (within the meaning of the Department of Labor's plan asset regulations, 29 C.F.R. § 2510.3-101, (the "Plan Asset Regulations"), as modified by the Pension Protection Act of 2006), the Manager is not a "fiduciary" (within the meaning of Section 3(21) of ERISA or any similar law) under ERISA or such similar law with respect to any assets of the Investor by reason of the Investor's investment in the Fund and that the Investor has not and is not relying on the Manager to provide, and that the Manager has not provided, any kind of investment advice with respect to the Investor's purchase or commitment to purchase an interest in the Fund.

(o) The Investor is a resident of, or if an entity has its principal place of business in, the state or territory or other jurisdiction identified in the address set forth under his or its signature attached hereto and the offer of the Units in the Fund was made to the Investor either in North Carolina or in such state, territory or other jurisdiction.

(p) The Investor, if a "U.S. Person" as defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended, has fully and accurately completed and delivered to the Company Form W-9. The Investor, if not a U.S. Person, has fully and accurately completed and delivered to the Company Form W-8BEN, Form W-8ECI, Form W-8EXP or Form W-8IMY, as applicable, and will complete and deliver the applicable Form W-8 (or successor form) upon the expiration of any previously submitted Form W-8. The Investor has accurately set forth such Investor's jurisdiction of organization, or if a natural person, his tax residence and country of citizenship, on the signature page hereto where indicated.

(q) The Investor acknowledges that the Manager has advised the Investor to consult his or its own legal and tax advisors in connection with its investment.

(r) **Investor Representation - Investors should check the OFAC website at <http://www.treas.gov/offices/enforcement/ofac> before making the following representations.**

The Investor represents that the amounts contributed by it to the Fund were not and are not directly or indirectly derived from activities that contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.

Federal regulations and Executive Orders administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals.[a] The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <http://www.treas.gov/offices/enforcement/ofac>. In addition, the programs administered by OFAC ("OFAC Programs") prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

---

[a] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

6

The Investor represents and warrants that, to the best of its knowledge, none of:

    1) the Investor;

    2) any person controlling or controlled by the Investor;

    3) if the Investor is a privately held entity, any person having a beneficial interest in the Investor; or

    4) any person for whom the Investor is acting as agent or nominee in connection with this investment

is a country, territory, individual or entity named on an OFAC list, nor is a person or entity prohibited under the OFAC Programs, and/or is a senior foreign political figure,[b] or any immediate family member[c] or close associate[d] of a senior foreign political figure as such terms are defined in the footnotes below.

Please be advised that the Fund may not accept any amounts from an Investor if it cannot make the representation set forth in the preceding paragraph. If an existing Investor cannot make these representations, the Fund may require the redemption of such limited partner's Interests or take such other actions as may be required under applicable law.

The Investor agrees promptly to notify the Fund should the Investor become aware of any change in the information set forth in these representations. The Investor is advised that, by law, the Fund may be obligated to "freeze the account" of such Investor, either by prohibiting additional investments from the Investor, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and the Fund may also be required to report such action and to disclose the Investor's identity to OFAC, or other applicable governmental or regulatory authorities. The Investor further acknowledges that the Fund may, by written notice to the Investor, suspend the payment of redemption proceeds payable to such Investor if the Fund reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Manager or any of the Fund's other service providers.

---

[b] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, or a senior executive of a non-U.S. government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[c] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[d] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial U.S. and non-U.S. financial transactions on behalf of the senior foreign political figure.

7

(s)  **THE INVESTOR HAS CAREFULLY READ AND UNDERSTANDS THE MEMORANDUM, THE OPERATING AGREEMENT, AND THIS AGREEMENT AND HAS CONSULTED HIS OR ITS OWN ATTORNEY, ACCOUNTANT, OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED BY THIS AGREEMENT AND ITS SUITABILITY FOR THE INVESTOR. NO OTHER ACKNOWLEDGMENT, REPRESENTATION, WARRANTY, OR AGREEMENT BY THE INVESTOR SHALL BE DEEMED TO LIMIT THE GENERALITY OF THIS REPRESENTATION AND WARRANTY. THE INVESTOR UNDERSTANDS THAT THE REAL ESTATE INVESTMENTS TO BE PURSUED BY THE FUND HAVE NOT BEEN IDENTIFIED AT THIS TIME AND CONSEQUENTLY INVESTORS WILL NOT BE ABLE TO EVALUATE FOR THEMSELVES THE MERITS OF A PARTICULAR REAL PROPERTY INVESTMENT PRIOR TO THE FUND INVESTING IN THE SAME. THE MANAGER WILL BE SOLELY RESPONSIBLE FOR DETERMINING FUND INVESTMENTS.**

## ACCREDITED INVESTOR STATUS

**Investor Representations as to Accredited Investor Status. One or more of the following categories of "accredited investor" (as defined in Rule 501 (a) of the Securities and Exchange Commission) correctly and in all respects describes the Investor, and the Investor has indicated in the appropriate place on the signature pane hereto which provision(s) of this Section 3.2 so describe(s) it:**

(a)  A natural person whose net worth (either individually or jointly with such person's spouse) as of the date hereof exceeds $1,000,000.

(b)  A natural person who had an individual income in excess of $200,000 or joint income with such person's spouse in excess of $300,000 in each of the last two calendar years and who reasonably expects to reach the same income level in the current calendar year.

(c)  A corporation, Massachusetts or similar business trust, partnership, limited liability company, or organization described in Section 501(c) (3) of the Code, not formed for the specific purpose of acquiring Units in the Fund, with total assets in excess of $5,000,000.

(d)  A bank (as defined in Section 3(a)(2) of the Securities Act) or a savings and loan association or other institution (as defined in Section 3(a)(5)(A) of the Securities Act), whether acting in regard to this investment in its individual or a fiduciary capacity.

(e)  A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

(f)  An insurance company (as defined in Section 2(a) (13) of the Securities Act).

(g)  An investment company registered under the Investment Company Act.

8

(h) A business development company (as defined in Section 2(a)(48) of the Investment Company Act).

(i) A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

(j) A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5,000,000.

(k) An employee benefit plan (an "ERISA Plan") within the meaning of Title I of ERISA whose decision to purchase the Units was made by a plan fiduciary (as defined in Section 3(21) of ERISA) that is either a bank, savings and loan association, insurance company or registered investment adviser.

(l) An ERISA Plan with total assets in excess of $5,000,000.

(m) A private business development company (as defined in Section 202(a)(22) of the Investment Advisers Act of 1940).

(n) A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring Units in the Fund, whose purchase of such Units is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act.

(o) An entity in which all of the equity owners fit into at least one of the categories listed under subsections (a) through (n) above.

**Adoption of Operating Agreement.** The Investor acknowledges receipt of the Operating Agreement, and hereby specifically accepts and agrees to each and every provision of such Operating Agreement as evidenced by the Investor's execution and delivery herewith of the Operating Agreement Certification attached hereto as Exhibit A.

**Default.** The Investor agrees that this Agreement shall not be revocable by the investor unless the Fund does not receive subscriptions totaling at least $3,000,000 by the Outside Closing Date of the Offering, which, in accordance with the Memorandum, shall take place no later than December 31, 2009. The Investor further agrees that this Agreement shall survive the death or disability of the Investor.

**Additional Terms.** The Investor recognizes and agrees to the additional terms and conditions of this subscription as follows:

(a) The Manager on behalf of the Fund, in its discretion may accept all or part of this subscription.

(b) The Manager, on behalf of the Fund, may reject, reduce or allot any or all

9

11206944 3.DOC

subscriptions received in such manner and in such differing proportions as the Manager in its sole discretion, shall determine.

(c) In the event of any default hereunder, or if the Manager shall determine that any representation made by the Investor herein is false or is likely to be false, the Manager may, in its discretion, declare this subscription to be null and void, in which case the funds held by the Escrow Agent with respect to this subscription shall be returned to the Investor, without interest.

(d) The Investor agrees to notify the Manager by telephone and in writing if any representation or warranty of the Investor or any information pertaining to the Investor contained in this Agreement becomes untrue.

(e) The Investor agrees to indemnify and hold harmless the Fund and the Manager and its members, directors, officers, agents, affiliates and subsidiaries and any other person subject to liability because of its or his or her relationship with the foregoing persons (collectively, the "Indemnified Parties"), against all claims, losses, damages and liabilities (or actions in respect thereof) resulting from any breach by the Investor of the representations, warranties, acknowledgments or covenants set forth in this Agreement and to reimburse the Indemnified Parties for any legal and other expense incurred by the Indemnified Parties in connection with investigating and defending any such claim, loss, damage or liability; provided, however, that the Indemnified Parties shall give the Investor written notice of any such claim, loss, damage or liability upon obtaining knowledge of the same, and the Investor shall have the right to defend against the same, at his or its sole cost and expense, retaining counsel of his or its choice who is satisfactory to the Indemnified Parties, but the failure to notify the Investor shall not relieve the Investor from any indemnification obligation he or it may have hereunder to the Indemnified Parties unless such failure to give notice shall directly, materially and adversely prejudice the Investor in the defense of any such claim, loss, damage or liability.

(f) This Agreement shall be governed by and construed in accordance with the internal laws of the State of North Carolina without regard to the conflict-of-law principles thereof.

(g) The provisions of this Agreement and the Operating Agreement contain the entire agreement between the parties related to the Investor's investment in the Fund and may not be modified or waived except in writing.

(h) This Agreement and the rights, powers and duties set forth herein shall bind and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto. The Investor may not assign any of his or its rights or interests in and under this Agreement without the prior written consent of the Manager, and any attempted assignment without such consent shall be void and without effect.

(i) This Agreement may be executed in one or more counterparts and by separate parties on separate counterparts, and each of such counterparts shall constitute one and the same agreement binding on all the parties.

10

## DCG/UGOC EQUITY FUND, LLC

### SIGNATURE PAGE

Dated: **4-20** , 20**10**          INVESTOR: Most Worshipful Grand Lodge of Free

Total Number of Units          **10**          Accepted Masons of Arkansas

Subscribed for herein: Printed Name(s)          Youth + Scholarship Fund

Total Purchase price: **50,000**

Social Security Number(s)/Taxpayer Identification Number: **390**

Residence Address: 700 Scott St

Little Rock, AR 72201

Telephone (home): 501 - 374 - 6408

Types(s) of Accredited Investor: A

(See **"Accredited Investor Status"**, page 7)

By: _____          By: _____

Print Name: Robert Jackson          Print Name: James Weatherall

Wire Transfer Instructions (if any):

Bank: _____          ☒ Reinvest

Account Name: _____

ABA Routing Number: _____

\*          In addition to the representations, warranties, covenants and other agreements contained
herein, by executing this Signature Page, you specifically warrant that you are an "accredited
investor" as defined above.

\*\*          Please notify the Fund promptly if this information changes. By executing this Signature
Page, you authorize the Fund to make all distributions to you by wire transfer to the account set
forth above.

11

## FOR FUND USE ONLY

**Subscription Accepted:**     DCG/UGOC Equity Fund, LLC hereby accepts this subscription, subject to the terms and conditions herein, as of the  20ᵗʰ day of  APRIL       2010

> By: DCG/UGOC Equity Fund, LLC
> By: DCG/UGOC Funds Management, LLC, LLC, Manager
>
> By:
> Name:     WALTER FUZZELINI
> Title:      MANAGER

11

## EXHIBIT A

### OPERATING AGREEMENT CERTIFICATION PAGE

DCG/UGOC Equity Fund, LLC
(a North Carolina Limited Liability Company)

By signing this Operating Agreement Certification Page, the undersigned accepts and agrees to be a party to and bound by and perform all the terms and provisions of that certain Operating Agreement of DCG-UGOC Equity Fund, LLC,

dated as of ~~4-20-2010~~ July 22, 2008 & Amended March 11, 2009

Dated this _____ **20th** day of _April_, 20**10**

Name(s): **Robert Jackson**
(please print)

Names:

James Weatherall

13

11206944 3.DOC